

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument.The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

2015050600577005001E4D4E

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 71 |
|---|---|

**Document ID:** 2015050600577005    Document Date: 04-30-2015    Preparation Date: 05-06-2015
Document Type: AGREEMENT
Document Page Count: 70

**PRESENTER:**

FIRST AMERICAN TITLE INSURANCE CO., NCS
666 THIRD AVENUE, 5TH FLOOR
3020-641692/IS
NEW YORK, NY 10017
212-551-9424
ISAVUNDRANAYAGAM@FIRSTAM.COM

**RETURN TO:**

DEPARTMENT OF HOUSEING PRESERVATION AND
DEVELOPMEN
OFFICE OF LEGAL AFFAIRS
100 GOLD STREET, ROOM 5-S4
NEW YORK, NY 10038

## PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1081 | 1 | Entire Lot | 555 WEST 52ND  STREET |

Property Type: APARTMENT BUILDING

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1081 | 16 | Entire Lot | 523 WEST 52ND  STREET |

Property Type: COMMERCIAL REAL ESTATE

## CROSS REFERENCE DATA

CRFN_____ *or* DocumentID_____ *or* _____Year_____ Reel____ Page_____ *or* File Number_____

## PARTIES

**PARTY 1:**
THE CITY OF NEW YORK
DEPT. OF HOUSING PRESERVATION AND
DEVELOPMENT, 100 GOLD STREET
NEW YORK, NY 10038

**PARTY 2:**
CLINTON HOUSING DEVELOPMENT COMPANY, INC.
403 WEST 40TH STREET
NEW YORK, NY 10018

## FEES AND TAXES

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES:   County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| Additional MRT: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |
| Recording Fee: | $ | 390.00 | | | |
| Affidavit Fee: | $ | 0.00 | | | |

**RECORDED OR FILED IN THE OFFICE**
**OF THE CITY REGISTER OF THE**
**CITY OF NEW YORK**
Recorded/Filed          05-13-2015 12:11
City Register File No.(CRFN):
**2015000160246**

*Annette M Hill*

*City Register Official Signature*

3020-641692

**THIS LAND DISPOSITION AGREEMENT** ("LDA"), entered into as of April 30, 2015, by and between **THE CITY OF NEW YORK**, a municipal corporation formed pursuant to the laws of the State of New York, having its principal office at City Hall, New York, New York, 10007 ("City"), acting by and through its **DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT**, having its principal office at 100 Gold Street, New York, New York 10038 ("HPD"), and **CLINTON HOUSING DEVELOPMENT COMPANY, INC.**, a New York not-for-profit corporation, having its principal offices at 403 West 40th Street, New York, NY 10018 ("Sponsor").

**WHEREAS,** the City is the owner of certain real property, consisting of all those plots, pieces, or parcels of real property situated, lying, and being in the City and State of New York, which property is designated Block 1081, Lot 1 (formerly part of lot 1) on the Tax Map of the City of New York, as more particularly described in Exhibit A annexed hereto and made a part hereof ("Land"), and all buildings and improvements situated on the Land ("Improvements"; the Land and the Improvements, collectively, the "Disposition Land"); and

**WHEREAS,** pursuant to a Zoning Lot Development and Easement Agreement ("ZLDA") dated as of the date hereof and intended to be submitted to the Office of the City Register for recording therein, the City proposes the separate transfer of 1,540 square feet of unused zoning floor area appurtenant to the remaining portion of Block 1081, Lot 80 (formerly part of Lot 1) (such zoning floor area the "Disposition Development Rights"; together with the Disposition Land, collectively, the "Disposition Area"), reserving and retaining such property and all other development rights appurtenant to Block 1081, Lot 80 (formerly part of Lot 1) for the use and benefit of the City, which Disposition Development Rights will be used to benefit the Project (as hereinafter defined); and

**WHEREAS,** the City is undertaking a project for the redevelopment of the Disposition Area ("Project"), as such Project is more fully described in this LDA between the City and Sponsor of even date herewith; and

**WHEREAS,** HPD has designated Clinton West 53rd Housing Development Fund Corporation ("HDFC") as a qualified and eligible sponsor of the Project pursuant to Section 695 of the General Municipal Law ("GML"); and

**WHEREAS,** Sponsor is an affiliate or successor of HDFC controlled by the same principal(s) that controlled HDFC; and

**WHEREAS,** Sponsor shall immediately convey the Disposition Area to 525 West 52 Property Owner LLC ("Developer") for a purchase price of $3,450,300, which proceeds shall be used to finance the development of affordable housing as more particularly described in that certain Land Disposition Agreement made by Sponsor and Clinton West 53rd Housing LLC, and HPD dated as of the date hereof and intended to be submitted to the New York City Register's Office of New York County for recording therein against Block 1081, Lot 50 (formerly part of Lot 1); and

1

Regular UDAAP – generic form
Clinton Site 7 -Project 2

#4    Lots 1#16

70

**WHEREAS**, Developer shall assume this LDA and construct the Project on the Disposition Area and on certain real property owned by Developer, consisting of all those plots, pieces, or parcels of real property situated, lying, and being in the City and State of New York, which property is designated as Block 1081, Lot 16 (formerly known as lots 1001-1008) on the Tax Map of the City of New York, as more particularly described in Exhibit A-1 annexed hereto and made a part hereof (the "Private Property"; together with the "Disposition Area" the "Development Area") in accordance with the terms of this LDA; and

**WHEREAS**, Upon Developer's purchase of the Disposition Area from Sponsor, Developer (and not Sponsor) will be deemed "Sponsor" as such term is used throughout this LDA; and

**WHEREAS**, HPD has prepared the Project Summary ("Project Summary") annexed hereto as Exhibit B and made a part hereof for the redevelopment of the Disposition Area as an Urban Development Action Area Project pursuant to Section 694 of the GML; and

**WHEREAS**, Sponsor proposes to purchase the Disposition Area from the City upon the terms and conditions set forth in this LDA, which redevelopment shall accomplish the construction and development of the Project; and

**WHEREAS**, Developer intends to file a Condominium Declaration (together with the by-laws and other schedules attached thereto, as same may be amended from time to time, the "Declaration") in accordance with Section 208 hereof, which will establish the Project as a condominium project to be constructed on the Disposition Area (the "Condominium"); and

**WHEREAS**, the Declaration will establish four (4) condominium units, including: (a) Residential Unit 1 which will contain seventy nine (79) low income residential rental units; (b) Residential Unit 2 which will contain three hundred twelve (312) market rate residential rental apartments and one (1) superintendent's apartment, and approximately 1,000 square feet of commercial space, (c) Commercial Unit 1 containing approximately 16,000 square feet of retail and storage space, and (d) Commercial Unit 2 containing approximately 13,700 square feet of retail and storage space (each a "Condominium Unit" and collectively, the "Condominium Units"); and

**WHEREAS**, after the formation of the Condominium and completion of Construction (as such term is defined in Section 201 of this LDA), Developer will retain ownership of Residential Unit 2 and will convey (i) Residential Unit 1 to 525 West 52 LI Property Owner LLC ("AHO LLC"), (ii) Commercial Unit 1 to LeNoble Properties LLC or its designee ("LeNoble"), and (iii) Commercial Unit 2 to Sponsor or its designee for conveyance by Sponsor to LeNoble; and

**WHEREAS**, on June 26, 2014, by Resolution No. 333, a copy of which is annexed hereto as Exhibit C and made a part hereof, the Council, having held a public hearing following notice of the date, time, place, and purpose of such hearing, (i) found that the present status of the Project Area tends to impair or arrest the sound growth and development of the municipality and that the proposed Urban Development Action Area Project is consistent with the policy and purposes of Section 691 of the GML, (ii) approved the designation of the Disposition Area as an Urban Development Action Area pursuant to Section 693 of the General Municipal Law, and (iii)

2

approved the project as an Urban Development Action Area Project pursuant to Section 694 of the General Municipal Law; and

**WHEREAS,** on April 29, 2015, by the document annexed hereto as <u>Exhibit D</u> and made a part hereof, the Mayor, having held a public hearing following notice of the date, time, place, and purpose of such hearing, (i) approved the designation of HDFC as a qualified and eligible sponsor pursuant to Section 695 of the GML, (ii) approved the sale of the Disposition Area by the City to HDFC pursuant to Section 695 of the GML, and (iii) approved this LDA; and

**NOW THEREFORE,** the parties hereto, in consideration of the mutual promises and agreements contained herein, covenant and agree as follows:

ARTICLE I
CONVEYANCE

101.  <u>Purchase and Sale</u>.  The City shall sell and convey the Disposition Area to Sponsor. Sponsor shall purchase and receive conveyance of the Disposition Area from the City, and Sponsor shall immediately convey the Disposition Area to Developer.

102.  <u>Purchase Price</u>.  The price for the sale of the Disposition Area from the City to the Sponsor is One Dollar ($1.00 per tax lot) (the "Disposition Price").  Sponsor shall pay the Disposition Price to the City upon delivery of the deed ("Deed") and the ZLDA for the Disposition Area.

103.  <u>Deed</u>.  The Deed shall include the covenants provided for in Section 13 of the Lien Law and shall be executed by Sponsor (which execution shall be acknowledged).

104.  <u>Certain Conditions of Conveyance</u>.

   A.  <u>"As Is" Condition</u>.  Sponsor and Developer accept the Disposition Area in its "as is" condition on the date ("Closing Date") of delivery of the Deed to Sponsor ("Closing"). The City has not made any representations regarding the condition of the Disposition Area and neither has nor had any obligation to undertake demolition, site clearance, or site preparation.  The City neither warrants nor represents that the surface and subsurface conditions of the Disposition Area will be suitable for the Project. Sponsor represents and warrants that it has inspected the Disposition Area and is fully familiar with its condition.

   B.  <u>Title</u>.  The Deed shall provide that the City conveys to Sponsor , and Sponsor accepts from the City, all right, title, and interest of the City in and to the Disposition Area, subject to, without limitation, the trust fund provisions of Section 13 of the Lien Law and all terms, covenants, and conditions of the Deed and this LDA.

   C.  <u>Additional Conditions</u>.  The Disposition Area shall also be sold and conveyed in accordance with the following:

3

Regular UDAAP -- generic form
Clinton Site 7 -Project 2

1. <u>Municipal Charges</u>. The City shall be responsible for all taxes, assessments, and water and sewer rents accrued against the Disposition Area as of the day preceding the Closing Date ("Accrued Municipal Charges"). On or after the Closing Date, HPD shall (i) advise the City's Department of Finance that such Accrued Municipal Charges are not to be collected or enforced against the Disposition Area and should be cleared from its records, and (ii) provide Sponsor with a copy of such instructions. Sponsor shall be responsible for all taxes, assessments, and water and sewer rents accruing against the Disposition Area on or after the Closing Date.

2. <u>Municipal Liens</u>. The City shall endeavor to remove any municipal liens or encumbrances of record existing on the Closing Date. In the event that the City fails to remove any such municipal liens or encumbrances, the City shall not enforce such municipal liens or encumbrances against the real property and improvements comprising the Disposition Area, any authorized purchaser, or any authorized mortgagee financing the construction of the improvements upon the Disposition Area.

3. <u>Transfer Taxes</u>. Sponsor shall pay (i) the Real Property Transfer Tax imposed on the Deed pursuant to Sections 2101-2118 of Title 11 of the Administrative Code, and (ii) the Real Estate Transfer Tax imposed on the Deed pursuant to Sections 1400-1410 of the Tax Law. Sponsor shall not be entitled to any exemptions or deductions which might otherwise be available solely because the City is the grantor, unless such an exemption is specifically granted by the City in writing.

4. <u>Recording</u>. Sponsor shall cause all recordable documents between Sponsor and the City or any participating lender (including, without limitation, the Deed and this LDA, the assignment of surplus money delivered pursuant to <u>Section 402</u>, any mortgage securing construction financing for the Project, and any modification, extension, consolidation, or other amendment of such mortgage) to be recorded against the Disposition Area in the Office of the City Register for the county in which the Disposition Area is located immediately following the Closing. Sponsor shall cause any building loan contract relating to the construction of the Project to be filed in the Office of the County Clerk for the county in which the Disposition Area is located immediately following the Closing. Sponsor shall pay all required fees and taxes in connection with such recording or filing, without any exemption or deduction which might otherwise be available solely because the City is the grantor.

5. <u>Condemnation</u>. In the event of acquisition by the City, by condemnation or otherwise, of any part or portion of the Disposition Area (except for the portion of the Disposition Area containing a building as of the date of title closing) lying within the bed of any street, avenue, parkway, expressway, park, public way, or catchbasin, as said street, avenue, parkway, expressway, park, public way, or catchbasin is shown on the present City Map, Sponsor shall only be entitled to the amount of One Dollar ($1.00) and shall not be entitled to compensation for any

4

buildings or structures erected thereon after the date of sale, within the lines of the street, avenue, parkway, expressway, park, public way, or catchbasin so laid and acquired. This covenant shall be binding upon and run with the land and shall endure until the owner of the Disposition Area obtains a written release of this covenant executed by a Deputy Commissioner or a person designated by the Mayor who may in his/her sole discretion execute such release if the City Map has already been changed so as to eliminate the lines of said street, avenue, parkway, expressway, park, public way, or catchbasin from any part or portion of the Disposition Area. If the City Map has not been changed, the said officer may execute such a release after authorization by the Mayor. The owner shall pay such consideration for the release as said officer may deem appropriate.

105. <u>Holder</u>. As used in this LDA, "Holder" shall mean an entity which holds a recorded mortgage on the Disposition Area to secure partial construction or permanent financing of the Construction (as defined in <u>Section 201</u>) and which either has been approved in writing by HPD or is (i) the Community Preservation Corporation, (ii) a local, state, or federal agency, or (iii) a financial institution (including, but not limited to, a savings bank, commercial bank, life insurance company, public real estate investment company, or pension fund) with assets in excess of Five Hundred Million Dollars ($500,000,000) whose loans are subject to regulation by a federal or state agency.

106. <u>Indemnification - Mennonite Claims</u>.

    1.   <u>Indemnification</u>. The City shall indemnify, if necessary, Sponsor, Sponsor's successors and assigns, any Holders, subsequent mortgagees of the Disposition Area, and title insurance companies providing mortgagee or fee insurance against any claims of interest in the Disposition Area, or any portion thereof, by the holders of any mortgage as of record against the Disposition Area, or any portion thereof, at the time the City acquired title.

    2.   <u>Defense</u>. If any actions or proceedings are commenced to foreclose, enforce or compel payment of any claims of interest in the Disposition Area, or any portion thereof, by any former mortgagees of the Disposition Area, or any portion thereof, the City shall defend such actions or proceedings. Sponsor shall cooperate fully in the defense of any such actions or proceedings at no cost to the City for such cooperation. If Sponsor is ordered by a court of competent jurisdiction, after the exhaustion of all appeals, to satisfy said claims, then the City shall pay the amounts which such court has so ordered to be paid to satisfy said claims in accordance with said Court's order.

    3.   <u>Limitation</u>. Except as set forth herein, the indemnified parties shall have no further right, recourse, or remedy against the City or HPD with respect to any action or proceeding brought to foreclose, enforce, or compel payment of said claims.

<u>ARTICLE II</u><br>
<u>SPONSOR'S OBLIGATIONS</u><br>
5

Regular UDAAP – generic form
Clinton Site 7 -Project 2

201. <u>Construction</u>.

    A.    <u>Construction</u>. Construction of the Project ("Construction") shall commence within the time specified in the loan documents executed between Developer and Holder or Developer and HPD ("Loan Documents"), but in no event later than two (2) months from the Closing Date ("Commencement Date"). Construction shall be in accordance with the plans and specifications previously approved for the Project by HPD ("Approved Plans") and shall proceed diligently to completion within the time specified in the Loan Documents ("Completion Date"). If a Holder, by action or inaction, extends such time for completion, the Completion Date shall be likewise extended; provided, however, that such extension shall not exceed eighteen (18) months from the time originally specified in the Loan Documents without the prior written consent of HPD.

    B.    <u>Completion</u>. If requested by Developer in writing, HPD or its designee shall promptly issue a Certificate of Completion in recordable form after (i) the City's Department of Buildings has issued a temporary or permanent Certificate of Occupancy for the improvements on the Development Area, and (ii) HPD has made a final inspection of the Project and has determined that Developer has fulfilled all of its Construction obligations. If HPD refuses or fails to issue a Certificate of Completion in accordance with the provisions of this <u>Section 201.B</u>, HPD shall provide Developer with a written statement indicating how Developer failed to complete Construction. When HPD has issued a Certificate of Completion, Construction of the Project shall be deemed to be completed ("Completion of Construction").

    C.    <u>Force Majeure</u>. Notwithstanding any provision of this LDA to the contrary, in the event of any delay or delays in the performance of Sponsor's Construction obligations, if such delay or delays are beyond the control and without the fault or negligence of the Sponsor, and are caused by reason of (i) any acts, laws, rules, regulations, or orders of any governmental authority, (ii) acts of God or of the public enemy, or (iii) fires, floods, epidemics, quarantine restrictions, strikes or other labor disputes, freight embargoes, material shortage, or weather of unusual severity, then the Completion Deadline shall be extended for such period as HPD shall find in writing to be the period of such delay or delays, but in no event more than one (1) year without the prior written consent of HPD (collectively, "Force Majeure Delays"). Such extension or extensions shall not be unreasonably withheld or delayed, provided that, promptly after the beginning of such Force Majeure Delay(s), Sponsor notifies HPD in writing of the Force Majeure Delay(s) and the cause or causes thereof. Sponsor shall proceed in accordance with this LDA with those obligations the performance of which is not prevented by such Force Majeure Delay(s) unless HPD, in writing, shall excuse Sponsor from proceeding with all or part of such obligations.

    D.    <u>Reports</u>. Sponsor shall, if requested by HPD, submit a written narrative report on the progress of Construction to HPD within six (6) months after the Closing Date and every six (6) months thereafter until the Completion of Construction.

Regular UDAAP – generic form
Clinton Site 7 -Project 2

E.  As Built Drawings.  Sponsor shall, if requested by HPD after the Completion of Construction, promptly submit "as built" drawings of the Project.  The as built drawings shall show all Construction performed by Sponsor and shall indicate the locations, elevations, and sizes of all buildings and work as actually built and installed.

202.  Non-Discrimination.  Sponsor covenants and agrees, for and on behalf of itself, its successors and assigns, and every successor in interest to the Development Area, or any part thereof, to be bound by the following covenants, which shall be binding for the benefit of the City and enforceable by the City against Sponsor and its successors and assigns to the fullest extent permitted by law and equity:

a.  Sponsor, its successors and assigns, and any lessees of the Development Area or any improvements erected or to be erected thereon, or any part thereof, shall comply with all applicable federal, state, and local laws in effect from time to time prohibiting discrimination or segregation by reason of actual or perceived age, race, creed, religion, gender, sex, color, national origin, ancestry, sexual orientation, disability, marital, partnership or familial status, alienage or citizen status, lawful source of income, lawful occupation, military status, or because children are, may be or would be residing with such person or persons or any other class protected from discrimination in housing accommodations by federal, state or local law (collectively, "Prohibited Distinctions") in the sale, lease, or occupancy of the Development Area or any improvements erected or to be erected thereon, or any part thereof.

b.  Sponsor, its successors and assigns, and any lessees of the Development Area or any improvements erected or to be erected thereon, or any part thereof, shall not effect or execute any agreement, lease, conveyance, or other instrument whereby the sale, lease, or occupancy of the Development Area or any improvements erected or to be erected thereon, or any part thereof, is restricted upon the basis of any Prohibited Distinction.

c.  Sponsor, its successors and assigns, and any lessees of the Development Area or any improvements erected or to be erected thereon, or any part thereof, shall include the covenants of Section 202.a and Section 202.b in any agreement, lease, conveyance, or other instrument with respect to the sale, lease, or occupancy of the Development Area or any improvements erected or to be erected thereon, or any part thereof.

203.  Executive Orders.  Sponsor shall comply with the provisions of Executive Order No. 50 and Executive Order No. 108, as amended, copies of which are set forth in Exhibit E annexed hereto and made a part hereof, and shall incorporate the language required thereby in any construction contract related to the Construction.

7

204.  Project Signs.  Sponsor shall, at its own cost and expense, erect and maintain a sign on the Development Area identifying HPD and the Project in lettering of such size and form as shall be approved by HPD.  At HPD's option, HPD may provide a sign for Sponsor's use.

205.  Limitation on Use of Disposition Area.  Prior to Completion of Construction, Sponsor shall not rent, license, or permit temporary use of the Development Area for purposes unrelated to the Construction or the Project without the prior written consent of HPD.

206.  Access.  Upon prior reasonable notice and during normal working hours for construction trades in New York City, Sponsor shall provide all representatives of the City with access to the Development Area for such purposes as the City deems necessary to effectuate this LDA, including, but not limited to, inspection of all work being performed in connection with Construction.

207.  Tax Lot Subdivision.  If any portion of the Disposition Area consists of a partial or tentative tax lot ("New Lot"), Sponsor shall promptly after Closing (i) cause the Tax Map of the City to be amended by subdividing the entire existing tax lot encompassing any such New Lot ("Prior Lot"), and (ii) cause a permanent tax lot number to be issued for any New Lot and every other portion of any Prior Lot.  Sponsor or Developer shall promptly take all actions necessary to cause such tax lot subdivision and issuance of permanent tax lot numbers to be completed, including, but not limited to (i) clearing accrued taxes, (ii) delivering copies of the recorded Deed and a survey of the Disposition Area showing the dimensions of any New Lot and any other tax lots to be formed from any portion of any Prior Lot to the City's Real Property Assessment Bureau, and (iii) amending any Certificate of Occupancy for the improvements on any New Lot or Prior Lot.  Sponsor will forever indemnify and hold the City, its agents, representatives, and employees harmless from any and all liabilities and claims for damages resulting from Sponsor's failure to complete the actions required by this Section 207.

208.  Submission to Condominium Ownership and Recording of a Declaration of Condominium.

Developer shall submit the Development Area to the Article 9-B of the New York Real Property Law of the State of New York, in accordance with the following: within eighteen months (18) months of closing hereunder, or otherwise in compliance with the Loan Documents, including without limitation that certain Regulatory Agreement between the City, Developer and 525 West 52 LI Property Owner LLC (the "IH Regulatory Agreement"), Developer shall record the Declaration in the Register's Office, establishing the Development Area as a four (4) unit condominium consisting of: Residential Unit 1, Residential Unit 2, Commercial Unit 1 and Commercial Unit 1. The Project shall be subject to the restrictions set forth in the IH Regulatory Agreement as more particularly set forth therein. Developer shall comply with the IH Regulatory Agreement, the terms of which are hereby incorporated herein.

209.  Permitted Transfers of Condominium Units.

Regular UDAAP – generic form
Clinton Site 7 -Project 2

Following creation of the Condominium Units described in Section 208 above, and subject to the terms of the IH Regulatory Agreement, Developer will retain ownership of Residential Unit 2 and will convey: Residential Unit 1 to AHO LLC, and expects to convey Commercial Unit 1 to LeNoble and Commercial Unit 2 to Sponsor or its designee. All of such conveyances shall be deemed Permitted Transfers as described in Section 306 C below.  The deed or instrument of transfer conveying a Condominium Unit permitted under this Section 209: (1) to AHO LLC shall contain a covenant that such permitted transferee assumes all obligations of Developer under the applicable deed and this LDA, and the IH Regulatory Agreement, and (2) to LeNoble and Sponsor shall contain a covenant that such permitted transferee assumes all obligations of Developer under the applicable deed and this LDA.

ARTICLE III
OWNERSHIP OF DISPOSITION AREA

301.    Development By Sponsor.  The development of the Development Area in accordance with this LDA is important to the City and to the general welfare of the community.  Substantial financing and other assistance has been made available by and through the City and by law for the purpose of making such development possible.  The City is conveying the Disposition Area to Sponsor  and is executing and delivering this LDA, the ZLDA and the Deed because of, and in reliance upon, the identity and qualifications of Sponsor and the principals of Sponsor.  The City is relying on Sponsor for the faithful performance of all obligations of Sponsor pursuant to this LDA.  Sponsor shall redevelop the Development Area in accordance with this LDA and shall not hold the Disposition Area for speculation.

302.    Certain Definitions.  As used in this Article III, the terms "person" and "entity" include any individual, partnership, shareholder, joint venture, limited liability company or corporation. Any reference in this Article III to Sponsor shall apply with equal force and effect to each and every entity comprising Sponsor, whether that entity is an individual, corporation, partnership, joint venture, or limited liability company, as though that entity were Sponsor, and each such person or entity must comply with the provisions herein concerning partnership, shareholder, and limited liability or operating agreements.

303.    Sponsor's Certification Pursuant to Section 695 of the GML.  Sponsor hereby represents, warrants, and certifies, pursuant to Section 695 of the GML, that Sponsor is neither a former owner in fee nor the spouse of a former owner in fee of all or any part of the Disposition Area, or of any property acquired by the City through real property tax or other lien enforcement proceedings, nor is Sponsor a business entity substantially controlled by such a former owner, nor is Sponsor a successor in interest to any such former owner.  If such representation, warranty, and certification by Sponsor is false in whole or in part, or if Sponsor otherwise violates or has violated Section 695 of the GML, this LDA and the Deed shall be voidable by the City in accordance with Section 695 of the GML.

304.    No Prior Change in Composition of Sponsor.  Sponsor previously submitted disclosure statements to HPD with respect to, inter alia, the ownership and operation of Sponsor ("Disclosure Statements").  Sponsor covenants and represents that (i) all of the information set forth in Sponsor's Disclosure Statements (including, but not limited to, the

9

Regular UDAAP – generic form
Clinton Site 7 -Project 2

identity and role of any officers, the identity and percentage of ownership interest of any shareholders, and the identity, and percentage of ownership interest, and role of any general partners) was accurate on the date of submission of the Disclosure Statements, and (ii) except as Sponsor has disclosed to HPD in writing, all of the information set forth in Sponsor's Disclosure Statements remains accurate as of the date of this LDA.

305.  Sponsor's Partnership Agreement, Shareholders' Agreement and Limited Liability Agreement.

A.  If Sponsor is a partnership, Sponsor's partnership agreement or limited partnership agreement ("Partnership Agreement") shall provide, and Sponsor represents and warrants that such Partnership Agreement does provide, inter alia, that, prior to Completion of Construction:

1.  There shall not be any voluntary dissolution of Sponsor without the prior written consent of HPD;

2.  There shall not be any voluntary merger or consolidation of Sponsor with any other entity without the prior written consent of HPD;

3.  The present general partners of Sponsor shall not have any authority or right to withdraw from Sponsor, and neither Sponsor nor any of its general partners shall have any authority or right to cause or permit the withdrawal of any of the present general partners of Sponsor, without the prior written consent of HPD;

4.  Neither Sponsor nor any of its general partners shall have any authority or right to cause or permit the substitution of a new person or entity for the any of the present general partners of Sponsor, or to cause any other person or entity to become a general partner of Sponsor, without the prior written consent of HPD;

5.  No distribution of the capital of Sponsor shall be made to any general or limited partner of Sponsor and, upon dissolution of Sponsor, no distribution shall be made to any person or entity which is not bound by this LDA; provided, however, that nothing contained in this Section 305.A.5 shall preclude Sponsor from paying any debts or fees owed by it to any general partner;

6.  No assignment, mortgage, or transfer of any interest in the Disposition Area or in this LDA shall take place without the prior written consent of HPD;

7.  Sponsor is subject to the terms covenants, conditions, and provisions of this LDA; and

8.  The provisions of the Partnership Agreement required by this Section 305.A shall not be amended without the prior written consent of HPD.

At the Closing, Sponsor shall furnish HPD with an attorney's opinion in form and substance acceptable to HPD stating that the Partnership Agreement complies with

10

Regular UDAAP – generic form
Clinton Site 7 -Project 2

this Section 305. At the Closing and at such other time or times as HPD may request prior to Completion of Construction, Sponsor shall furnish HPD with a sworn statement setting forth all of the general partners of Sponsor and the extent of their respective holdings pursuant to the Partnership Agreement.

B.  If Sponsor is a corporation, Sponsor shall produce a shareholders' agreement ("Shareholders' Agreement") listing the names and home addresses of all of Sponsor's officers, principals, and shareholders and the number and percentage of shares owned by each shareholder. The Shareholders' Agreement shall provide, and Sponsor represents and warranties that such Shareholders' Agreement does provide, inter alia, that, prior to Completion of Construction:

1.  There shall not be any voluntary dissolution of Sponsor without the prior written consent of HPD;

2.  There shall not be any voluntary merger or consolidation of Sponsor with any other entity without the prior written consent of HPD;

3.  No more than ten percent (10%) of the currently issued and outstanding shares of Sponsor shall be further issued;

4.  No more than ten percent (10%) of the issued and outstanding shares of Sponsor shall be assigned, transferred, pledged, conveyed, or sold without the prior written consent of HPD;

5.  No assignment, mortgage, or transfer of any interest in the Disposition Area or in this LDA shall take place without the prior written consent of HPD;

6.  The individuals comprising more than one third (1/3) of Sponsor's Board of Directors and Sponsor's officers may not be changed or removed without the prior written consent of HPD;

7.  Sponsor is subject to the terms, covenants, conditions, and provisions of this LDA; and

8.  The provisions of the Shareholders' Agreement required by this Section 305.B shall not be amended without the prior written consent of HPD.

At the Closing, Sponsor shall furnish HPD with an attorney's opinion in form and substance acceptable to HPD stating that the Shareholders' Agreement complies with this Section 305. At the Closing, and at such other time or times as HPD may request prior to the Completion of Construction, Sponsor shall furnish HPD with a sworn statement identifying all of Sponsor's shareholders, members of its Board of Directors, and officers and the extent of their respective stock holdings.

C.  If Sponsor is a limited liability company ("LLC"), Sponsor's limited liability agreement or operating agreement ("LLC Agreement") shall provide, and Sponsor represents

11

and warrants that such LLC Agreement does provide, inter alia, that, prior to the Completion of Construction:

1. There shall not be any voluntary dissolution of Sponsor without the prior written consent of HPD;

2. There shall not be any voluntary merger or consolidation of Sponsor with any other entity without the prior written consent of HPD;

3. The present managing member(s) of Sponsor shall not have any authority or right to withdraw from Sponsor, and neither Sponsor nor any of its managing member(s) shall have any authority or right to cause or permit the withdrawal of any of the present managing member(s) of Sponsor without the prior written consent of HPD;

4. Neither Sponsor nor any of its managing member(s) shall have any authority or right to cause or permit the substitution of a new person or entity for any of the present managing member(s) of Sponsor, or to cause any other person or entity to become a managing member of Sponsor, without the prior written consent of HPD;

5. No distribution of the capital of Sponsor shall be made to any managing member(s) or investor member(s) of Sponsor and, upon dissolution of Sponsor, no distribution shall be made to any person entity which is not bound by this LDA; provided, however, that nothing contained in this Section 305.C.5 shall preclude Sponsor from paying any debts or fees owed by it to any managing member;

6. No assignment, mortgage or transfer of any interest in the Disposition Area or in this LDA shall take place without the prior written consent of HPD;

7. Sponsor is subject to the terms, covenants, conditions, and provisions of this LDA; and

8. The provisions of the LLC Agreement required by this Section 305.C shall not be amended without the prior written consent of HPD.

At the Closing, Sponsor shall furnish HPD with an attorney's opinion in form and substance acceptable to HPD stating that the LLC has the authority to enter into this LDA. At the Closing, and at such other time or times as HPD may request prior to Completion of Construction, Sponsor shall furnish HPD with a sworn statement setting forth all of the managing members of Sponsor and the extent of their respective holdings pursuant to the LLC Agreement.

306. Prohibition Against Transfers.

12

Regular UDAAP – generic form
Clinton Site 7 -Project 2

A.  Prior to Completion of Construction, Sponsor shall not cause or permit, or suffer to be caused or permitted, any of the following ("collectively, "Prohibited Transfers") without the prior written consent of HPD:

   1.  Any total or partial sale, disposition, transfer, assignment, conveyance, mortgage, lease, trust, power, or transfer in any other mode or form of or with respect to this LDA or the Development Area (or any part of or interest in the real property therein);

   2.  Any contract or agreement which would result in any total or partial sale, disposition, transfer, assignment, conveyance, mortgage, lease, trust, power, or transfer in any other mode or form of or with respect to this LDA or the Development Area (or any part of or interest in the real property therein);

   3.  Where Section 305 requires the inclusion of a provision in a partnership, corporate or limited liability company document, any failure to include such provision in such document.

   4.  Any act in violation any provision required by Section 305; or

   5.  Any act or transaction involving or resulting in a material change in the management of Sponsor which is prohibited by the provisions of Sponsor's Partnership Agreement or Shareholders' Agreement described in Section 305;

   6.  Any act or transaction involving or resulting in a material change in the identity of the parties in control of Sponsor, or their respective degrees of control of Sponsor, which is prohibited by the provisions of Sponsor's Partnership Agreement or Shareholders' Agreement described in Section 305;

B.  Notwithstanding anything to the contrary in this Section 306, Sponsor may execute the Loan Documents required by a Holder, or a collateral assignment of this LDA to a Holder without the assignment of Sponsor's obligations hereunder, and the execution of such documents shall not constitute a Prohibited Transfer.

C.  Permitted Transfers. Immediately following the transfer of the Disposition Area from the City to Sponsor, Sponsor will transfer the Disposition Area to Developer for development of affordable housing. Such transfer and the transfers of Condominium Units described in Section 209 above shall be deemed Permitted Transfers hereunder and under the Deed, provided that (i) any conveyance document shall be subject to HPD approval, and (ii) Sponsor, and Developer shall be jointly and severally responsible for compliance with the provisions of this LDA.

ARTICLE IV
REVESTING

401.  Revesting.

13

Regular UDAAP – generic form
Clinton Site 7 -Project 2

A.   Default. Until the issuance of a Certificate of Completion for the entire Project pursuant to Section 201.B, the occurrence of any of the following shall constitute an event of default ("Default"):

1.   Failure to commence Construction on or before the Commencement Date;

2.   Failure to perform the Construction in accordance with the Approved Plans;

3.   Abandonment or substantial suspension of Construction after the Commencement Date and before the Completion Date;

4.   Failure to complete ninety five percent (95%) of the value of Construction in accordance with the Approved Plans, as such percentage and compliance are determined by HPD, on or before the Completion Date; and

5.   Any Prohibited Transfer without the prior written consent of HPD.

B.   Cure.

1.   Upon the occurrence of any Default, HPD shall give written notice of such Default ("Default Notice") to Sponsor and to any Holder which has previously requested such Default Notice in writing.

2.   Sponsor and any Holder shall be permitted thirty (30) days from the date of any Default Notice ("Cure Period") to cure such Default to the satisfaction of HPD ("Cure").

3.   If HPD, in its sole discretion, determines in writing that the nature of the Default makes it impossible to complete a Cure within the Cure Period, Sponsor or any Holder shall be permitted to commence the Cure of such Default during the Cure Period and to thereafter diligently and continuously pursue the Cure of such Default until such Default shall be completely Cured; provided, however, that such Default shall be completely Cured not later than ninety (90) days after the Completion Date ("Extended Cure Period").

4.   Any Default which is Cured within the Cure Period or, if applicable, any Extended Cure Period, shall be deemed to be a Cured Default ("Cured Default"). Any Default which is not Cured within the Cure Period or, if applicable, any Extended Cure Period, shall be deemed to be an uncured Default ("Uncured Default").

5.   If, after the issuance of a Default Notice, such Default is Cured within the Cure Period or, if applicable, any Extended Cure Period, HPD shall issue, within thirty (30) days after receipt of a written request therefor by Sponsor or any Holder, a written notice ("Cure Notice") (i) certifying that such Default is a Cured Default, (ii) certifying that such Cured Default will not result in an exercise of the City's rights pursuant to this Section 401, and (iii) reserving the right of the City to

14

exercise its rights pursuant to this <u>Section 401</u> for any other or future Default; provided, however, that the failure to explicitly reserve any right in the Cure Notice shall not result in the waiver of any such right.

6.   In the event of any Uncured Default, the City may, at its sole option, exercise the City's rights pursuant to <u>Section 401.C.</u>

C.   <u>Revesting</u>. If any Uncured Default shall occur prior to the issuance of a Certificate of Completion for the entire Project pursuant to <u>Section 201.B</u>, the City may, subject to the laws of the State of New York, re-enter and take possession of the Disposition Area and terminate and revest in the City the estate conveyed to Sponsor, in which event all right, title, and interest of Sponsor in and to the Disposition Area shall revert to the City. Upon the issuance of a Certificate of Completion for the entire Project pursuant to <u>Section 201.B</u>, the City's rights pursuant to this <u>Section 401</u> shall terminate. Upon the issuance of a Certificate of Completion for a portion of the Project pursuant to <u>Section 201.B</u>, the City's right to revest that portion of the Project pursuant to this <u>Section 401</u> shall terminate.

D.   <u>Subordination</u>.

1.   Notwithstanding the provisions of this <u>Section 401</u>, any revesting of title in the City pursuant to the terms of this LDA or the Deed shall be subject to and limited by, and shall not defeat, render invalid, or limit in any way (i) the lien of any mortgage ("Mortgage") held by a Holder which is authorized by this LDA, or (ii) any rights or interests provided in this LDA for the protection of the Holder of such Mortgage.

2.   Upon the request of Sponsor, the City shall deliver to the Holder at the Closing an instrument in recordable form, whereby the City's rights and interests and Sponsor's covenants under this LDA and the Deed (except for the provisions of <u>Section 202</u> and any provisions which would control by operation of law even in the absence of this LDA and the Deed) are subordinated to the lien of the Mortgage in the event that Sponsor ceases to hold title to the Disposition Area as a result of the Holder's exercise of a remedy for the Sponsor's default under the Loan Documents.

3.   If, after the issuance of any Default Notice, any Holder shall Cure the Default before the expiration of the Cure Period (or, if applicable, any Extended Cure Period), such Holder may add the cost of Curing such Default to the Mortgage debt and to the lien of its Mortgage.

402.   <u>Assignment of Surplus Money</u>. If title to the Disposition Area is revested in the City pursuant to this <u>Article IV</u>, and HPD thereafter determines to sell all or any portion of the Disposition Area, the proceeds thereof, if any, shall be retained by HPD. Sponsor hereby assigns to HPD any surplus money paid into a court as the result of any foreclosure of any lien on any portion of the Disposition Area prior to the issuance of the Certificate of Completion for that portion. Sponsor shall execute an assignment of surplus money in

15

recordable form if the City, in its sole discretion, determines that such a document is necessary in order to effectuate such assignment.

403. Other Remedies. As provided in Section 607.D, and notwithstanding any provisions of this Article IV to the contrary, the remedies of the City pursuant to this Article IV shall not be exclusive. With respect to any Default, the remedies of the City pursuant to this Article IV shall be in addition to and concurrent with all other defenses, rights, and remedies which the City has, will have, or may have pursuant to this LDA, the Deed, or any other agreement between the City and Sponsor or under law, equity, or otherwise. With respect to any violation of this LDA which is not a Default, the City shall retain each and every defense, right, and remedy which the City has, will have, or may have pursuant to this LDA, the Deed, or any other agreement between the City and Sponsor or under law, equity, or otherwise.

ARTICLE V
INVESTIGATIONS

501. Definitions.

A. The terms "license" and "permit," as used in this Article V, shall be defined as a license, permit, franchise, or concession not granted as a matter of right.

B. The term "person," as used in this Article V, shall be defined as any natural person doing business alone or associated with another person or entity as a partner, director, officer, principal, or employee.

C. The term "entity," as used in this Article V, shall be defined as any firm, partnership, corporation, association, or person that receives money, benefits, licenses, leases, or permits from or through the City or otherwise transacts business with the City.

D. The term "member," as used in this Article V, shall be defined as any person associated with another person or entity as a partner, director, officer, principal, or employee.

502. Cooperation. The parties to this LDA shall cooperate fully and faithfully with any investigation, audit, or inquiry conducted by a State of New York ("State") or City governmental agency or authority that is empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath, or conducted by the Inspector General of a governmental agency that is a party interest to the transaction, submitted bid, submitted proposal, contract, lease, permit, or license that is the subject of the investigation, audit, or inquiry.

503. Refusal to Testify.

If (i) any person who has been advised that his or her statement, and any information from such statement, will not be used against him or her in any subsequent criminal proceeding refuses to testify before a grand jury or other governmental agency or

16

Regular UDAAP – generic form
Clinton Site 7 -Project 2

authority empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath concerning the award of or performance under any transaction, agreement, lease, permit, contract, or license entered into with the City, the State, or any political subdivision or public authority thereof, or the Port Authority of New York and New Jersey, or any local development corporation within the City, or any public benefit corporation organized under the laws of the State of New York, or; (ii) any person refuses to testify for a reason other than the assertion of his or her privilege against self-incrimination in an investigation, audit or inquiry conducted by a City or State governmental agency or authority empowered directly or by designation to compel the attendance of witnesses and to take testimony under oath, or by the Inspector General of the governmental agency that is a party in interest in, and is seeking testimony concerning the award of, or performance under, any transaction, agreement, lease, permit, contract, or license entered into with the City, the State, or any political subdivision thereof or any local development corporation within the City, then, the commissioner or agency head whose agency is a party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit, or license shall convene a hearing, upon not less than five (5) days written notice, to the parties involved to determine if any penalties should attach for the failure of a person to testify.

504. <u>Adjournments</u>.  If any non-governmental party to the hearing requests an adjournment, the Commissioner or agency head who convened the hearing may, upon granting the adjournment, suspend any contract, lease, permit, or license pending the final determination pursuant to <u>Section 506</u>, without the City incurring any penalty or damages for delay or otherwise.

505. <u>Penalties</u>.  The penalties which may attach after a final determination by the Commissioner or agency head may include, but shall not exceed:

    A.   The disqualification for a period not to exceed five (5) years from the date of an adverse determination for any person, or any entity of which such person was a member at the time the testimony was sought, from submitting bids for, or transacting business with, or entering into or obtaining any contract, lease, permit, or license with or from the City; and/or

    B.   The cancellation or termination of any and all such existing City contracts, leases, permits, or licenses that the refusal to testify concerns and that have not been assigned as permitted under this LDA, nor the proceeds of which pledged, to an unaffiliated and unrelated institutional lender for fair value prior to the issuance of the notice scheduling the hearing, without the City incurring any penalty or damages on account of such cancellation or termination; money lawfully due for goods delivered, work done, rentals, or fees accrued prior to the cancellation or termination shall be paid by the City.

506. <u>Factors</u>.  The Commissioner or agency head shall consider and address in reaching his or her determination and in assessing an appropriate penalty the factors in <u>Sections 506.A and 506.B</u>.  The Commissioner or agency head may also consider, if relevant and

17

appropriate, the criteria established in Sections 506.C and 506.D in addition to any other information which may be relevant and appropriate.

A.  Good Faith Efforts.  The party's good faith endeavors or lack thereof to cooperate fully and faithfully with any governmental investigation or audit, including, but not limited to, the discipline, discharge, or disassociation of any person failing to testify, the production of accurate and complete books and records, and the forthcoming testimony of all other members, agents, assignees, or fiduciaries whose testimony is sought.

B.  Relationship to the Entity.  The relationship of the person who refused to testify to any entity that is a party to the hearing, including, but not limited to, whether the person whose testimony is sought has an ownership interest in the entity and/or the degree of authority and responsibility the person has within the entity.

C.  Nexus.  The nexus of the testimony sought to the subject and its contracts, leases, permits, or licenses with the City.

D.  Effect of a Penalty.  The effect a penalty may have on an unaffiliated and unrelated party or entity that has a significant interest in an entity subject to penalties under Section 505, provided that the party or entity has given actual notice to the Commissioner or agency head upon the acquisition of the interest, or at the hearing called for in Section 503 gives notice and proves that such interest was previously acquired.  Under either circumstance, the party or entity must present evidence at the hearing demonstrating the potential adverse impact a penalty will have on such person or entity.

507.  Warranties and Enforcement.

A.  The parties to this LDA warrant and represent that to the best of their knowledge, (1) that no officer, agent, employee, or representative of the City has received any payment or other consideration for the making of this LDA or in connection with the performance thereof, and (2) that no officer, agent, employee, or representative of the City has any interest, directly or indirectly, in this LDA or the proceeds thereof. The parties to this LDA agree that they shall not hereafter make or pay any consideration as aforesaid and that they will cooperate fully with the Commissioner of Investigation of the City and will promptly report in writing any solicitation of money, goods, requests for future employment, or other benefit or thing of value, by or on behalf of any employee of the City or other person, firm, corporation, or entity for any purpose which may be related to the procurement or obtaining of this LDA by the parties or affecting the performance of this LDA.

B.  In the event of a violation of Section 507.A, the Commissioner of HPD may convene a hearing pursuant to Section 503 and, upon such hearing, make a determination, in accordance with the considerations set forth in Section 506, as to whether or not a violation has occurred.  The penalties imposed may include but shall not exceed the penalties set forth in Section 505.A.

18

Regular UDAAP – generic form
Clinton Site 7 -Project 2

ARTICLE VI
MISCELLANEOUS PROVISIONS

601.  Covenants Running With Land.  The agreements and covenants set forth in this LDA
shall run with the land and shall be binding to the fullest extent permitted by law and
equity.  Such covenants shall inure to the benefit of the City and shall bind and be
enforceable against Sponsor and its successors and assigns.

602.  Binding Effect.  This LDA shall inure to the benefit of and be binding upon any successor
of any party hereto, but this provision shall not operate to permit any assignment or other
voluntary transfer of any rights created hereunder except in such manner as may be
expressly permitted by this LDA.

603.  Conflicts of Interest.  No person, firm, corporation, partner, associate, member, official, or
employee thereof (hereinafter in this Section 603 collectively called "person") presently or
formerly employed by the City has or will have any interest in or activity with Sponsor
which constitutes a conflict of interest pursuant to the provisions of Chapter 68 of the New
York City Charter.  Any person employed by Sponsor on any planning and/or execution
activities or services pertaining to such locale or the Disposition Area shall not be
employed by the City in connection with any matter pertaining to this LDA.

604.  City Employees.

A.  No Personal Interest.  No official or employee of the City shall have any personal
interest, direct or indirect, in this LDA, nor shall any such member, official, or
employee participate in any decision relating to this LDA or any agreement arising
out of or through this LDA which affects his or her personal interest or the interest of
any corporation, partnership, or association in which he or she is directly or indirectly
interested.

B.  No Payment or Consideration.  Sponsor warrants and represents that no officer,
agent, employee, or representative of the City has received any payment or other
consideration for the making of this LDA and that no officer, agent, employee, or
representative of the City has any interest, directly or indirectly, in the Disposition
Area or the proceeds thereof.

605.  Procurement.  Sponsor represents and warrants that no person or selling agency has
been employed or retained to solicit or secure this LDA, upon an agreement or
understanding for a commission, percentage, brokerage fee, contingent fee, or any other
compensation.  Sponsor further represents and warrants that no payment, gift, or thing of
value has been made, given, or promised to obtain this or any other agreement between
the parties.  Sponsor makes such representations and warranties to induce the City to
enter into this LDA and the City relies upon such representations and warranties in the
execution of this LDA.

19

Regular UDAAP -- generic form
Clinton Site 7 -Project 2

606. <u>No Commission</u>.  No brokerage or any other fee or compensation shall be due or payable by the City for this transaction.

607. <u>Claims and Actions</u>.

A.    <u>No Claims Against Officers, Agents, or Employees</u>.  No claim whatsoever shall be made by Sponsor, its successors or assigns against any officer, agent, or employee of the City for, or on account of, any thing done or omitted to be done in connection with this LDA.

B.    <u>Cooperation</u>.  If any action is brought against the City, and the action relates in any way to this LDA or the Development Area and the City and the Sponsor are not adverse parties in such action, then the Sponsor shall diligently render to the City, without additional compensation, any and all assistance which the City may require.

C.    <u>Reports of Actions</u>.  If, prior to Completion of Construction, any legal action or proceeding shall be initiated by or against Sponsor in connection with or relating to this LDA or the Development Area, Sponsor shall report the initiation of such legal action or proceeding to the City in writing within ten (10) days after such initiation.

D.    <u>All Rights Reserved</u>.  Each and every defense, right, and remedy which the City has pursuant to this LDA is not exclusive and is in addition to and concurrent with all other defenses, rights, and remedies which the City has pursuant to this LDA and which the City otherwise has, will have, or may have under law, equity, or otherwise.

E.    <u>Choice of Law and Consent to Jurisdiction and Venue</u>.

1.    This LDA shall be deemed to be executed in the City and State of New York, regardless of the domicile of Sponsor, and shall be governed by and construed in accordance with the laws of the State of New York.

2.    Any and all claims asserted by or against the City arising under this LDA or related thereto shall be heard and determined either in the courts of the United States located in New York City ("Federal Courts") or in the courts of the State of New York ("New York State Courts") located in the City and County of New York.  To effect this agreement and intent, the Sponsor agrees:

a.    If the City initiates any action against the Sponsor in Federal Court or in New York State Court, service of process may be made on the Sponsor either in person, wherever Sponsor may be found, or by registered mail addressed to the Sponsor at its address as set forth in this LDA, or to such other address as the Sponsor may provide to the City in writing; and

b.    With respect to any action between the City and Sponsor in New York State Court, Sponsor expressly waives and relinquishes any rights it might otherwise have (i) to move to dismiss on grounds of <u>forum non coveniens</u>,

20

        (ii) to remove to Federal Court; and (iii) to move for a change of venue to a New York State Court outside New York County.

    c.    With respect to any action between the City and the Sponsor in Federal Court located in New York City, Sponsor expressly waives and relinquishes any right it might otherwise have to move to transfer the action to a United States Court outside the City of New York.

    d.    If Sponsor commences any action against the City in a court located other than in the City and State of New York, upon request of the City, Sponsor shall either consent to a transfer of the action to a court of competent jurisdiction located in the City and State of New York or, if the court where the action is initially brought will not or cannot transfer the action, Sponsor shall consent to dismiss such action without prejudice and may thereafter reinstitute the action in a court of competent jurisdiction in New York City.

608.  <u>Notices.</u>

  A.    All notices, approvals, requests, waivers, consents, or communications given or required to be sent under this LDA shall be in writing and sent by certified mail, return receipt requested, addressed as follows:

    1.    When sent by the City to Sponsor, at:

        c/o Taconic Investment Partners
        111 Eighth Avenue
        New York, NY 10011

    2.    When sent by Sponsor to the City, to:

        Department of Housing Preservation and Development
        100 Gold Street, Room 9W-5
        New York, New York  10038
        Attention:  Deputy Commissioner for Development

  B.    Each party shall notify the other in the case of a change in address, which changed address shall thereafter be the address to which notices are sent.

  C.    Notwithstanding any provision of this <u>Section 608.C</u> to the contrary, the construction progress reports required pursuant to <u>Section 201.E</u> may be sent by regular mail or personal delivery.

  D.    Any notice given hereunder shall be deemed to have been given upon personal delivery or upon the third (3rd) day after such notice has been deposited in the United States mail, postage prepaid.  Any notice of a change in address shall only be deemed to have been given when received by the other party.

21

Regular UDAAP – generic form
Clinton Site 7 -Project 2

609. <u>No Waiver</u>.  Waiver by either party of any breach of any provision of this LDA shall not be deemed to be a waiver of any other subsequent breach and shall not be construed to be a modification of the terms of this LDA unless and until the same be agreed to in a writing executed and acknowledged by the parties hereto.

610. <u>Provisions Required by Law Deemed Inserted</u>.  Each and every provision of law and governmental regulation required by law to be inserted in this LDA shall be deemed to be inserted herein and this LDA shall read and shall be enforced as though so included herein.  If, through mistake or otherwise, any such provision is not inserted, or is not correctly inserted, then, upon the application of either party, this LDA shall be deemed to be amended to make such insertion or correction so as to comply strictly with the law and without prejudice to the rights of either party hereunder.

611. <u>Duplicate Originals</u>.  This LDA may be executed in any number of counterparts, each of which shall be an original, and all collectively shall constitute but one instrument.

612. <u>Titles</u>.  Any titles of the several parts, Articles, Sections, and Subsections of this LDA are for convenience only and shall be disregarded in construing or interpreting any of its provisions.

613. <u>Survival</u>.  None of the provisions of this LDA are intended to or shall be merged in the Deed conveying title to the Disposition Area and the Deed shall not be deemed to affect or impair the provisions and covenants of this LDA, all of which shall survive the delivery of the Deed.

614. <u>No Merger</u>.  Notwithstanding the specific recital in this LDA of certain of the covenants and agreements which are provided for in the Deed or Loan Documents, each and every covenant, term, provision, and condition contained in the Deed or Loan Documents shall survive this LDA and shall remain in full force and effect, and no covenant, term, provision, or condition contained in the Deed or Loan Documents shall in any event or in any respect be merged with this LDA.

615. <u>Compliance With Laws</u>.  Sponsor shall comply with all applicable laws, ordinances, orders, rules, and regulations promulgated by any local, state, or federal authority having jurisdiction over the subject matter thereof, as the same may be amended from time to time.

616. <u>Severability</u>.  If any term or provision of this LDA shall be found to be void, voidable, or otherwise unenforceable, such term or provision shall be deemed severed from this LDA and shall have no further force or effect, and the remaining terms and provisions shall thereafter continue in full force and effect to accomplish the intent and purpose of this LDA to the fullest extent possible.

617. <u>Waiver</u>.  To the extent permitted by law, Sponsor hereby waives any and all rights it may have, at law or equity, to challenge, modify, set aside, extinguish, enjoin enforcement of, or seek relief from any of the terms, conditions, covenants, restrictions, or agreements in this LDA.

22

Regular UDAAP – generic form
Clinton Site 7 -Project 2

618. <u>Cross-Default</u>. A default pursuant to the Deed or any other document between Developer and the City shall constitute a default pursuant to this LDA.

619. <u>Negative Declaration</u>. Sponsor shall comply with the Negative Declaration annexed hereto as **Exhibit F**.

620. <u>Additional Requirements</u>. Sponsor shall comply with the terms and conditions contained in **Exhibit G** annexed hereto and made a part hereof.

23

Regular UDAAP – generic form
Clinton Site 7 -Project 2

**IN WITNESS WHEREOF**, THE CITY OF NEW YORK, acting by its Mayor, has caused its corporate seal to be affixed hereto and duly attested and this LDA to be signed by its Commissioner of Housing Preservation and Development and Sponsor has caused this LDA to be signed as of the day and year first above written.

**ATTEST:**

_____
Michael McSweeney
City Clerk

Seal of The City of New York

**THE CITY OF NEW YORK**

**By:**    **DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT**

By:    _____
Vicki Been
Commissioner

**CLINTON HOUSING DEVELOPMENT COMPANY, INC.**

By:    _____
Joe Restuccia
Executive Director

APPROVED AS TO FORM
BY STANDARD TYPE OF CLASS
FOR USE UNTIL September 30, 2016
By:    /s/ Howard Friedman
        Acting Corporation Counsel

24

Regular UDAAP – generic form
Clinton Site 7 -Project 2

STATE OF NEW YORK     )
                              ) ss:
COUNTY OF NEW YORK   )

On the _30th_ day of April in the year 2015, before me, the undersigned, personally appeared **Vicki Been**, personally known to me or proved to me on the basis of satisfactory evidence to be the individuals whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individuals acted, executed the instrument.

NOTARY PUBLIC

BENJAMIN STEINER
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02ST6043316
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES JUNE 12, 2018

STATE OF NEW YORK     )
                              ) ss:
COUNTY OF NEW YORK   )

On the _30th_ day of April in the year 2015, before me, the undersigned, personally appeared **MICHAEL McSWEENEY**, personally known to me or proved to me on the basis of satisfactory evidence to be the individuals whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individuals acted, executed the instrument.

NOTARY PUBLIC

WENDY IRIZARRY-LOPEZ
Commissioner of Deeds
City of New York No. 2-12331
Certificate Filed in New York County
Commission Expires Jan 23, 20__

1/1/2016

25

Regular UDAAP – generic form
Clinton Site 7 -Project 2

STATE OF NEW YORK        )
                         ) ss:
COUNTY OF NEW YORK       )

On the 30th day of April. in the year 2015, before me, the undersigned, personally appeared **Joe Restuccia**, personally known to me or proved to me on the basis of satisfactory evidence to be the individuals whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individuals acted, executed the instrument.

                                          NOTARY PUBLIC

                                          KENNETH R. WONG
                               Notary Public, State of New York
                                 No. 01WO4967932
                               Qualified in New York County
                               Commission Expires 06-11-18

Regular UDAAP – generic form
Clinton Site 7 -Project 2

<u>EXHIBIT A</u>

Property Description
Disposition Land

All those certain plots, pieces and parcels of land, with the buildings and improvements thereon erected, situate, lying and being in the City and State of New York, designated on the Tax Map of the City of New York as of April 29, 2015, as:

| <u>Block(s)</u> | <u>Lot(s)</u> |
|---|---|
| 1081 | 1 (formerly part of Lot 1) |

<u>County:</u>     New York

27

Regular UDAAP -- generic form
Clinton Site 7 -Project 2

<u>Exhibit A-1</u>
Description of Private Property

All those certain plots, pieces and parcels of land, with the buildings and improvements thereon erected, situate, lying and being in the City and State of New York, designated on the Tax Map of the City of New York as:

<u>Block(s)</u>    <u>Lot(s)</u>
1081          16 (formerly Lots 1001-1008)

<u>County:</u>      New York

and also described as:

ALL THAT PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, COUNTY, CITY AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF WEST 52ND STREET, DISTANT 275 FEET WESTERLY FROM THE CORNER FORMED BY THE INTERSECTION OF THE NORTHERLY SIDE OF WEST 52ND STREET WITH THE WESTERLY SIDE OF TENTH AVENUE;

RUNNING THENCE NORTHERLY PARALLEL WITH THE WESTERLY SIDE OF TENTH AVENUE, 200 FEET 10 INCHES TO THE SOUTHERLY SIDE OF WEST 53RD STREET;

THENCE WESTERLY ALONG THE SOUTHERLY SIDE OF WEST 53RD STREET, 150 FEET;

THENCE SOUTHERLY AND PARALLEL WITH TENTH AVENUE, 200 FEET 10 INCHES TO THE NORTHERLY SIDE OF WEST 52ND STREET; AND

THENCE EASTERLY ALONG THE NORTHERLY SIDE OF WEST 52ND STREET, 150 FEET TO THE POINT OR PLACE OF BEGINNING.

Regular UDAAP – generic form
Clinton Site 7 -Project 2

<u>EXHIBIT B</u>

Project Summary

(next page)

29

## PROJECT SUMMARY
## PROJECT SITE 2

| | | |
|---|---|---|
| 1. | **PROGRAM:** | MIXED INCOME PROGRAM |
| 2. | **PROJECT:** | Clinton Site 7 (New Construction) |
| 3. | **LOCATION:** | |
| | a.   **BOROUGH:** | Manhattan |
| | b.   **COMMUNITY DISTRICT:** | 4 |
| | c.   **COUNCIL DISTRICT:** | 3 |

d.   **DISPOSITION AREA 2:**

| BLOCK | LOTS | ADDRESSES |
|---|---|---|
| 1081 | 1    * | 530-536 W. 53rd St |

\* Formerly part of Lot 1

e.   **DEVELOPMENT AREA:**

| BLOCK | LOTS | ADDRESSES |
|---|---|---|
| 1081 | 1    * | 530-536 W. 53rd St. |
| 1081 | 16   ** | 520-528 W. 53rd St. |
| | | 523-531 W. 52nd St. |

\* Formerly part of Lot 1
\*\* Formerly Lot 1001-1008

| | | |
|---|---|---|
| 4. | **BASIS OF DISPOSITION PRICE:** | Negotiated |
| 5. | **TYPE OF PROJECT:** | New Construction |
| 6. | **APPROXIMATE NUMBER OF BUILDINGS:** | 1 building to be constructed on the Development Area. |
| 7. | **APPROXIMATE NUMBER OF UNITS:** | 391 rental dwelling units plus one superintendent unit. |
| 8. | **HOUSING TYPE:** | Rental |
| 9. | **ESTIMATE OF INITIAL RENTS** | Rents will be established in compliance with the requirements of lenders, at market levels, and/or, where public sources have provided construction financing, at levels affordable to families with incomes up to 60% of area median income (AMI) for 20% of the units. |
| 10. | **INCOME TARGETS** | Market rate and up to 60% AMI for 20% of the units. |
| 11. | **PROPOSED FACILITIES:** | 30,700 square feet of commercial space |
| 12. | **PROPOSED CODES/ORDINANCES:** | None |
| 13. | **ENVIRONMENTAL STATUS:** | Negative Declaration |
| 14. | **PROPOSED TIME SCHEDULE:** | Approximately 24 months from closing to completion of construction |

EXHIBIT C

City Council Resolution

(next page)

30

Regular UDAAP – generic form
Clinton Site 7 -Project 2

THE COUNCIL OF THE CITY OF NEW YORK
RESOLUTION NO. 333

**Resolution approving the application submitted by the New York City Department of Housing Preservation and Development ("HPD") and the decision of the City Planning Commission, ULURP No. C 140185 HAM, approving the designation of property located at 530-548 West 53rd Street (Block 1081, Part of Lot 1), 543-551 West 52nd Street (Block 1081, Part of Lot 1) and 556-560 West 52nd Street (Block 1080, Part of Lot 103), Borough of Manhattan, as an Urban Development Action Area, approving an Urban Development Action Area Project, and approving the disposition of city-owned property located at 530-548 West 53rd Street (Block 1081, Part of Lot 1), unused development rights at 543-551 West 52nd Street (Block 1081, Part of Lot 1) and property located at 556-560 West 52nd Street (Block 1080, Part of Lot 103) to a developer selected by HPD (L.U. No. 65; C 140185 HAM).**

**By Council Members Greenfield and Weprin**

WHEREAS, the City Planning Commission filed with the Council on May 12, 2014 its decision dated May 7, 2014 (the "Decision"), on the application submitted by the New York City Department of Housing Preservation and Development pursuant to Section 197-c of the New York City Charter and Article 16 of the General Municipal Law of New York State regarding:

a)   the designation of property located at 530-548 West 53rd Street (Block 1081, Part of Lot 1), 543-551 West 52nd Street (Block 1081, Part of Lot 1) and 556-560 West 52nd Street (Block 1080, Part of Lot 103), as an Urban Development Action Area (the "Area");

b)   an Urban Development Action Area Project for such Area (the "Project"); and

pursuant to Section 197-c of the New York City Charter for the disposition of city-owned property located at 530-548 West 53rd Street (Block 1081, Part of Lot 1), unused development rights at 543-551 West 52nd Street (Block 1081, Part of Lot 1) and property located at 556-560 West 52nd Street (Block 1080, Part of Lot 103), to a developer selected by the New York City Department of Housing Preservation and Development to facilitate development of two new buildings with a total of approximately 530 dwelling units, including approximately 206 affordable units, approximately 58,709 gross square feet of commercial floor area, and three community gardens on portions of two blocks bounded by West 51st Street and West 53rd Street between Tenth and Eleventh avenues in Community District 4 (the "Disposition"), (ULURP No. C 140185 HAM) Community District 4, Borough of Manhattan (the "Application");

WHEREAS, the Application is related to applications C 140181 ZMM (L.U. No. 62), an amendment of the Zoning Map, Section No. 8c to change M1-5 (CL) and R8 (CL) districts to R9/C2-

**Page 2 of 3**
**C 140185 HAM**
**Res. No. 333 (L.U. No. 65)**

5 (CL), and R8 (CL) to R8A (CL) districts; N 140182 ZRM (L.U. No. 63), an amendment to Zoning Resolution Section 96-00 Appendix A to include portions of the Project area in the Other Area - Western Subarea C2; Appendix F to include portions of the Project area in the Inclusionary Housing designated area; Section 96-31 to amend IH program to include low-, moderate and middle-income bands within R8A districts in the CL; Section 96-32 to amend IH program to include low-, moderate- and middle-income bands within R9 districts in the CL, and permit certain commercial and manufacturing uses in the Project area; and C 140183 ZSM (L.U. No. 64), a special permit pursuant to Section 74-74, Large-Scale General Development, to permit the transfer of floor area and height and setback waivers in a new Large-Scale General Development;

WHEREAS, the Decision is subject to review and action by the Council pursuant to Section 197-d(b)(1) of the City Charter;

WHEREAS, the Application and Decision are subject to review and action by the Council pursuant to Article 16 of the General Municipal Law of New York State;

WHEREAS, by letter dated June 13, 2014 and submitted June 16, 2014, the New York City Department of Housing Preservation and Development (HPD) submitted its requests respecting the Application;

WHEREAS, upon due notice, the Council held a public hearing on the Application and Decision on June 17, 2014;

WHEREAS, the Council has considered the land use and financial implications and other policy issues relating to the Application;

WHEREAS, the Council has considered the relevant environmental issues including the revised negative declaration (CEQR No. 13HPD106M) dated April 29, 2014 (the "Revised Negative Declaration");

RESOLVED:

The Council finds that the action described herein will have no significant impact on the environment as set forth in the Revised Negative Declaration.

Pursuant to Section 197-d of the New York City Charter, based on the environmental determination and the consideration described in the report (C 140185 HAM) and incorporated by reference herein, the Council approves the Decision of the City Planning Commission.

Page 3 of 3
C 140185 HAM
Res. No. 333 (L.U. No. 65)

The Council finds that the present status of the Project Area tends to impair or arrest the sound growth and development of the City of New York and that a designation of the Project as an urban development action area project is consistent with the policy and purposes stated in Section 691 of the General Municipal Law.

The Council approves the designation of the Project Area as an urban development action area pursuant to Section 693 of the General Municipal Law.

The Council approves the Project as an urban development action area project pursuant to Section 694 of the General Municipal Law, subject to the terms and conditions of the Project Summaries.

The Project shall be developed in a manner consistent with the three Project Summaries submitted to the Council by HPD for Project Site 1 Clinton Site 7 (New Construction); Project Site 2 Clinton Site 7 (New Construction); and Clinton Site 7 (Rehabilitation)", copies of which is attached hereto.

The Council approves the disposition of city-owned property located at 530-548 West 53rd Street (Block 1081, Part of Lot 1), unused development rights at 543-551 West 52nd Street (Block 1081, Part of Lot 1) and property located at 556-560 West 52nd Street (Block 1080, Part of Lot 103) to a developer selected by the New York City Department of Housing Preservation and Development.

Adopted.

Office of the City Clerk, }
The City of New York,  } ss.:

I hereby certify that the foregoing is a true copy of a Resolution passed by The Council of The City of New York on June 26, 2014, on file in this office.

City Clerk, Clerk of The Council

EXHIBIT D

Mayoral Approval Document

(next page)

Regular UDAAP – generic form
Clinton Site 7 -Project 2

**THE MAYOR**
**CITY OF NEW YORK**

**April 29, 2015**

**Cal. No.  11**

**WHEREAS**, The Department of Housing Preservation and Development ("HPD") of the City of New York ("City") has proposed to the Council the sale of certain City-owned real property located in the Borough of Manhattan, City and State of New York, known as:

| Block | Lots |
|-------|------|
| 1081  | 50 (formerly p/o Lot 1) |
| 1081  | 1 (formerly p/o Lot 1) |

on the Tax Map of the City and known as Clinton Site 7 and by the street addresses 538-548 West 53rd St ("Project Site 1") and 530-536 West 53rd St ("Project Site 2") (collectively, "Disposition Land") in HPD's Mixed Income Program; and

**WHEREAS**, HPD also proposed the transfer of unused development rights associated with adjacent City-owned property located on Block 1081, Lot 80 (formerly p/o Lot 1), known by the street address 543-551 West 52nd Street ("Disposition Development Rights" ) (the Disposition Land and Disposition Development Rights shall be collectively referred to as the "Disposition Area"); and

**WHEREAS**, the Disposition Development Rights consists of approximately 1,540 square feet of unused zoning floor area; and

**WHEREAS**, the Council, pursuant to Article 16 of the General Municipal Law, has held a public hearing upon due notice and has (i) approved the designation of the Disposition Area as an Urban Development Action Area, and (ii) approved the proposed project ("Project") as an Urban Development Action Area Project, and

**WHEREAS**, the City Planning Commission duly filed with the Council and the affected Borough President its approval (Report No. C 140185 HAM, dated May 7, 2014) of the use and disposition of the Disposition Area in conformity with the land use review procedures required by Sections 197-c and 197-d of the Charter, which have been adhered to; and

**WHEREAS**, the action of the City Planning Commission has been approved or deemed approved by the Council pursuant to Section 197-d of the Charter; and

**WHEREAS**, pursuant to Article 8 of the Environmental Conservation Law, Part 617 of Volume 6 of the Codes, Rules and Regulations of the State of New York, Chapter 5 of Title 62 of the Rules of the City of New York, and Mayoral Executive Order No. 91 of August 24, 1977, as amended, HPD has issued a Negative Declaration which has been duly considered by the Mayor; and

**WHEREAS**, this approval replaces the prior approval for the Project dated November 24, 2014 (Cal. No. 5): and

**WHEREAS**, HPD has designated **Clinton West 53rd Housing Development Fund Corporation** ("Sponsor") as a qualified and eligible sponsor; and

**WHEREAS**, proposed agreements ("Land Disposition Agreements") between the City and Sponsor providing for the sale of the Disposition Area to Sponsor for the price of $1.00 per tax lot ("Disposition Price") and setting forth the terms and conditions for the development of the Disposition Land has been submitted to the Mayor; and

WHEREAS, immediately upon acquisition of the Disposition Area, Sponsor will sell Project Site 2 together with the Disposition Development Rights to 525 West 52 Property Owner LLC (the "LLC") for a purchase price of not less than $3,097,200 and will retain Project Site 1; and

WHEREAS, Sponsor will develop a project on Project Site 1 ("Site 1 Project") and the LLC will develop a project on Project Site 2 ("Site 2 Project") (the Site 1 Project and the Site 2 Project shall be collectively referred to as the "Project"); and

WHEREAS, it is anticipated that the Site 1 Project will contain approximately one building containing approximately 103 dwelling units and approximately 23,707 square feet of commercial space (consisting of approximately 11,361 square feet of commercial space at the ground level and approximately 12,346 square feet of commercial space at the cellar level); and

WHEREAS, it is anticipated that the Site 2 Project will contain approximately one building containing approximately 392 dwelling units and approximately 30,700 square feet of commercial space (consisting of approximately 22,700 square feet of commercial space at the ground level and approximately 8,000 square feet of commercial space at the cellar level); and

WHEREAS, it is anticipated that the Site 1 Project will also include 2,510 square feet of open space; and

WHEREAS, the Mayor has held a public hearing upon due notice published in The City Record, as required by Section 1802(6)(j) of the Charter, and in a newspaper of general circulation in New York City, as required by Section 695(2)(b) of the General Municipal Law; and

WHEREAS, as certified below, a duly noticed public hearing in the matter of the disposition, pursuant to Section 1802(6)(j) of the Charter, was held and closed by the Mayor on April 29, 2015 (Cal. No. 11). At such public hearing, no amendments were made and no testimony was offered. The relevant portion of the calendar is annexed hereto.

CERTIFICATION by the Mayor's Office Of Contract Services/Public Hearings Unit of the actions at and final disposition of the Real Property Public Hearing held on April 29, 2015 (Cal. No. 11).

| | | |
|---|---|---|
| _Jacqueline Daley_ | _Hearing Secretary_ | _April 29 2015_ |
| NAME | TITLE | DATE |

NOW THEREFORE:

1.   The Mayor hereby approves the designation of Sponsor as a qualified and eligible sponsor.

2.   The Mayor hereby authorizes and approves the sale of the Disposition Area at the Disposition Price by negotiated sale, without public auction or sealed bids.

3.   The Mayor hereby approves the Land Disposition Agreements in substantially the form submitted and authorizes the subordination of the Land Disposition Agreements to the lien of mortgages securing loans financing the Project.

4.   The Mayor hereby authorizes any Deputy Mayor or the Commissioner of HPD to execute Land Disposition Agreements in substantially the forms submitted, when approved as to form by the Corporation Counsel, and directs the City Clerk or acting City Clerk to attest the same and to affix the seal of the City thereto.

5.   The Mayor hereby authorizes the City, as more particularly described in the Land Disposition Agreements, to indemnify Sponsor and its successors or assigns, holders of mortgages securing loans financing the Project and their successors or assigns, and title companies against any claims of interest in the Disposition Land, or any portion thereof, by the holders of any mortgages of record against the Disposition Land, or any portion thereof, at the time the City acquired title.

6.    The Mayor hereby authorizes any Deputy Mayor or the Commissioner of HPD to execute and deliver to Sponsor, or to an affiliate or successor of Sponsor controlled by the same principal(s) that controlled Sponsor, a deed or deeds of conveyance of title to the Disposition Land and a Zoning Lot Development Agreement or equivalent document for the transfer of the Disposition Development Rights, when approved as to form by the Corporation Counsel, at the Disposition Price, without public auction or sealed bids, and upon the terms and conditions contained in the Land Disposition Agreements, and directs the City Clerk or acting City Clerk to attest said deed and to affix the seal of the City thereto.

Date: 4·29 , 201 5

By:

Paul Prissel, General Counsel
Mayor's Office of Contract Services

EXHIBIT E

Executive Orders

(next page)

32

Regular UDAAP – generic form
Clinton Site 7 -Project 2



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

EXECUTIVE ORDER NO. 50

APRIL 25, 1980

BUREAU OF LABOR SERVICES

By the power vested in me as Mayor of the City of New York,

it is hereby ordered:

Section 1.  Purpose.  It is the purpose of this Order to

ensure compliance with the equal employment opportunity requirements

of City, State and Federal law in City contracting.

§ 2.  Bureau Continued.  The Bureau of Labor Services

shall continue to serve such purposes and to have such responsibilities

as restated by this Order.

§ 3.  Definitions.  Whenever used in this Executive Order,

the following terms shall have the following meanings:

(a)  Bureau means the Bureau of Labor Services;

(b)  construction project means any construction,
reconstruction, rehabilitation, alteration, conversion,
extension, improvement, repair or demolition of real
property contracted by the City;

(c)  contract means any written agreement, purchase
order or instrument whereby the City is committed to expend
or does expend funds in return for work, labor, services, supplies,
equipment, materials, or any combination of the foregoing;

-2-

(i) Unless otherwise required by law, the term "contract" shall include any City grant, loan, guarantee or other City assistance for a construction project.

(ii) The term "contract" shall not include:

(A) contracts for financial or other assistance between the City and a government or government agency;

(B) contracts, resolutions, indentures, declarations of trust, or other instruments authorizing or relating to the authorization, issuance, award, and sale of bonds, certificates of indebtedness, notes or other fiscal obligations of the City, or consisting thereof; or

(C) employment by the City of its officers and employees which is subject to the equal employment opportunity requirements of applicable law.

(d) contracting agency means any administration, board, bureau, commission, department or other governmental agency of the City of New York, or any official thereof, authorized on behalf of the City to provide for, enter into, award or administer contracts;

(e) contractor means a person, including a vendor, who is a party or a proposed party to a contract with a contracting agency, first-level subcontractors of supply or service contractors, and all levels of subcontractors of construction contractors;

(f) Director means the Director of the Bureau of Labor Services;

(g) economically disadvantaged person means a person who, or a member of a family which, is considered economically disadvantaged under applicable law.

(h) employment report means a report filed by a contractor containing information as to the employment practices, policies and programs, employment statistics and collective bargaining agreements, if any, of the contractor in such form as the Bureau may direct by regulation;

(i)  equal employment opportunity means the treatment of all employees and applicants for employment without unlawful discrimination as to race, creed, color, national origin, sex, age, handicap, marital status, sexual orientation or affectional preference in all employment decisions, including but not limited to recruitment, hiring, compensation, training and apprenticeship, promotion, upgrading, demotion, downgrading, transfer, lay-off and termination, and all other terms and conditions of employment except as provided by law;

(j)  trainee means an economically disadvantaged person who qualifies for and receives training in one of the construction trades pursuant to a program other than apprenticeship programs, approved by the Bureau and, where required by law, the State Department of Labor or the United States Department of Labor, Bureau of Apprenticeship and Training.

§ 4.  Responsibilities of Bureau.  The responsibilities of the Bureau shall be as follows:

(a)  To implement, monitor compliance with, and enforce this Order and programs established pursuant to City, State and Federal law requiring contractors to provide equal employment opportunity;

(b)  To implement, monitor compliance with, and enforce on-the-job training requirements on construction projects;

(c)  To monitor compliance by contractors with State and Federal prevailing wage requirements where required;

(d)  To advise and assist contractors and labor unions with respect to their obligations to provide equal employment opportunity;

(e)  To advise and assist persons in the private sector with respect to employment problems;

(f)  To establish advisory committees, including representatives of employers, labor unions, community organizations and others concerned with the enforcement of this Order; and

(g)  To serve as the City's principal liaison to Federal, State and local contract compliance agencies.

-4-

## § 5.  Contract Provisions.

(a) Equal Employment Opportunity.  A contracting agency shall include in every contract to which it becomes a party such provisions requiring the contractor to ensure equal employment opportunity as the Bureau may direct by regulation.

(b) On-the-Job Training.  A contracting agency shall include in every contract concerning a construction project to which it becomes a party such provisions requiring the contractor to provide on-the-job training for economically disadvantaged persons as the Bureau may direct by regulation.

(c) Subcontractors.  A contracting agency shall include in every contract to which it becomes a party such provisions requiring the contractor not to discriminate unlawfully in the selection of subcontractors as the Bureau may direct by regulation.

## § 6.  Employment Reports.

(a) Submission Requirements.  No contracting agency shall enter into a contract with any contractor unless such contractor's employment report is first submitted to the Bureau for its review.  Unless otherwise required by law, an employment report shall not be required for the following:

(i) a contract in the amount of $50,000 or less;

(ii) an emergency contract or other exempt contract except as the Bureau may direct by regulation; and

(iii) a contract with a contractor who has received a certificate of compliance with the equal employment opportunity requirements of applicable law from the Bureau, or an appropriate agency of the State of New York or the United States within the preceding twelve months, except as the Bureau may direct by regulation.

-5-

(b) Bureau Review. The Bureau shall review all employment reports to determine whether contractors are in compliance with the equal employment opportunity requirements of City, State and Federal law and the provisions of this Order. The contracting agency shall transmit the employment report to the Bureau within ten business days after the selection of a proposed contractor. A contracting agency may thereafter award a contract unless the Bureau gives prior written notice to the contracting agency and the contractor as follows:

(i) If the Bureau notifies the contracting agency and the contractor within five business days after the receipt by the Bureau of the employment report that the contractor has failed to submit a complete employment report, the Director may require the contracting agency to disapprove the contractor unless such deficiency is corrected in a timely manner;

(ii) If the Bureau notifies the contracting agency and the contractor within fifteen business days of the receipt by the Bureau of the completed employment report that the Bureau has found reason to believe that the contractor is not in substantial compliance with applicable legal requirements and the provisions of this Order, the Bureau shall promptly take such action as may be necessary to remedy the contractor's noncompliance as provided by this Order.

Provided that a contracting agency may award a requirements contract or an open market purchase agreement prior to review by the Bureau of the contractor's employment report, but may not make a purchase order against such contract or agreement until it has first transmitted such contractor's employment report to the Bureau and the Bureau has completed its review in the manner provided by this Section.

(c) Employment Program. The Bureau may require a contractor to adopt and adhere to a program designed to ensure equal employment opportunity.

(d) Periodic Reports. Contractors shall file periodic employment reports after the award of a contract in such form and frequency as the Bureau may direct by regulation to determine whether such contractors are in compliance with applicable legal requirements and the provisions of this Order.

-ΰ-

§ 7.  **Training Programs**.  The Bureau shall monitor the recruitment, training and placement of economically disadvantaged persons in on-the-job training programs on construction projects.  Contracting agencies shall require contractors to make a good faith effort to achieve the ratio of one trainee to four journey-level employees of each craft on each construction project.

> (a) The Bureau shall determine the number of trainees and hours of training required by each contractor or subcontractor for each construction project.

> (b) In the event that a contractor fails to make a good faith effort to train the required number of individuals for the required amount of hours, the Bureau, after consultation with the contracting agency, shall direct such agency to reduce the contractor's compensation by an amount equal to the amount of wages and fringe benefits which the contractor failed to pay to trainees.

> (c) On-the-job training of economically disadvantaged persons shall not be required on construction contracts in the amount of $125,000 or less.

§ 8.  **Compliance Investigations and Hearings**.  The Bureau shall conduct such investigations and hold such hearings as may be necessary to determine whether contractors are in compliance with the equal employment opportunity requirements of City, State and Federal law and the provisions of this Order.

> (a) **Voluntary Compliance**.  The Bureau shall seek to obtain the voluntary compliance of contractors and labor unions with applicable legal requirements and the provisions of this Order.

-7-

(b)  Noncompliance.  Upon receiving a complaint
or at its own instance, the Bureau shall determine
whether there is reason to believe a contractor is not
in compliance with applicable legal requirements and
the provisions of this Order.

(c)  Hearings.  The Bureau shall hold a hearing
on prior written notice to a contractor and the con-
tracting agency before any adverse determination is
made with respect to such contractor's employment
practices or imposing any sanction or remedy for non-
compliance with applicable legal requirements and the
provisions of this Order.  The hearing shall be held
before a City hearing officer, or such other person
designated by the Director, who shall submit a report
containing findings of fact and recommendations to the
Director.  Based on the record as a whole, the Director
shall determine whether a contractor has failed to com-
ply with applicable legal requirements or the provi-
sions of this Order and the appropriate sanctions for
noncompliance.

(d)  Notices.  The Bureau shall give prior
notice of any hearing and shall provide a copy of any
hearing report and determination of the Director under
paragraph (c) of this Section to the contracting agency,
the Corporation Counsel and the Comptroller.  The Bureau
shall notify appropriate City, State and Federal agencies
of violations of law and may, with the approval of the
Corporation Counsel, initiate proceedings in such
agencies.

§ 9.  Sanctions and Remedies.  After making a determina-
tion that a contractor is not complying with applicable legal re-
quirements and the provisions of this Order, the Director may
direct that such sanctions as may be permitted by law or contractual
provisions be imposed, including the disapproval of a proposed con-
tractor, the suspension or termination of a contract and the
reduction of a contractor's compensation, except as follows:

(a) within five business days of the issuance of a determination by the Director under Section 8(c), a contracting agency head may file with the Director written objections to the sanctions to be imposed. Where such objections have been filed, the Director and the contracting agency head shall jointly determine the appropriate sanctions to be imposed.

(b) In lieu of any of the foregoing sanctions, the Director may require a contractor to adopt and adhere to a program to ensure equal employment opportunity.

§ 10.  <u>Public Agencies</u>.  Any administration, board, bureau, commission, department or other public agency, not subject to this Order, which imposes by rule, regulation or order equal employment opportunity requirements, may, with the consent of the Mayor, delegate such responsibilities to the Bureau as may be consistent with this Order.

§ 11.  <u>Confidentiality</u>.  To the extent permitted by law and consistent with the proper discharge of the Bureau's responsibilities under this Order, all information provided by a contractor to the Bureau shall be confidential.

§ 12.  <u>Regulations</u>.  The Bureau shall promulgate such regulations, subject to the approval of the Mayor, as may be necessary to discharge its responsibilities under this Order, including regulations increasing the dollar amounts referred to in this Order.  Any regulations of the Bureau establishing terms and conditions for contractors shall be approved as to form by the Corporation Counsel.

-9-

§ 13.  Annual Report.  The Bureau shall submit an
annual report to the Mayor concerning its responsiblities under
this Order

§ 14.  Separability.  If any provision of this Order or
the application thereof is held invalid, the remainder of this
Order and the application thereof to other persons or circum-
stances shall not be affected by such holding and shall remain
in full force and effect.

§ 15.  Revocation of Prior Orders.  Executive Orders
No. 71 (1968), No. 20 (1970), No. 23 (1970), No. 27 (1970),
No. 31 (1971), No. 74 (1973), No. 7 (1974), and No. 80 (1977)
are hereby revoked and the first paragraph of Section 2 of
Executive Order No. 4 (1978) is hereby deleted.  Nothing in
this Order shall be deemed to relieve any person of any obli-
gation not inconsistent with this Order assumed or imposed
pursuant to an Order superseded by this Order.

§ 16.  Effective Date.  This Order shall take effect
immediately.


                                   EDWARD I. KOCH
                                   M A Y O R.



JUN 2 3 1986

THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

Executive Order No. 94
June 20, 1986

Amendment of Executive Order No. 50
(April 25, 1980)

## BUREAU OF LABOR SERVICES

By the power vested in me as Mayor of the City of New York, it is hereby ordered:

Section 1.  Prior Order Amended.

a.    Section 1 of Executive Order No. 50, dated April 25, 1980, is amended to read as follows:

"Purpose.  It is the purpose of this Order to ensure equal employment opportunity in City contracting."

b.    Section 3(l) of such Order is amended to read as follows:

"equal employment opportunity means the treatment of all employees and applicants for employment without unlawful discrimination as to race, creed, color, national origin, sex, age, disability, marital status or sexual orientation in all employment decisions, including but not limited to recruitment, hiring, compensation, training and apprenticeship, promotion, upgrading, demotion, downgrading, transfer, lay-off and termination, and all other terms and conditions of employment;"

c.    Section 5(a) of such Order is amended to read as follows:

"Equal Employment Opportunity.  A contracting agency shall include in every

contract to which it becomes a party such
provisions requiring the contractor to ensure
equal employment opportunity as the Bureau
may direct, consistent with this Order."

d.    Section 12 of such Order is amended to read as follows:

"Regulations.  The Bureau shall promulgate
such regulations, subject to the approval of
the Mayor, as may be necessary to
discharge its responsibilities under this
Order, including regulations increasing the
dollar amounts and number of employees
referred to in this Order.  Any regulations
of the Bureau establishing terms and
conditions for contractors shall be approved
as to form by the Corporation Counsel.

Nothing contained herein shall be
construed to bar any religious or
denominational institution or organization, or
any organization operated for charitable or
educational purposes, which is operated,
supervised or controlled by or in connection
with a religious organization, from limiting
employment or giving preference to persons
of the same religion or denomination or
from making such selection as is calculated
by such organization to promote the
religious principles for which it is
established or maintained.  The regulations
shall set forth this exemption for religiously-
sponsored organizations and provide for the
discharge of the Bureau's responsibilities in
a manner consistent with such exemption."

Section 2.    Effective Date.  This Order shall take effect immediately.

Edward L. Koch
M A Y O R



THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

Executive Order No. 108
December 29, 1986

Amendment of Executive Order No. 50
(April 25, 1980)

BUREAU OF LABOR SERVICES

By the power vested in me as Mayor of the City of New York,
it is hereby ordered:

Section 1.  Prior Order Amended.

a.  Section 6(a) of Executive Order No. 50, dated
April 25, 1980, is amended to read as follows:

"Submission Requirements.  No contracting
agency shall enter into a contract with any
contractor unless such contractor's
employment report is first submitted to the
Bureau for its review.  Unless otherwise
required by law, an employment report shall
not be required for the following:

(i)    a construction contract in the
amount of less than $1 million; a
construction subcontract in the amount of
less than $750,000; or a supply and service
contract in the amount of $50,000 or less
or of more than $50,000 in which the
contractor employs fewer than 50 employees
at the facility or facilities involved in
the contract;

(ii)    an emergency contract or other
exempt contract except as the Bureau may
direct by regulation; and

(iii)  a contract with a contractor who has
received a certificate of compliance with
the equal employment opportunity
requirements of applicable law from the
Bureau within the preceding twenty-four
months, or an appropriate agency of the
State of New York or of the United States
within the preceding twelve months, except
as the Bureau may direct by regulation."

b.    Section 7(c) of such Order is amended to read as
follows:

"On-the-job training of economically
disadvantaged persons shall be required on
all construction contracts covered by the
submission requirements of this Order."

Section 2.  <u>Effective Date</u>.  This Order shall take effect
immediately, but shall have no retrospective effect with respect
to the two (2) year approval period provided for in Section 1(a)
of this Order, amending Section 6(a)(iii) of Executive Order
No. 50, dated April 25, 1980.

Edward I. Koch
M A Y O R

- 2 -

NEGATIVE DECLARATION
**Exhibit F**
(Next Page)

33

Regular UDAAP – generic form
Clinton Site 7 -Project 2



**NYC**
**Department of**
**Housing Preservation**
**& Development**
nyc.gov/hpd

VICKI BEEN
Commissioner
ERIC ENDERLIN
Acting Deputy Commissioner
JOHN E. GEARRITY
Assistant Commissioner

Office of Development
Building & Land Development
Services
100 Gold Street
New York, N.Y. 10038

## REVISED NEGATIVE DECLARATION

### (Supersedes Negative Declaration issued on November 26, 2013)

**Project Identification**

Location:                           525 W. 52nd Street & 540 W. 53rd Street, Manhattan
                                    (Block 1080, Lots 10 and p/o 103)
                                    (Block 1081, Lots 7501 and p/o 1)
CEQR Number:                        13HPD106M
SEQRA Classification:               Unlisted

### Name and Description of Proposed Action

525 W. 52nd Street / 540 W. 53rd Street Rezoning:

The proposal involves an application by HPD, on behalf of the project sponsor, Clinton Housing Development Company (CHDC), for several discretionary actions (collectively referred to as the "proposed action") subject to City Planning Commission (CPC) approval, including the disposition of City-owned property, project approval and designation as an Urban Development Action Area Project (UDAAP), zoning map and text amendments, and a zoning special permit for the establishment of a Large Scale General Development (LSGD). For the LSGD application, 525 West 52 Property Owner LLC is a co-applicant.

In addition to the CPC approvals, HPD is seeking an amendment to a previously approved Mayoral Zoning Override. HPD may also fund construction activities at one or more sites and may consider approval of Affordable Housing Plans in connection with the Inclusionary Housing Program (IHP). The proposed action is intended to facilitate the development of three proposed mixed-use developments (collectively referred to as the "proposed project"), including a total of 530 dwelling units (DUs) of which 205 would be affordable, retail and community facility space, and the creation of three community gardens in the Clinton neighborhood of Manhattan, Community District 4.

A Negative Declaration was originally issued for the proposal on November 26, 2013. As reflected in the project description below, subsequent to the issuance of the November 26, 2013 Negative Declaration, a modification was made to the certified ULURP application resulting in an increase of 1,609 gross square feet (gsf) in the amount of retail floor area to be provided on the ground floor of the shared base of Development Sites 1 and 2, changing the total projected gross retail area generated by the proposed action from 57,100 gsf to 58,709 gsf. The change is attributable to an applicant error that undercounted the proposed retail floor area by approximately 409 sf on the ULURP application and a reconfiguration of approximately 1,200 gsf of space adjacent to the residential lobby that is now proposed to be occupied by a coffee bar or similar type of local retail use. This local retail use would primarily serve as an amenity/convenience to building residents, but would also be accessible, by means of an exterior door to West 53rd Street, to passersby and local residents outside of the building. This area had been previously identified as a residential amenity space such as a lounge. The modified proposal was assessed in a Technical Memorandum dated April 25, 2014, which concludes that the modified program would not result in new or different significant adverse impacts than previously disclosed.

*Revised Negative Declaration*
*CEQR No. 13HPD106M*
*525 W. 52nd Street / 540 W. 53rd Street Rezoning*
*Page 2*

The proposed zoning map amendment affects an area covering portions of two blocks, including part of Block 1080, which is bounded by W. 52nd Street to the north, Tenth Avenue to the east, W. 51st Street to the south, and Eleventh Avenue to the west, and part of Block 1081, which is bounded by W. 53rd Street to the north, Tenth Avenue to the east, W. 52nd Street to the south, and Eleventh Avenue to the west. The zoning change would generate development on three sites (referred to in the Environmental Assessment Statement as Sites 1, 2, and 3). Sites 1 and 2 are located on Block 1081. Site 1 is located on an approximately 17,171-square-foot (sf) portion of Lot 1, which is currently City-owned. Site 2 is located on an approximately 38,058 sf portion of Lots 1 and 7501, of which approximately 30,125 sf is privately owned by the co-applicant, 525 West 52 Property Owner LLC (Lot 7501) and the remaining 7,933 sf is currently City-owned (p/o Lot 1). Site 1 would be conveyed to CHDC by HPD. The approximately 7,933 sf portion of Site 2 that is City-owned would also be conveyed to CHDC. 525 West 52 Property Owner LLC would then acquire this property from CHDC. Block 1081 also includes other parcels (p/o Lot 1, Lot 60) that are part of the LSGD, but would not be developed. These parcels would transfer available development rights to Sites 1 and 2.

Sites 3 and 4 are both City-owned and located on Block 1080, Lot 103. Site 3 is located on an approximately 7,531 sf portion of Lot 103 and Site 4 is located on an approximately 10,042 sf portion of Lot 103. Site 4 is identified in the EAS as a Potential Development Site that could be developed at some point in the future pursuant to the proposed zoning. However, this site is City-owned and would require additional discretionary actions in order to be redeveloped and is not currently the subject of a redevelopment proposal. Accordingly, consistent with CEQR methodologies, the EAS analyzes Site 4 as a potential development site by analyzing it for site-specific effects but not for density-related effects. The proposed action would also create three new community gardens (described below), all of which would be publicly accessible.

The proposed action would generate a total of 530 DUs (including 205 affordable DUs), approximately 58,709 gross square feet (gsf) of retail space, approximately 4,162 gsf of community facility space, and approximately 50 accessory parking spaces on Sites 1, 2, and 3; as well as approximately 7,530 sf of new publicly accessible community garden space. The proposed developments on Sites 1, 2, and 3 are considered the Reasonable Worst Case Development Scenario (RWCDS) under Build conditions. Absent the proposed action, the co-applicant has indicated that Site 2 (under its ownership) would be redeveloped with a new as-of-right hotel with retail uses. In recent years there has been a strong trend of hotel development in M1-5 districts in Midtown West and Hell's Kitchen. The RWCDS for the proposed action assumes that Site 2 would be redeveloped with a new building maximizing the M1-5 permitted 5.0 FAR with approximately 172 guest rooms, approximately 30,125 gsf of local retail space, and approximately 34 accessory parking spaces.

The proposed action would facilitate two separate mixed use buildings on Sites 1 and 2 that would share an integrated first floor and cellar base. The shared space would enable the sites to accommodate vested commercial tenants who had a lease at the time the property was acquired by the City, and other local retail uses. The vested commercial tenants are described below. The proposed building on Site 1 would be a single 12-story tower and the proposed adjoining building on Site 2 to the east would have two towers ranging from 14 to 22 stories tall. Combined these two developments would include approximately 508 dwelling units, of which approximately 183 would be affordable housing units for low, moderate, and middle income residents; approximately 58,709 gsf of retail space; and approximately 50 accessory parking spaces in a below-grade garage.



*Revised Negative Declaration*
*CEQR No. 13HPD106M*
*525 W. 52nd Street / 540 W. 53rd Street Rezoning*
*Page 3*

One of the commercial occupants in the Site 1/Site 2 integrated first floor base is expected to be LeNoble Lumber, a business formerly located in the area which relocated its lumber business to Long Island City, Queens approximately six years ago. While LeNoble would be permitted to operate a retail lumber store (Use Group 8) other retail uses are considered more likely given the area's growing residential population with demand for local retail services. In any event, lumber operations would be limited to a retail lumber store with operations consisting mainly of assembly and delivery of wood products purchased from suppliers. A lumber yard business with industrial uses such as wood processing would not be a permitted use under the proposed zoning. The other expected occupant in the Site 1/Site 2 commercial base would be Cybert Tire and Car Care, an existing auto repair business located at 726 Eleventh Avenue that would relocate to the new development.

Site 1 would also be located immediately east of an approximately 2,510 sf community garden expansion of Adam's Garden (referred to in the EAS as "Adam's Garden Expansion"). An approximately 2,510 sf community garden is also proposed to the south of Site 1 along the north side of W. 52nd Street (referred to in the EAS as the "W. 52nd Street Community Garden"). Both the Adam's Garden Expansion and the W. 52nd Street Community Garden would function as public open space. The site of the proposed W. 52nd Street Community Garden is currently used for construction staging (for an adjacent residential development at 533 W. 52nd Street) and will remain under City ownership following creation of the garden, which will be maintained by CHDC. The Adam's Garden Expansion site would be conveyed to CHDC or one of its affiliates as part of the proposed actions. Both of the proposed community gardens on Block 1081 would be maintained by CHDC (or its affiliated entities).

On Site 3, the proposed action would facilitate the conversion of an existing vacant, 5-story, approximately 30,000 gsf City-owned building (known as "Captain Post") into a mixed-use building with a sixth floor addition of approximately 2,000 gsf. This development would include approximately 4,162 gsf of community facility space on the first floor and cellar level and approximately 22 affordable dwelling units. Site 3 would not provide any accessory parking. Site 3 would also be located adjacent to an approximately 2,510-sf community garden (referred to in the EAS as the "Captain Post Community Garden") that would function as a public open space. Both Site 3 and the adjacent Captain Post Community Garden site would be conveyed to CHDC (or its affiliated entities) as part of the proposed action. The Captain Post Community Garden would be maintained by CHDC (or its affiliated entities).

The rezoning area is located within the Special Clinton District (CL). The proposed zoning map amendment would affect both blocks. On Block 1081, the midblock portion of the currently zoned M1-5 (CL) would be rezoned to R9/C2-5 (CL). In addition, the 25-foot wide westernmost portion of the existing R8A district on Block 1081 would be rezoned to R9/C2-5. Part of this area (encompassing Development Sites 1 and 2) would also be mapped with a C2-5 commercial overlay, extending the existing overlay located along Eleventh Avenue. With this change the existing M1-5 district on Block 1081 would be eliminated and the existing R8A would be reduced in size with a reduction of its frontage on W. 52nd Street from 150 feet to 125 feet. On Block 1080, the midblock portion of the block currently zoned R8 (CL) would be rezoned to R8A (CL). This would be located near, though not contiguous to the R8A district on the midblock portion of Block 1081 which would remain. The western boundary of this new R8A (CL) district on Block 1080 would be located 100



Printed on paper containing 30% post-consumer material.

*Revised Negative Declaration*
*CEQR No. 13HPD106M*
*525 W. 52nd Street / 540 W. 53rd Street Rezoning*
*Page 4*

feet east of Eleventh Avenue. On the northern half of Block 1080, the eastern boundary of this new R8A (CL) district would be 225 feet east of Eleventh Avenue and on the southern half of Block 1080, the eastern boundary of this new R8A (CL) district would be 200 feet east of Eleventh Avenue.

The proposed zoning text amendments would include several changes to Article IX, Chapter 6 of the Zoning Resolution (ZR), which is the text for the Special Clinton District. In addition, portions of the rezoning area would be identified as Inclusionary Housing designated areas. The proposed zoning text amendments would:

> • Amend Appendix A, Special Clinton District Map in ZR Article IX, Chapter 6 to extend boundary of "Other Area – Western Subarea C2" to include part of the rezoning area on Block 1081. This would include a 400- foot long portion of Block 1081 bounded by a line 125 feet east of Eleventh Avenue and 275 west of Tenth Avenue. As such, this would apply to Block 1081, the portion of Lot 1 within the rezoning area and all of Lots 101 and 7501.

> • Amend Appendix F of the ZR to designate Inclusionary Housing areas. On Block 1080, the designated areas would include the portion of Lot 103 within the rezoning area and on Block 1081, the portion of Lot 1 within the rezoning area and all of Lots 101 and 7501.

> • Amend ZR §96-32 to allow the continuation of existing uses and previously approved expansion of specific uses related to certain title vested urban renewal uses and existing community facility and arts facilities within the new LSGD.

> • Amend ZR §96-31 and §96-32a to modify the Inclusionary Housing income bands to expand the definition of affordable housing to add eligibility of moderate and middle income floor area for the designated Inclusionary Housing area encompassing Block 1081, the portion of Lot 1 within the rezoning area and all of Lots 101 and 7501.

The proposed LSGD special permit would apply to proposed developments on Block 1081 (Sites 1 and 2). The LSGD special permit would allow for modification of certain bulk regulations. Pursuant to ZR §74-743(a)(1), this would permit distribution of total allowable floor area without regard for district boundaries and pursuant to ZR §74-743(a)(2) this would permit location of buildings without regard for applicable court and height and setback (including tower) regulations in ZR §23-62, §23 633, §35-24.

A Mayoral Zoning Override is being requested to accommodate the proposed density for Sites 1 and 2 in their shared zoning lot on Block 1081. The proposed override would modify a zoning override issued in 2011 that limited the use of floor area on the zoning lot containing Sites 1 and 2. The 2011 zoning override allowed the Park Clinton project (then known as Clinton Commons), to use 15,000 zoning square feet (zsf) in addition to the floor area generated by its zoning lot. The 2011 zoning override provided that, as HPD disposed of the remaining portions of the adjoining properties, i.e., the City-owned properties on Block 1081 that would be disposed as part of the proposed action, HPD would impose restrictions to ensure that those future projects contain approximately 15,000 zsf less floor area than what the zoning in effect would allow. The proposed modification would reduce this figure to 13,300 zsf, allowing an additional approximately 1,700 zsf of floor area to be used for Sites 1 and 2.



Printed on paper containing 30% post-consumer material.

*Revised Negative Declaration*
*CEQR No. 13HPD106M*
*525 W. 52nd Street / 540 W. 53rd Street Rezoning*
*Page 5*

According to the EAS, the project has a build year of 2016. Absent the proposed action, existing conditions on the City-owned sites would remain. As described above, the RWCDS for the proposed action assumes that privately owned Site 2 would be redeveloped with a new hotel building maximizing the M1-5 permitted 5.0 FAR with approximately 172 guest rooms, approximately 30,125 gsf of local retail space, and approximately 34 accessory parking spaces.

The proposed project would be implemented in conformance with the following provisions in order to ensure that there are no significant adverse impacts. The provisions are as follows:

Historic Architectural Resources
According to the Landmarks Preservation Commission (LPC) and the New York State Office of Parks, Recreation, and Historic Preservation (OPRHP), the existing integrated building located at 552 and 554 W. 53rd Street and known as "The Flats" and the "Old School", is eligible for listing on the State and National Register (S/NR) of Historic Places. This resource is located within 90 feet to the west of Development Site 1 (Block 1081, p/o Lot 1). In order to preclude construction-related impacts to this resource, CHDC would be responsible for implementing a Construction Protection Plan (CPP) during all excavation and construction activities at Development Site 1. The CPP would be developed in accordance with the requirements stipulated in the New York City Department of Buildings Technical Policy Procedure Notice #10/88 and LPC guidelines described in "Protection Programs for Landmarked Buildings." This measure would require consultation with and review and acceptance by LPC. In the event federal funding from HUD is utilized, approval from OPRHP, acting as the State Historic Preservation Officer (SHPO), would also be required. This measure would be required through the Land Disposition Agreement (LDA) between HPD and CHDC (or its affiliated entities).

Hazardous Materials
Blocks 1080 and 1081 currently include a mix of manufacturing and residential zoning districts and were historically zoned to allow light manufacturing uses. Due to historic uses of these and adjacent properties, HPD has determined that New York City Department of Environmental Protection (DEP)-approved Phase II testing and remediation (if warranted) would be required for Sites 1, 3, and the related community garden sites including Adam's Garden Expansion, the W. 52nd Street Garden, and the Captain Post Garden. Phase II testing would consist of soil, groundwater, and soil vapor sampling in accordance with a DEP-approved workplan and health and safety plan (HASP). The Phase II testing and remediation requirements for Site 2, which is privately owned by 525 West 52 Property Owner LLC, would be required through an (E) designation, as described below.

For the above referenced sites subject to disposition by HPD, the developer/sponsor would be responsible for providing a written report with findings and conclusions, and a summary of the subsurface investigation testing program and laboratory results to HPD. The report should clearly indicate if remediation is required and its extent. Upon completion of this review and if the document is acceptable to HPD, HPD will transmit these documents to DEP for review approval. If DEP determines that no further soil or groundwater testing or remediation is necessary, written notice shall be given by DEP that the site may be developed as proposed.



Printed on paper containing 30% post-consumer material.

*Revised Negative Declaration*
*CEQR No. 13HPD106M*
*525 W. 52nd Street / 540 W. 53rd Street Rezoning*
*Page 6*

If DEP determines that remediation is warranted, the project sponsor is responsible to perform any and all remediation and construction activities in accordance with a Remedial Action Plan (RAP), Construction Health and Safety Plan (CHASP), and other necessary reports as approved by HPD and DEP. After completion of remediation, if required, the project sponsor shall provide a Site Closure report in accordance with DEP requirements to serve as proof that remediation is complete. If DEP accepts the closure report, DEP will notify HPD and the project sponsor that the proposed remediation work has been satisfactorily completed, and that the site is suitable for re-use/occupancy.

The New York State Department of Environmental Conservation (NYSDEC) may have jurisdiction over some or all activities. If it is determined that the NYSDEC has jurisdiction, the developer/sponsor is responsible to ensure a review of such plans is coordinated with the NYSDEC. If applicable, the developer/sponsor shall be responsible to provide copies of all correspondence with the State to HPD/DEP as it becomes available. If required, the developer shall provide any and all plans and reports generated in association with the requisite work to DEC. If applicable, the developer is responsible to ensure that a no further action determination is consistent with NYSDEC requirements.

For Sites 1, 3, the Adam's Garden Expansion, and the Captain Post Garden, the above measures would be required through provisions contained in the Land Disposition Agreements (LDA) between HPD and CHDC (or its affiliated entities). For the W. 52nd Street Garden, which would remain under City ownership but maintained by CHDC, the responsible party for ensuring compliance with these measures would be CHDC (or its affiliated entities).

For Site 2 (Block 1081, Lot 7501), which is privately owned by 525 West 52 Property Owner LLC, an (E) designation would be placed on the property in connection with the zoning map amendment to ensure that no significant adverse impacts associated with hazardous materials would result from the proposed project. The (E) designation program is administered by the NYC Office of Environmental Remediation (OER). The (E) designation mapped on Site 2 in connection with the proposed action indicates the presence of an environmental requirement which must be satisfied at OER prior to issuance of building permits from the Department of Buildings. The (E) designation number is E-326. The text for the (E) designation [E-326] for Site 2 is as follows:

**Task 1**
**The applicant must submit to the NYC Office of Environmental Remediation (OER), for review and approval, a soil and groundwater testing protocol including a description of methods and a site map with all sampling locations clearly and precisely represented.**

**No sampling program may begin until written approval of a protocol is received from OER. The number and location of sample sites should be selected to adequately characterize site, the specific source of suspected contamination (i.e., petroleum based contamination and (i.e., petroleum based contamination and non-petroleum based contamination) and the remainder of the site's condition.**



Printed on paper containing 30% post-consumer material.

*Revised Negative Declaration*
*CEQR No. 13HPD106M*
*525 W. 52nd Street / 540 W. 53rd Street Rezoning*
*Page 7*

**The characterization should be complete enough to determine what remediation strategy (if any) is necessary after review of the sampling data. Guidelines and criteria for choosing sampling sites and performing sampling will be provided by OER upon request.**

**Task 2**
**A written report with findings and a summary of the data must be presented to OER after completion of the testing phase and laboratory analysis for review and approval. After receiving such test results, a determination will be provided by OER if the results indicate that remediation is necessary. If OER determines that no remediation is necessary, written notice shall be given by OER.**

**If remediation is necessary according to test results, a proposed remediation plan must be submitted to OER for review and approval. The fee owner(s) of the lot(s) restricted by this (E) designation must perform such remediation as determined necessary by OER. After completing the remediation, the fee owner(s) of the lot restricted by this (E) designation should provide proof that the work has been satisfactorily completed.**

**An OER-approved construction-related health and safety plan would be implemented during excavation and construction activities to protect workers and the community from potentially significant adverse impacts associated with contaminated soil and/or groundwater. This Plan would be submitted to OER for review and approval prior to implementation.**

<u>Noise</u>
Existing noise levels were obtained for each of three weekday noise analysis time periods -- AM peak hour (8:00 AM to 10:00 AM), midday peak hour (12:00 PM to 2:00 PM), and PM peak hour (4:00 PM to 6:00 PM) on Wednesday, June 13, 2012 and Wednesday, July 25, 2012. The noise measurements were taken on both W. 52nd and W. 53rd streets at the approximate locations of future building facades for Sites 1, 2, and 3. Pursuant to Section 723 of the *2012 CEQR Technical Manual*, the measurement and reporting of noise levels was conducted in accordance with both CEQR and HUD noise guidelines.

Noise levels in the future with the proposed action (build year 2016) were calculated for the three peak analysis periods. The peak readings along W. 53rd Street and W. 52nd Street were calculated to be 77 dBA L10 (74 dB Ldn) and 74.6 dBA L10 (71.6 dB Ldn), respectively.

Based on these readings, and in order to maintain an interior noise level of 45 dBA under closed window conditions, the W. 53rd Street residential facade of Site 1 would be required to provide a minimum of 33 dBA of window-wall attenuation along with an alternate means of ventilation. For the ground floor retail uses on Site 1, the window-wall attenuation requirement would be 5 dBA less (28 dBA). For the W. 52nd Street residential and community facility facades of Site 3, the requirement would be a minimum of 31 dBA of window-wall attenuation along with an alternate means of ventilation.



Printed on paper containing 30% post-consumer material.

*Revised Negative Declaration*
*CEQR No. 13HPD106M*
*525 W. 52nd Street / 540 W. 53rd Street Rezoning*
*Page 8*

In the event federal funding from HUD (allocated through HPD) is sought in connection with construction activities on Sites 1 and 3, the window-wall attenuation requirements would be at least 31 dB for the W. 53rd Street residential facades of Site 1 (no requirement for ground floor retail) and at least 28 dB for the W. 52nd Street residential/community facility facades of Site 3.

Construction in accordance with the above specifications for Sites 1 and 3 would be required through the LDA between HPD and CHDC (or its affiliated entities) to ensure that no significant adverse noise impacts would occur.

For Site 2 (Block 1081, Lot 7501), which is privately owned by 525 West 52 Property Owner LLC, an (E) designation would be placed on the property in connection with the zoning map amendment to ensure that no significant adverse impacts associated with noise would occur. The (E) designation program is administered by the NYC Office of Environmental Remediation (OER). The (E) designation mapped on Site 2 in connection with the proposed action indicates the presence of an environmental requirement which must be satisfied at OER prior to issuance of building permits from the Department of Buildings. The (E) designation number is E-326. The text for the (E) designation [E-326] for Site 2 is as follows:

**In order to ensure an acceptable interior noise environment of 45 dBA under closed window conditions, future residential uses must provide a minimum of 33 dBA window-wall attenuation on the W. 53rd Street facade and a minimum of 31 dBA window-wall attenuation on the W. 52nd Street façade. If the project is federally assisted with funding from the U.S. Department of Housing and Urban Development (made available through HPD) the attenuation requirements would be 31 dB for the W. 53rd Street facade and 28 dB for the W. 52nd Street facade in order to satisfy HUD guidelines. In either instance, the attenuation requirements for ground floor commercial uses would be approximately 5 dB less than the residential requirement and an alternate means of ventilation would be required for the habitable space of all residential units along these facades.**

<u>Stationary Source Air Quality</u>
A screening analysis was performed pursuant to the *2012 CEQR Technical Manual* to assess the potential for air quality impacts from the boiler (heating and hot water systems) emissions from each development site. Based on the results of the screening analysis for Site 3 (Block 1080, p/o Lot 103), boiler equipment would be required to utilize natural gas fuel and the emission stack(s) must be located no more than 75 feet from the northern lot line facing West 52nd Street and no more than 30 feet from the eastern lot line facing Tenth Avenue. Construction in accordance with these specifications would be required through the Land Disposition Agreement between HPD and CHDC (or its affiliated entities) to ensure that no significant adverse stationary source air quality impacts would occur as a result of rehabilitation activities on Site 3.



*Revised Negative Declaration*
*CEQR No. 13HPD106M*
*525 W. 52nd Street / 540 W. 53rd Street Rezoning*
*Page 9*

For Site 2 (Block 1081, Lot 7501), which is privately owned by 525 West 52 Property Owner LLC, an (E) designation would be placed on the property in connection with the zoning map amendment to ensure that no significant adverse impacts associated with stationary source air quality would occur. The (E) designation program is administered by the NYC Office of Environmental Remediation (OER). The (E) designation mapped on Site 2 in connection with the proposed action indicates the presence of an environmental requirement which must be satisfied at OER prior to issuance of building permits from the Department of Buildings. The (E) designation number is E-326. The text for the (E) designation [E-326] for Site 2 is as follows:

**Any new residential and/or commercial development must ensure that the fossil fuel-fired heating, ventilating and air conditioning equipment be fitted with low NOx (9 ppm) burners and fire only natural gas, and that the stack(s) shall be located no less than 15 feet from the eastern lot line facing Tenth Avenue and 43 feet from the northern lot line facing West 53rd Street, to avoid any potential significant adverse stationary source air quality impacts.**

**Statement of No Significant Effect:**
Pursuant to the CEQR rules adopted on June 6, 1991, Executive Order 91, HPD has completed its technical review of the Environmental Assessment Statement (EAS) dated November 25, 2013 and subsequent Technical Memorandum dated April 25, 2014 has determined that the proposed action will have no significant effect on the quality of the environment.

**Supporting Statement:**
The measures described above related to historic architectural resources, noise, stationary source air quality, and hazardous materials would be implemented as part of the proposed project on Sites 1, 3 and the community garden sites through the Land Disposition Agreement between HPD and the project sponsor, CHDC. Measures related to hazardous materials, noise, and stationary source air quality would be implemented as part of the proposed project on Site 2 (Block 1081, Lot 7501) through the mapping of an (E) designation [E-326] in connection with the proposed zoning changes.

The November 25, 2013 EAS and April 25, 2014 Technical Memorandum are on file with HPD and available for public review. This Revised Negative Declaration has been prepared in accordance with Article 8 of the Environmental Conservation Law 6NYCRR Part 617.

_____          April 29, 2014
Patrick S. Blanchfield, AICP                Date
Director of Environmental Planning
City of New York - HPD

Printed on paper containing 30% post-consumer material.

ADDITIONAL REQUIREMENTS
**Exhibit G**
(Next Page)

34



**OFFICE OF ENVIRONMENTAL REMEDIATION**
100 Gold Street – 2nd Floor
New York, New York 10038

**Daniel Walsh, Ph.D.**
**Director**
Tel: (212) 788-8841
Fax: (212) 788-2941

**NOTICE TO PROCEED**
**DOB Job Number NB 121185626**

January 9, 2015

Martin Rebholz, R.A.
Manhattan Borough Commissioner
NYC Department of Buildings
280 Broadway, 3rd Floor
New York, NY 10007

Re:   525 West 52nd Street
       Manhattan Block 1081, Lot 7501 and p/o Lot 1
       Hazardous Materials, Air Quality, Noise "E" Designation
       E-326: June 26, 2014 525 W 52nd Street / 540 W 53rd Street Rezoning - CEQR 13HPD106M
       OER Project Number 15EHAN155M

Dear Commissioner Rebholz:

The New York City Office of Environmental Remediation (OER) hereby issues a Notice to Proceed for the above-referenced Department of Buildings Job Number. This correspondence is provided pursuant to OER's responsibilities as established in Chapter 24 of Title 15 of the Rules of the City of New York and Section 11-15 of the Zoning Resolution of the City of New York. The Applicant has filed a Hazardous Materials remedial action plan and Noise and Air Quality remedial action plan that are acceptable to this Office and has prepared a Construction Health and Safety Plan for implementation on this project. OER's Decision Document that defines the remedial actions required for this project has been prepared and filed and is available on request.

At the conclusion of remedial activities required under this action, the Zoning Resolution and §24-07 of the Rules of the City of New York requires that OER issue a Notice of Satisfaction signifying that all remedial action requirements established for this project have been satisfied prior to issuance of the Certificate of Occupancy or Temporary Certificate of Occupancy by Department of Buildings.

If you have any questions or comments, please feel free to contact Shana Holberton at 212-788-3220.

Sincerely,

Maurizio Bertini, Ph.D.
Assistant Director

cc:   Andrew Schwartz, 525 West 52 Property Owner LLC – aschwartz@tacon.com
       Christopher McMahon, Langan – cmcmahon@Langan.com
       Christian Thompson, AKRF – cthompson@akrf.com
       Gary Handel, Handel Architects LLP – ghandel@handelarchitects.com
       Daniel Walsh, Shaminder Chawla, Zach Schreiber, Maurizio Bertini, Hannah MoorE
       Shana Holberton, PMA-OER

COPY - NOT FOR DOB FILING



**OFFICE OF ENVIRONMENTAL REMEDIATION**
100 Gold Street – 2nd Floor
New York, New York 10038

**Daniel Walsh, Ph.D.**
**Director**
Tel: (212) 788-8841
Fax: (212) 788-2941

## DECISION DOCUMENT
### E-Designation Remedial Action Plan Approval

January 9, 2015

Re:    **525 West 52nd Street**
**Manhattan Block 1081, Lot 7501 and p/o Lot 1**
**Hazardous Materials, Air Quality, Noise "E" Designation**
**E-326: June 26, 2014 525 W 52nd Street / 540 W 53rd Street Rezoning - CEQR 13HPD106M**
**OER Project Number 15EHAN155M**

The New York City Office of Environmental Remediation (OER) has completed its review of the Remedial Action Plan (RAP) dated December 2014 and the Remedial Action Plan for Air Quality and Noise dated December 2014 for the above-referenced project. These Plans were submitted to OER under the NYC E-Designation Program.

**Project Description**
The proposed development includes a residential high-rise building with a single-cellar level. The building will occupy the entire site footprint with exception of a 2,000-square foot portion on the northeast corner of the building where there is an existing Amtrak easement. The proposed use of the cellar is retail, storage, mechanical / utility rooms and tenant amenity space. The first floor will consist of retail, bicycle storage, a residential lobby with lounge areas and a courtyard, and mercantile space (to be built out by future tenants).

**Statement of Purpose and Basis**
This document presents the remedial action for the NYC E-Designation Program project known as "525 West 52nd Street" pursuant to the Zoning Resolution and §24-07 of the Rules of the City of New York.

**Description of Selected Remedy for Hazmat**
The remedial action selected for the 525 West 52nd Street site is protective of public health and the environment. The elements of the selected remedy are as follows:

1. Perform a Community Air Monitoring Program for particulates and volatile organic carbon compounds.
2. Establish Soil Cleanup Objectives (SCOs) for contaminants of concern.
3. Site mobilization involving Site security setup, equipment mobilization, utility mark outs and marking & staking excavation areas
4. Excavation and removal of soil/fill exceeding SCOs. The entire property will be excavated to a depth of approximately 16- to 18 feet below existing sidewalk grade for a cellar level with exception of a portion on the northeast corner of the building where there is an existing Amtrak easement. Depending on bedrock, between 6,050 and 10,200 tons of soil will be excavated and removed from this Site.
5. Screening of excavated soil/fill during intrusive work for indications of contamination by visual means, odor, and monitoring with a PID. Appropriate segregation of excavated media on-Site.
6. Removal of underground storage tanks and closure of petroleum spills (if encountered) in compliance with applicable local, State and Federal laws and regulations.
7. Transportation and off-Site disposal of all soil/fill material at permitted facilities in accordance with applicable laws and regulations for handling, transport, and disposal, and this plan. Sampling and analysis of excavated media as required by disposal facilities. Appropriate segregation of excavated media onsite.

8.  Collection and analysis of end-point samples to determine the performance of the remedy with respect to attainment of SCOs.
9.  Import of materials to be used for backfill and cover in compliance with this plan and in accordance with applicable laws and regulations.
10. Construction and maintenance of an engineered composite cover consisting of 9-inches of clean crushed stone overlain by a 6-inch concrete cellar slab and associated foundation elements to prevent human exposure to residual soil/fill remaining under the Site.
11. Installation of a vapor barrier system consisting of Grace Preprufe®/160R or Bituthene® 3000/4000 waterproofing/vapor barrier system with a minimum thickness of 20-mil will be installed beneath the building foundation and on the outside of the foundation walls.
12. Implementation of storm-water pollution prevention measures in compliance with applicable laws and regulations.
13. Performance of all activities required for the remedial action, including permitting requirements and pretreatment requirements, in compliance with applicable laws and regulations.
14. Submission of a Remedial Closure Report (RCR) that describes the remedial activities, certifies that the remedial requirements have been achieved, and describes all Engineering and Institutional Controls to be implemented at the Site, and lists any changes from this RAP.

**Description of Selected Remedy for Air Quality**
The elements of the remedial action selected for Air Quality for the 525 West 52nd Street site are as follows:

In order to satisfy the requirements of the E-designation, natural gas will be utilized at the site for space heating, hot water, and HVAC systems.

In order to satisfy the requirement to use low $NO_x$ (< 9 ppm) burners, three 6,000 cfh Benchmark 6000 boilers manufactured by AERCO will be used for the site's heating and hot water systems. Additionally, there would be several small natural gas-fired units for kitchen and laundry use as well as a natural gas-fired emergency generator.

In order to satisfy the requirements of the E-Designation, there would be a common HVAC system shared by both towers on the project site that will exhaust to a single 26 inch diameter stack located on the roof of the northern tower. The stack would be located 61 feet from the northern lot line facing West 53rd Street and 69 feet from the eastern lot line facing Tenth Avenue.

**Description of Selected Remedy for Noise**
The elements of the remedial action selected for Noise for the 525 West 52nd Street site are as follows:

In order to meet the requirements of the E-Designation, the following window/wall attenuation(s) will be achieved at the locations described below:
1.  28 dBA in the commercial spaces fronting West 53rd Street based on an allowed reduction of 5 dBA from the attenuation requirement outlined in the E-Designation;
2.  26 dBA in the commercial and amenity spaces on West 52nd Street based on an allowed reduction of 5 dBA from the attenuation requirement outlined in the E-Designation;
3.  33 dBA on the West 53rd Street façade for windows less than 100 feet above street level with masonry/ wall elements and as documented by the composite calculations;
4.  31 dBA on the West 53rd Street façade for windows from 101 feet above street level based on a reduction of 3 dBA from the projected street-level $L_{10}$ value of 76.7 dBA to 73.7 dBA;
5.  31 dBA on the West 52nd Street façade for windows less than 100 feet above street level; and
6.  28 dBA on the West 52nd Street façade for windows from 101 feet above street level to the top of the building based on a reduction of 3 dBA from the projected street-level $L_{10}$ value of 72.5 dBA to 69.5 dBA.

The following windows will be installed:

| Façade Floor Range | OITC Rating | OITC Certification | Manufacturer and Model | Glazing |
|---|---|---|---|---|
| West 53rd Street<br><br>Floor 1<br><br>Commercial | 30 | ASTM E-90 acoustical report | Viracon 1" IGU Test TL97-37 | 1/4" – 1/2" air space – 1/4" |
| West 52nd Street<br><br>Floors 1 and 2<br><br>Commercial and Amenity | 30 | ASTM E-90 acoustical report | Viracon 1" IGU Test TL97-37 | 1/4" – 1/2" air space – 1/4" |
| West 53rd Street<br><br>Floors 2 though 22<br><br>Residential | 31 | ASTM E-90 acoustical report in and composite calculations | Mannix Series 7800 Casement Window | 1" IG (1/4" annealed exterior, 1/2" air space, 1/4" laminated interior) |
| West 52nd Street<br><br>Floors 3 though 10<br><br>Residential | 31 | ASTM E-90 acoustical report | Mannix Series 7800 Casement Window | 1" IG (1/4" annealed exterior, 1/2" air space, 1/4" laminated interior) |
| West 52nd Street<br><br>Floors 11 through 14<br><br>Residential | 28 | ASTM E-90 acoustical report | Mannix Series 7800 Casement Window | 1" IG (1/4" annealed, 1/2" air space, 1/4" annealed |

As shown in a letter from the RA and composite calculations, the following windows may be installed as a substitute to those listed above:

| Façade Floor Range | OITC Rating | OITC Certification | Manufacturer and Model | Glazing |
|---|---|---|---|---|
| West 53rd Street Floors 11 through 22 Residential | 29 | ASTM E-90 acoustical report and composite calculations | Mannix Series 5000 | 1" IG (1/4" annealed – 1/2" air space – 1/4" annealed) |
| West 53rd Street Floors 11 through 22 with setback Residential | 30 | ASTM E-90 acoustical report and composite calculations | Viracon 1" IGU Test TL97-37 | 1" IG (1/4" – 1/2" air space – 1/4") |
| West 52nd Street Floors 2 through 10 Residential | 30 | ASTM E-90 acoustical report and composite calculations | Viracon 1" IGU Test TL97-37 | 1" IG (1/4" – 1/2" air space – 1/4") |
| West 52nd Street Floors 11 through 14 Residential | 27 | ASTM E-90 acoustical report and composite calculations | Crystal Window Series 8800 | 1-3/16" IG (3/16" annealed – 13/16" air space – 3/16" annealed) |

If the selected manufacturer does not have the ASTM E90 test data on file for the specific window assembly to be installed, a mock-up will be laboratory tested as per ASTM E90 to demonstrate compliance with the minimum OITC requirements listed above. The composite calculations were conservatively performed assuming the shadow box portion of the windows would have the same OITC rating as the vision portion. In reality, the shadow box portions will have backing construction that will increase the OITC rating.

In order to satisfy the requirements of the E-Designation, Alternate Means of Ventilation (AMV) will be installed in order to maintain a closed window condition. AMV for this project will be achieved by:

1. Trickle Vents: Installing Trimvent 90 250 Ventilator/Canopy trickle vents on all floors in all residential units facing West 53rd and West 52nd Street. Fresh air will be provided to all bedrooms and living rooms by the trickle vents. Heating and cooling will be provided by Omega vertical stack water source heat pumps Models HRP030, HRP040, HRP060, and HRP080.
2. Combination of Dedicated Fresh Air/ HVAC System. Installing C-Series and VS-Series model split systems with condensing systems manufactured by United Cool Air on the roof and air handling units in each lounge and amenity space serving the lounge and amenity spaces on Floors 1, 2, and 15 for heating and cooling. Façade mounted louvers located on the north and south facades and air handling units and associated ducting will provide fresh air to each lounge and amenity space.

3. Compliance with Mechanical Code: Providing outside air to commercial spaces and common areas such as lobbies and corridors in accordance with the NYC Mechanical Code.

The remedies for Hazardous Materials, Air Quality, and Noise described above conform to the promulgated standards and criteria that are directly applicable, or that are relevant and appropriate and takes into consideration OER guidance, as appropriate.

1-9-2015

_____      _____
Date                              Shana Holberton
                                  Project Manager


1-9-2015

_____      _____
Date                              Maurizio Bertini
                                  Assistant Director


cc:   Andrew Schwartz, 525 West 52 Property Owner LLC – aschwartz@tacon.com
      Christopher McMahon, Langan – cmcmahon@Langan.com
      Christian Thompson, AKRF – cthompson@akrf.com
      Gary Handel, Handel Architects LLP – ghandel@handelarchitects.com
      Daniel Walsh, Shaminder Chawla, Zach Schreiber, Maurizio Bertini, Hannah Moore
      Shana Holberton, PMA-OER

# LAND DISPOSITION AGREEMENT

## THE CITY OF NEW YORK

### AND

### CLINTON HOUSING DEVELOPMENT COMPANY, INC.,

Block(s)     Lot(s)
1081        1 (formerly part of Lot 1)
1081        16 (formerly Lots 1001-1008)

County:     New York

**RECORD AND RETURN TO:**

Department of Housing Preservation
    and Development
Office of Legal Affairs
100 Gold Street, Room 5-S4
New York, New York 10038

First American Title
Insurance Company
666 Third Avenue   5th fl
New York, N.Y. 10017
Phone: (212) 922-9700
Fax: (212) 922-0881

35

Regular UDAAP – generic form
Clinton Site 7 -Project 2