# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .............................................................................. iv

RELEVANT FACTS .......................................................................................... 1

RELEVANT STATUTORY FRAMEWORK......................................................... 3

New York City Department of Housing Preservation and Development ("HPD")....................... 3

Section 421-a ................................................................................................... 3

The Low Income Housing Tax Credit Program ................................................. 4

The Inclusionary Housing Program.................................................................. 4

The Rehabilitation Act of 1973......................................................................... 5

The Americans with Disabilities Act ................................................................ 6

New York State Human Rights Law .................................................................. 8

New York City Human Rights Law.................................................................... 9

Rental Assistance Programs.............................................................................. 9

Source of Income Protections ........................................................................... 10

SUMMARY JUDGMENT STANDARD ............................................................ 11

**Page**

ARGUMENT

      POINT I

          HPD TOOK NO PART IN PHIPPS'S DECISION
          TO OFFER PLAINTIFF A ONE-BEDROOM
          UNIT (4B-N) RATHER THAN A TWO-
          BEDROOM UNIT, AND THEREFORE
          CANNOT BE FOUND TO HAVE
          DISCRIMINATED AGAINST PLAINTIFF. .......................................12

      POINT II

          HPD'S REVIEW OF ITS RECORDS
          REGARDING THE INITIAL LEASE-UP OF
          THE SUBJECT DEVELOPMENT SHOWS
          COMPLIANCE WITH THE APPLICABLE
          ANTI-DISCRIMINATION PROVISIONS.............................................13

          A. HPD records show no violation by Phipps of
             Section 504 or the ADA....................................................15

          B. HPD records show no violation by Phipps of
             the Fair Housing Act. .......................................................16

          C. HPD records show no discrimination by
             Phipps on the basis of plaintiff's use of a rent
             voucher.............................................................................16

          D. HPD records show that the subject
             development is in compliance with Section
             504's requirement for providing set-aside
             units, including affordable set-aside units. .......................17

      POINT III

          HPD PLAYS NO ROLE IN THE
          MANAGEMENT OF A PRIVATELY OWNED
          DEVELOPMENT AND CANNOT PROVIDE
          PLAINTIFF WITH AN AFFORDABLE TWO-
          BEDROOM SET-ASIDE UNIT OUTSIDE OF
          THE LOTTERY PROCESS. .................................................................18

**Page**

POINT IV

        THIS   COURT   SHOULD   DECLINE   TO
        EXERCISE  SUPPLEMENTAL  JURISDICTION
        OVER PLAINTIFF'S STATE LAW CLAIMS. ....................................19

CONCLUSION.............................................................................................................. 20

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                                     **<u>Pages</u>**

*Cales v. New Castle Hill Realty,*
    2011 U.S. Dist. LEXIS 9619 (S.D.N.Y. Jan. 31, 2011)..........................................................16

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)...........................................................................................................11

*Clarkson v. Coughlin,*
    898 F. Supp 1019 (S.D.N.Y. 1995) ..........................................................................7, 8, 15

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973)...........................................................................................................16

*D'Amico v. New York State Bd. of Law Examiners,*
    813 F. Supp. 217 (W.D.N.Y. 1993) ....................................................................................7

*Easley v. Snider,*
    36 F.3d 297 (3d Cir. 1994)...................................................................................................7

*Ellen S. v. Florida Board of Bar Examiners,*
    859 F. Supp. 1489 (S.D. Fla. 1994) ..................................................................................15

*Harmer v. Virginia Elec. & Power Co.,*
    831 F. Supp 1300 (E.D. Va. 1993) .....................................................................................8

*Kinney v. Yerusalim,*
    9 F.3d 1067 (3d Cir. 1993)...................................................................................................7

*Lincoln CERCPAC v. Health and Hospitals Corp.,*
    920 F. Supp 488 (S.D.N.Y. 1996) .......................................................................................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)...........................................................................................................11

*Mitchell v. Shane,*
    350 F.3d 39 (2d Cir. 2003).................................................................................................16

*P.C. v. McLaughlin,*
    913 F.2d 1033 (2d Cir. 1990)...............................................................................................5

*People First of Tennessee v. Arlington Developmental Center,*
    878 F. Supp. 97 (W.D. Tenn. 1992)...................................................................................15

*Pitchell v. Callan,*
    13 F.3d 545 (2d Cir. 1994).................................................................................................19

**Cases**                                                                                   **Pages**

*Scotto v. Almenas*,
 143 F.3d 105 (2d Cir. 1998)..................................................................................11

*Staron v. McDonald's Corp.*,
 51 F.3d 353 (2d Cir. 1995)....................................................................................7

*Traynor v. Turnage*,
 485 U.S. 535 (1988)...............................................................................................5

*Vande Zande v. State of Wisconsin Dep't of Administration*,
 851 F. Supp 353 (W.D. Wis. 1994) ......................................................................8

*Windham v. Time Warner, Inc.*,
 275 F.3d 179 (2d Cir. 2001)................................................................................16

**Statutes**

24 C.F.R. § 8.22..........................................................................................................6

24 C.F.R. **§** 8.22(b)......................................................................................................6

24 C.F.R. § 8.32..........................................................................................................6

28 C.F.R. § 35.103.......................................................................................................8

28 RCNY Chapter 6.....................................................................................................4

68 RCNY §§ 8-01 *et seq*.............................................................................................9

68 RCNY § 8-05........................................................................................................10

28 U.S.C. § 1367(c)(3)...............................................................................................19

29 U.S.C. § 701 *et seq*................................................................................................5

29 U.S.C. § 794...........................................................................................................5

29 U.S.C. § 794(a) ......................................................................................................5

42 U.S.C. § 12101 *et seq*.(the "ADA")......................................................................6

**Statutes**                                                                                    **Pages**

42 U.S.C. § 12132 (aka ADA § 202)....................................................................7

42 U.S.C. § 12134(a) ....................................................................................6, 7

42 U.S.C. § 12206(a) .....................................................................................6-7

42 U.S.C. § 12206(c) .....................................................................................6-7

City Charter § 1802........................................................................................3

Exec. Law § 291(2) .......................................................................................8

Exec. Law § 296(2-a)(a) ...............................................................................8, 10

Exec. Law § 296(2-a)(b) ...............................................................................8, 10

Fed. R. Civ. Proc. 56.....................................................................................1

Fed. R. Civ. Proc.  56(a) ...............................................................................11

NY Rental Property Tax Law § 421-a .........................................................1, 3, 4

NYC Admin. Code § 8-101 *et seq.*(NYC Human Rights Law).....................9

NYC Admin. Code § 8-102(25)....................................................................11

NYC Admin. Code § 8-107(5).......................................................................10

NYC Admin. Code § 8-107(5)(a) ..................................................................9

NYC Admin. Code § 11-243 .........................................................................3

NYC Admin. Code §§ 11-245-11-245.1-b ....................................................4, 8

NYC ZR Article II, Chapter 3, § 23-90 ........................................................4

NYC ZR § 23-911..........................................................................................5, 12

NYC ZR § 23-96 *et seq* ...............................................................................5

NYS Exec. Law § 290 *et seq.* (NYS Human Rights Law) ...........................8

Rehab. Act of 1973 § 504 ..............................................................2, 5, 7, 8, 15, 17, 18

RPTL § 421-a: Chapter 10.............................................................................4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x
BERNADETTE SKORUPSKA,

                                            Plaintiff,

            -against-                            20 Civ. 2831 (KPF)

525 WEST 52 PROPERTY OWNER LLC, CITY OF
NEW YORK, PHIPPS HOUSING DEVELOPMENT
CORPORATION, and TACONIC MANAGEMENT LLC,

                                            Defendants.
------------------------------------------------------------------------- x

### DEFENDANT CITY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

            Pursuant to Federal Rule of Civil Procedure 56, defendant THE CITY OF NEW YORK (the "City"), by its attorney, GEORGIA M. PESTANA, Corporation Counsel of the City of New York, moves for summary judgment on all of the claims in the complaint herein.

### RELEVANT FACTS

            At issue in this case is the initial lease-up of the housing development located at 525 West 52nd Street, Manhattan (the "subject development"), which was constructed pursuant to the City's Inclusionary Housing Program and the Low Income Housing Tax Credit Program of the NYS Homes and Community Renewal, and received a tax exemption under Section 421-a of the NY Rental Property Tax Law. The subject development is owned by defendant 525 West 52 Property Owner LLC. Defendant Taconic Management LLC is the managing agent. Defendant Phipps Houses Services, Inc. ("Phipps") was the marketing agent directly responsible for administering the lottery by which the affordable dwelling units were offered to eligible applicants. HPD has an oversight function with respect to the lease-up of certain housing developments, but does not screen individual applicants or make decisions to offer individual

applicants specific units.  Those decisions are squarely within the responsibility of the owners of the developments, whether directly or indirectly through the marketing agents they retain.

Plaintiff set forth the facts and the legal theories underlying her claims in an initial "Statement of Facts in Support of Complaint" that is appended to the court's complaint form [Doc. No. 2][1] and a subsequent "Statement of Facts in Support of Amended Complaint" ("Amended Complaint" [Doc. No. 48]).  She alleges unlawful discrimination against her and her disabled minor child on the basis of both disability and her intended use of a voucher to pay part of her rent.  The basis for her claims is that marketing agent Phipps did not offer her an affordable *two-bedroom* unit that had been set aside in the subject development for those with disabilities  (a "set-aside unit") but rather offered her an affordable *one-bedroom* set-aside unit, which she accepted and in which she and her child lived until approximately January 1, 2021.[2] She alleges that the failure of Phipps to offer her an affordable two-bedroom set-aside unit in the subject development was in violation of the HPD Marketing Handbook governing the offering of affordable units, and violated Section 504 of the Rehabilitation Act of 1973 (hereinafter "Section 504"), the Americans Disabilities Act (the "ADA"), the Fair Housing Act, the New York State Human Rights Law, and the New York City Human Rights Law.

It is indisputable that plaintiff was offered an affordable set-aside unit at the subject development, as were five other applicants who presented proof of disability.  It is also indisputable that she was offered an affordable set-aside unit despite using a rent voucher, as were four other applicants who were offered affordable set-aside units at the subject

---

[1] "Doc. No." references refer to entries on this case's electronic docket.

[2] Upon information and belief, as of January 1, 2021, plaintiff moved into a two-bedroom affordable set-aside unit in a development at 400 West 61st Street, Manhattan, that was also constructed in part with City financing and that was leased up through the lottery system.

City's Memorandum of Law in Support of
Summary Judgment                - 2 -

development.  There is thus no evidence of discrimination against plaintiff on the basis of either disability or the source of her rent being a voucher.

For these reasons, the City's motion for summary judgment should be granted.

## RELEVANT STATUTORY FRAMEWORK

### New York City Department of Housing Preservation and Development ("HPD")

HPD is a mayoral agency of the City, established pursuant to Chapter 61 of the New York City Charter ("City Charter").  The powers of the HPD Commissioner are set forth in City Charter § 1802, in relevant part as follows:

> **§ 1802 Powers and duties of commissioner.**
>
> Except as otherwise specifically provided by law, the commissioner may exercise or delegate any of the following functions, powers and duties which are vested in the department:
>
> * * *
>
> 6. the functions, powers and duties to:
>
> * * *
>
>> (b) administer laws authorizing tax exemption or tax abatement, or both, including, but not limited to, section 11-243 of the administrative code of the city of New York and section four hundred twenty-one of the real property tax law, which are in aid of the construction, rehabilitation, alteration or improvement of residential buildings …

### Section 421-a

In 1971, the New York State Legislature enacted Section 421-a of the Real Property Tax Law ("RPTL") to spur housing development in New York City at a time when housing market conditions were dire.  To incentivize development of permanent housing, a

program under RPTL § 421-a[3], New York City Administrative Code ("Administrative Code") §§ 11-245–11-245.1-b, and Chapter 6 of Title 28 of the Rules of the City of New York ("RCNY"), provide tax exemptions for new housing development throughout New York City (hereinafter the "421-a Tax Exemption Program").  The 421-a Tax Exemption Program provides a partial exemption from local real property taxes for newly-constructed multiple dwellings meeting the statutory and regulatory qualifications.

### The Low Income Housing Tax Credit Program

The Low Income Housing Tax Credit Program ("LIHTC") provides federal tax credits that are given to states to distribute.[4]  Of relevance herein is the federal tax credit allocation received by NYS Homes and Community Renewal ("NYS HCR") for distribution through HPD to allocate for projects in New York City.

### The Inclusionary Housing Program

The Inclusionary Housing Program is designed to preserve and promote affordable housing within neighborhoods where zoning has been modified to encourage new development.

The subject development was developed pursuant to NYC Zoning Resolution ("ZR") Article II, Chapter 3, § 23-90, which sets forth the requirements for the construction and maintenance of inclusionary housing, which is housing that includes affordable housing units as

---

[3] The State legislature enacted two laws that amended RPTL § 421-a: Chapter 10 of the Laws of 2015, which took effect June 15, 2015, and Chapter 59 of the Law of 2017, which took effect April 10, 2017.  The amended version of the statutory framework, to the extent these amendments affect the issuance of 421-a tax exemption benefits to developments that commenced construction on or before December 31, 2015, is referenced herein.

[4] Further information about LIHTC can be found on HUD's website, https://www.huduser.gov/portal/datasets/lihtc.html, and on HPD's website, https://www1.nyc.gov/site/hpd/services-and-information/lihtc.page.

defined in ZR § 23-911, that is, housing units to be occupied by low-income households as defined in ZR § 23-911.  Said housing is to be administered pursuant to a regulatory agreement that sets forth the parameters for the creation and occupancy of affordable housing units for the particular housing development.

The requirements for affordable housing units in an inclusionary housing site are set forth in ZR § 23-96 *et seq.*

## The Rehabilitation Act of 1973

The Rehabilitation Act of 1973 (codified as 29 U.S.C. § 701 *et seq.*) was enacted to give individuals with disabilities the opportunity to maximize employment options, be economically self-sufficient, be independent, and to be included and integrated into society.  29 U.S.C. § 701.  The Rehabilitation Act was designed to prevent unfounded prejudices against disabled people from interfering with those individuals' rights to enjoy the same privileges and duties afforded to all United States citizens.  *Traynor v. Turnage*, 485 U.S. 535, 548 (1988); *P.C. v. McLaughlin*, 913 F.2d 1033 (2d Cir. 1990).  The Act sets forth a comprehensive regulatory scheme governing programs offering vocational rehabilitation services, training programs, services in support of independent living, and employment opportunities for people with disabilities.  Also included in its purview are issues of physical accessibility to the programs offering these services with the support of federal monies.  Of particular relevance herein is 29 U.S.C. § 794(a) (also known as § 504 of the Rehabilitation Act):

**§ 794.  Nondiscrimination under Federal grants and programs**

**(a)  Promulgation of rules and regulations**

No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal

financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

* * *

Enabling regulations were codified in Title 24 of the Code of Federal Regulations as 24 C.F.R. § 8.22(b):

### § 8.22 New construction - housing facilities.

(a) New multifamily housing projects … shall be designed and constructed to be readily accessible to and usable by individuals with handicaps.

(b) Subject to paragraph (c) of this section, a minimum of five percent of the total dwelling units or at least one unit in a multifamily housing project, whichever is greater, shall be made accessible for persons with mobility impairments. A unit that is on an accessible route and is adaptable and otherwise in compliance with the standards set forth in § 8.32 is accessible for purposes of this section. An additional two percent of the units (but not less than one unit) in such a project shall be accessible for persons with hearing or vision impairments.

## The Americans with Disabilities Act

The purpose of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 *et seq*.) ("ADA") was to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101. Pursuant to 42 U.S.C. § 12134(a), the Attorney General and the Department of Justice are empowered to issue regulations to implement the ADA's provisions. In addition, Congress authorized the Attorney General to provide technical guidance to those with "rights or duties" under the law. 42 U.S.C. §§ 12206(a) and (c). The Department of Justice publishes technical assistance materials, addressing the ADA's requirements for state and local governments.[5]

---

[5] Those materials can be found via the following website: https://www.ada.gov/ta-pubs-pg2.htm.

Like the Rehabilitation Act of 1973, the ADA was enacted "to place those with disabilities on an equal footing" with non-disabled individuals. *D'Amico v. New York State Bd. of Law Examiners*, 813 F. Supp. 217, 221 (W.D.N.Y. 1993).

As part of Congress' response to the issues facing disabled individuals, Title II of the ADA was enacted to address discrimination against disabled people with respect to public services, programs, or activities.[6] 42 U.S.C. § 12132. 42 U.S.C. § 12132 (also referred to as ADA § 202) provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefit of the services, programs, or activities of a public entity."

ADA § 202 was intended to parallel Section 504 of the Rehabilitation Act. However, where that section applies only to "any program or activity receiving Federal financial assistance," ADA § 202 extended the Rehabilitation Act's proscriptions to all state and local government programs and services irrespective of federal funding. See H. R. Rep. No. 101-485(II), 101st Cong., 2d Sess. 84 (1990). *See also, Kinney v. Yerusalim*, 9 F.3d 1067 (3d Cir. 1993); *Easley v. Snider*, 36 F.3d 297, 300 (3d Cir. 1994); and *Clarkson v. Coughlin*, 898 F. Supp 1019 (S.D.N.Y. 1995). Pursuant to 42 U.S.C. § 12134(a), the Attorney General and the Department of Justice are empowered to issue regulations to implement the ADA's provisions. These regulations, codified as Title 28 of the Code of Federal Regulations ("C.F.R."), "confirm the uniformity of interpretation between the ADA and the Rehabilitation Act." 28 C.F.R. § 35.103.

---

[6]    Title I of the ADA addresses employment discrimination against individuals with disabilities. Title III of the ADA addresses discrimination against individuals with disabilities in public accommodations and services operated by private entities.

In construing the ADA, courts are guided by case law interpreting and applying the Rehabilitation Act. *Staron v. McDonald's Corp.*, 51 F.3d 353, 355-56 (2d Cir. 1995); *Harmer v. Virginia Elec. & Power Co.*, 831 F. Supp 1300 (E.D. Va. 1993); *Vande Zande v. State of Wisconsin Dep't of Administration*, 851 F. Supp 353, 359 (W.D. Wis. 1994). The test, therefore, to determine whether Title II of the ADA has been violated in the instant matter is essentially the same as that applied under Rehabilitation Act § 504. *Lincoln CERCPAC v. Health and Hospitals Corp.*, 920 F. Supp 488 (S.D.N.Y. 1996); and *Clarkson v. Coughlin*, 898 F. Supp at 1036.

## New York State Human Rights Law

New York State Executive Law § 290 *et seq.* ("Exec. Law," also known as the "New York State Human Rights Law") defines unlawful discriminatory practices regarding employment, places of public accommodation, and housing. Definitional Section Exec. Law § 291(2), "Equality of Opportunity a Civil Right," states in relevant part as follows:

> The opportunity to obtain … use and occupancy of housing accommodations … without discrimination because of … disability, as specified in section two hundred ninety-six of this article, is hereby recognized as and declared to be a civil right.

Exec. Law § 296(2-a)(a) & (b) state as follows:

2-a. It shall be an unlawful discriminatory practice for the owner, lessee, sub-lessee, assignee, or managing agent of publicly-assisted housing accommodations or other person having the right of ownership or possession of or the right to rent or lease such accommodations:

(a) To refuse to sell, rent or lease or otherwise to deny to or withhold from any person or group of persons such housing accommodations because of the race, creed, color, disability, national origin, sexual orientation, gender identity or expression, military status, age, sex, marital status, lawful source of income or familial status of such person or persons, or to represent that any

housing accommodation or land is not available for inspection, sale, rental or lease when in fact it is so available.

(b)  To discriminate against any person because of his or her race, creed, color, disability, national origin, sexual orientation, gender identity or expression, military status, age, sex, marital status, lawful source of income or familial status in the terms, conditions or privileges of any publicly-assisted housing accommodations or in the furnishing of facilities or services in connection therewith. her household size fit the required number of individual for the unit size being offered, and that plaintiff's application contained the required disability verification form, since the unit being offered was a disability set-aside unit.

### New York City Human Rights Law

New York City Administrative Code § 8-101 *et seq*. (hereinafter "Admin. Code," also known as the New York City Human Rights Law) echoes the provisions of the New York State Human Rights Law with respect to protections against discrimination in leasing housing to people with disabilities.  Admin. Code § 8-107(5)(a).

### Rental Assistance Programs

There are rental assistance programs administered by the federal, state, and local governments.  The most well-known is the federal Section 8 program.  Of relevance herein is the City Family Eviction Prevention Supplement ("CityFEPS"), a City rental assistance program administered by the New York City Human Resource Administration ("HRA").

The rules governing the CityFEPS program are set forth in Title 68 of the Rules of the City of New York ("RCNY") §§ 8-01 *et seq*..  The rules include the following chart setting forth the maximum rent that is permissible for a unit to be rented by a CityFEPS recipient, including the portion of the rent for which the recipient is responsible:

§ 8-05 Maximum Rents and Calculation of Monthly Program Participant Contributions and Rent Supplement Amounts.

(a) Except as otherwise provided in this section, at the time of approval pursuant to paragraph (2) of subdivision (a) of

68 RCNY §8-03 or 8-04, the maximum CITYFEPS rent supplement amount and the maximum rent towards which CITYFEPS rent supplements may be applied shall not exceed the amounts set forth in the table below.

| Household Size | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| Maximum Rent | $1,213 | $1,268 | $1,515 | $1,515 | $1,956 | $1,956 | $2,197 | $2,197 |
| Maximum CITYFEPS Rent Supplement | $936 | $985 | $1,115 | $1,065 | $1,455 | $1,432 | $1,651 | $1,651 |

## Source of Income Protections

As cited hereinabove, the New York State Human Rights Law prohibits housing discrimination based on any lawful source of income.  Exec. Law § 291(2-a)(a) & (b).

The New York City Human Rights Law also prohibits housing discrimination based on any lawful source of income.  Admin. Code § 8-107(5) provides as follows:

(a) It shall be an unlawful discriminatory practice for the owner . . .  or other person having the right to sell, rent or lease or approve the sale, rental or lease of a housing accommodation . . .or any agent or employee thereof:

(1) Because of . . .  of any lawful source of income of such person. . .

(a) To refuse to sell, rent, lease, approve the sale, rental or lease or otherwise deny to or withhold from any such person or group of persons such a housing accommodation or an interest therein;

(b)  To discriminate against any such person or persons in the terms . . .of the sale, rental or lease of any such housing accommodation . . .in the furnishing of facilities or services in connection therewith; …

* * *

(c) It shall be an unlawful discriminatory practice for any real estate broker, real estate salesperson or employee or agent thereof:

(1) To refuse to sell, rent or lease any housing accommodation. . .or otherwise to deny or withhold any housing accommodation. . .because of any lawful source of income of such person. . .

The NYCHRL defines "lawful source of income" in § 8-102(25) as follows:

City's Memorandum of Law in Support of
Summary Judgment                           - 10 -

The term "lawful source of income" shall include income derived from social security, or any form of federal, state or local public assistance or housing assistance including section 8 vouchers.

## SUMMARY JUDGMENT STANDARD

To be entitled to summary judgment, the movant must show that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. FRCP 56(a). Because plaintiff bears the burden of proof at trial, the City is entitled to summary judgment where "there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). To defeat the City's summary judgment motion, plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Nor can a plaintiff "rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Rather, as to each of her claims, when opposing a motion for summary judgment, plaintiff must submit competent evidence establishing a genuine issue of material fact warranting a trial. *Celotex Corp., supra* at 322-24

HPD had a limited role when reviewing plaintiff's application file *after* Phipps had offered her a one-bedroom affordable set-aside unit *and* she had accepted that offer. In light of that sequence of events, plaintiff cannot show that HPD violated her right not to be discriminated against on the basis of her son's disability or the source of her income being, in part, a rent voucher. HPD's review of her application file showed that it was in compliance with all applicable rules and offended no anti-discrimination laws. The fact that Phipps offered plaintiff a one-bedroom unit rather than the two-bedroom unit she wanted did not constitute a violation of her rights. The fact that she wanted a two-bedroom unit rather than a one-bedroom unit was completely unknown to HPD. Nothing in her application file signaled that she believed

she was being discriminated against by that offer and would later bring such a claim against HPD.  The offer of a one-bedroom affordable set-aside unit did not violate any rule applicable to the subject development.

**ARGUMENT**

**POINT I**

**HPD TOOK NO PART IN PHIPPS'S DECISION TO OFFER PLAINTIFF A ONE-BEDROOM UNIT (4B-N) RATHER THAN A TWO-BEDROOM UNIT, AND THEREFORE CANNOT BE FOUND TO HAVE DISCRIMINATED AGAINST PLAINTIFF.**

The instant case presents no disputable issues of fact.  It is undisputable that defendant Phipps Houses Services was the marketing agent[7] for the subject development and was responsible for the initial lease-up of the affordable units in conformance with the Regulatory Agreement (Exhibit 2 at 7, ¶ 11, and at 12, ¶ 21).[8]

The accompanying declaration of HPD's Director of the Marketing and Affordability Oversight Program, Monica Morgan, sets forth her role in 2017 as the project manager who reviewed the application files by Phipps for the initial lease-up of the subject development.  She received plaintiff's application file with Unit 4B-N already designated as the unit being offered to plaintiff.  She states that she plays no part in the decisions of a marketing agent regarding which units to offer to which applicants (Morgan Dec. ¶¶ 27, 33, 50).  She only reviews those decisions after the fact to ensure compliance with the Marketing Handbook and other applicable anti-discrimination laws (Morgan Dec. ¶¶ 14, 21, 33, 42, 53, 54).

---

[7] The marketing agent is referred to in the Regulatory Agreement as the "Administering Agent for the Affordable Housing Units."   "Administering Agent" is defined in Zoning Resolution § 23-911.

[8] All exhibits referenced herein are annexed to the accompanying Moed Declaration.

Plaintiff alleges that she met with a Phipps staff member on August 21, 2017 and had subsequent contact with Phipps about her pending application (Amended Complaint [Doc. No. 48] ¶¶ 13, 20).   At her deposition, she identified her Phipps contact person as "Nicky" (Exhibit 17 throughout, e.g. at 34, 36, 63, 81, 82, 85, 86, 87, 91), who has since been identified by Phipps as one of its employees, Nickeisha Smith Silvera.   Plaintiff recounts the supposed content of various conversations with Nicky regarding the availability of an affordable two-bedroom set-aside unit and then about its unavailability.  *Id.*  She does not allege, nor did she testify at her deposition that she spoke to anyone from HPD during the application process. Plaintiff first contacted Sanja Stegich, then HPD's Disability Services Facilitator who used an office title of "ADA Coordinator," by email dated May 21, 2018, six months after she moved into the subject development about her dissatisfaction with the one-bedroom affordable set-aside unit in which she was living (Exhibit 13).

It is indisputable that HPD did not make the decision challenged herein by plaintiff, and thus the City cannot be liable for the discrimination that plaintiff claims infected the offer to her by Phipps of a one-bedroom affordable unit that had been set aside for someone with vision or hearing impairments rather than a two-bedroom unit set aside for someone with mobility impairments.

## POINT II

### HPD'S REVIEW OF ITS RECORDS REGARDING THE INITIAL LEASE-UP OF THE SUBJECT DEVELOPMENT SHOWS COMPLIANCE WITH THE APPLICABLE ANTI-DISCRIMINATION PROVISIONS.

Even though plaintiff's Amended Complaint describes her application as having been handled by Phipps and not by HPD, plaintiff nonetheless claims that HPD is responsible for

supposedly failing to prevent Phipps from supposedly discriminating against her and her son. Plaintiff alleges that HPD failed to properly ensure that the subject development was in compliance with the applicable provisions of law that protect disabled people from exclusion from housing (Amended Complaint [Doc. No. 48] ¶¶ 31, 34, 36, 44; letter dated March 17, 2021 [Doc. No. 71] at 2).

However, HPD's records regarding the initial lease-up of the subject development do not show discrimination against plaintiff or her son.  HPD's Director of the Marketing and Affordability Oversight Program, Monica Morgan, reviewed the application records provided by Phipps to HPD and has found them to demonstrate compliance with the applicable anti-discrimination provisions.

When she was the Project Manager for the initial lease-up of the subject development, Ms. Morgan reviewed plaintiff's application file to ensure that her household size fit the unit size being offered, and that plaintiff's application contained the required disability verification forms, since the unit being offered was a disability set-aside unit.  Plaintiff's application file included a rent voucher to assist her in paying her rent, and thus plaintiff's income did not have to be reviewed by Ms. Morgan in reliance on the voucher having been reviewed by the marketing agent and having been found to be sufficient.

There was nothing in plaintiff's file that signaled that any discrimination had occurred:  plaintiff and her son were being offered a one-bedroom affordable set-aside for which they qualified on the basis of plaintiff's son's disabilities (Morgan Dec. ¶¶ 33, 42).  There are no guidelines in the Marketing Handbook (Exhibit 4 at 53, § 5-7) that caused Ms. Morgan to question the fact that plaintiff was going to share a one-bedroom with her son.  Morgan Dec. ¶¶ 43-44.

**A.**     **HPD records show no violation by Phipps of Section 504 or the ADA.**

       The standard for setting forth a violation of the Rehabilitation Act and the ADA

are set forth in *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1037 (S.D.N.Y. 1995) as follows:

> The requirements for stating a claim under the ADA are virtually
> identical to those under § 504 of the Rehabilitation Act [citations
> omitted].  Stated in the ADA's terms, a plaintiff is expected to
> show that: (1) he or she is a "qualified individual with a disability";
> (2) he or she is being excluded from participation in, or being
> denied the benefits of some service, program, or activity by reason
> of his or her disability; and (3) the entity which provides the
> service, program or activity is a public entity. *See Ellen S. v.
> Florida Board of Bar Examiners,* 859 F. Supp. 1489, 1492-93 &
> n.4 (S.D. Fla. 1994); *People First of Tennessee v. Arlington
> Developmental Center,* 878 F. Supp. 97, 100 (W.D. Tenn. 1992);
> …

       HPD does not dispute that plaintiff's son qualifies as an individual with a

disability.  In response to plaintiff's claim that HPD has violated the Rehabilitation Act or the

ADA on the basis of having been responsible for reviewing the application files for the initial

lease-up of the subject development, HPD does not dispute that it is a public entity and that its

review of application files for City-assisted housing falls within the parameters of providing a

"service, program, or activity" within the meaning of the Rehabilitation Act.

       However, it is indisputable that plaintiff and her son were not denied the benefit

of said "service, program, or activity" by reason of her son's disability or any other reason.  To

the contrary, she and her son were offered an affordable set-aside unit at the subject

development, which offer plaintiff accepted.  Thus, plaintiff's allegation of discrimination

against her and her son by Phipps and/or HPD on the basis that her son was disabled is meritless

on its face.

       Review of the application files sent to HPD shows that each of the six applicants

(including plaintiff) to whom Phipps offered set-aside units submitted sufficient paperwork

attesting to their disabilities. Morgan Dec. ¶ 35 and Exhibits 11 and 12. Thus HPD had no reason to believe that Phipps discriminated against disabled applicants in leasing-up the subject development.

**B.     HPD records show no violation by Phipps of the Fair Housing Act.**

The standard for setting forth a violation of the Fair Housing Act is set forth in *Cales v. New Castle Hill Realty*, 2011 U.S. Dist. LEXIS 9619, at *13-15 (S.D.N.Y. Jan. 31, 2011) as follows:

> Under *McDonnell Douglas* [*Corporation v. Green*, 411 U.S. 792, 798 (1973)], a plaintiff bears the initial burden of establishing a prima facie case of discrimination through direct or circumstantial evidence. *Windham v. Time Warner, Inc.*, 275 F.3d 179, 187 (2d Cir. 2001). Plaintiffs may establish a prima facie case of housing discrimination by showing (1) that they are members of a protected class; (2) that they sought and were qualified to rent or purchase the housing; (3) that they were rejected; and (4) that the housing opportunity remained available to other renters or purchasers. *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003).

It is not necessary herein to set forth the burden shifting process, as plaintiff cannot make out a *prima facie* case of discrimination in that she was not rejected but was offered (and accepted) a rental unit.

**C.     HPD records show no discrimination by Phipps on the basis of plaintiff's use of a rent voucher.**

Review of the application files sent to HPD shows that five of the six applicants who were given affordable set-aside units (including plaintiff) indicated that they would be using rent vouchers for at least part of the rent on their units (Morgan Dec. ¶¶ 41 and 54; Exhibit 9). Plaintiff complains that Phipps misinterpreted the amount of her CityFEPS rent voucher and allegedly deemed it insufficient for the rent on a two-bedroom unit (letter dated November 19, 2020 [Doc. No. 45]; Amended Complaint [Doc. No. 48] ¶¶ 17, 26, 35). Without addressing the

merits of Phipps's assessment of plaintiff's rent voucher (an assessment in which no City employee took part), that assessment does not implicate the prohibition against source of income discrimination, which, of relevance herein, prohibits discrimination based on the fact that an applicant will be using a rent voucher rather than salary or wages to pay the rent. It is indisputable that no source of income discrimination occurred here, as Phipps offered units to applicants, including plaintiff, who were going to use rent vouchers. Morgan Dec. ¶¶ 38-41.

**D.    HPD records show that the subject development is in compliance with Section 504's requirement for providing set-aside units, including affordable set-aside units.**

Plaintiff alleges that HPD has failed to ensure that the subject development is in compliance with the provisions of Section 504 regarding the number of affordable set-aside units that must be included in the development (Amended Complaint [Doc. No. 48] ¶¶ 8-9, 32, 38, 41-44; letter dated March 17, 2021 [Doc. No. 71] at 2).

The subject development was required, pursuant to Section 504 of the Rehabilitation Act, to set aside 5% of its units for people with mobility impairments and 2% of its units for people with either hearing or vision impairments. An architect acting on behalf of the development's owner filed with the HPD Division of Building and Land Development Services both pre-construction and post-construction accessibility statements bearing the seal of an architect attesting to the fact that the development met the requirements for setting aside units for people with disabilities and other accessibility design requirements (Exhibits 6 and 7). According to both of those statements, the entire development of 312 rental units contained twenty units set aside for people with mobility impairments, and eight units set aside for people with vision or hearing impairments. Other documents submitted to HPD confirmed that the subject development contained the required number of set-asides: four for people who had mobility impairments and two for people who had vision or hearing impairments. See the

City's Memorandum of Law in Support of
Summary Judgment                              - 17 -

accompanying Declaration of Rona Reodica, HPD's Assistant Commissioner for the Division of Building and Land Development Services, ¶ 14.  See also Exhibits 9 and 10.

It was proper for HPD to rely on the documents that were submitted to it by the developer's architect that attested to said compliance and draw the conclusion that the subject development was in compliance with all applicable laws regarding access to disabled people. Given that architects have the primary responsibility for designing developments to be compliant with those provisions, it was proper and sufficient for HPD to rely on the attestation of the development's architect, upon which he placed his seal.  HPD also relied on the architectural plans that were approved by the New York City Department of Buildings and the Temporary Certificate of Occupancy issued by that agency (Exhibit 7).

## POINT III

**HPD PLAYS NO ROLE IN THE MANAGEMENT OF A PRIVATELY OWNED DEVELOPMENT AND CANNOT PROVIDE PLAINTIFF WITH AN AFFORDABLE TWO-BEDROOM SET-ASIDE UNIT OUTSIDE OF THE LOTTERY PROCESS.**

After the initial lease-up of a City-assisted development, HPD exercises no further control over the management of the development, which is privately owned and operated in the same manner as any other privately-owned housing development.  Plaintiff has at times asked HPD to provide her and her son with a two-bedroom unit at the subject development (e.g., letter efiled on August 10, 2021 [Doc. No. 93] at 2), and faults HPD for failing to provide her with such a unit (Amended Complaint [Doc. No. 48] ¶¶ 37-38) but HPD has no authority or power whatsoever to allocate units at a privately owned development outside of the lottery process.

**POINT IV**

**THIS COURT SHOULD DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE LAW CLAIMS.**

As is argued above, this Court should grant the City's motion for summary judgment and dismiss all of the federal claims against it.   Accordingly, under 28 U.S.C. § 1367(c)(3), in the absence of a federal claim, this Court should decline to exercise jurisdiction over the state law claims in the complaint.  *Pitchell v. Callan*, 13 F.3d 545, 549 (2d Cir. 1994) ("it is axiomatic that a court should decline to exercise jurisdiction over state-law claims when it dismisses the federal claims").

Furthermore, plaintiff's claims under the New York State and New York City Human Rights Laws must fail for the same reasons plaintiff's federal claims fail:  the undisputed facts demonstrate that plaintiff's claims against the City fail as a matter of law.

City's Memorandum of Law in Support of
Summary Judgment                                        - 19 -

## **CONCLUSION**

Plaintiff has produced no evidence that rebuts the indisputable evidence that the City, through its agency HPD, did not make the application determination that plaintiff claims was discriminatory.  The challenged determination to offer plaintiff an affordable one-bedroom unit that had been set aside for an occupant with a visual or hearing disability was made by defendant Phipps.  Furthermore, on its face, that determination was not discriminatory on the basis of disability or source of income.  HPD acted properly in deeming plaintiff's application file to be in compliance with all applicable laws and rules and to tell Phipps that it could proceed with leasing that unit to plaintiff.

Dated:        New York, New York
              November 15, 2021

                                        GEORGIA M. PESTANA
                                        Corporation Counsel of the
                                          City of New York
                                        Attorney for Defendant City of New York


                                        By:    _____/s_____
                                               LOUISE MOED, Assistant Corporation
                                               Counsel
                                               Admin Law & Reg. Litig.
                                               100 Church Street
                                               New York, NY  10007
                                               (212) 356-2180
                                               LMOED@LAW.NYC.GOV

MICHELLE GOLDBERG-CAHN,
AVE MARIA BRENNAN,
LOUISE MOED,
    Of Counsel.