UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BERNADETTE SKORUPSKA,

                              Plaintiff,

                    -v.-

525 WEST 52 PROPERTY OWNER LLC,
CITY OF NEW YORK, PHIPPS HOUSES
SERVICES, INC., and TACONIC
MANAGEMENT COMPANY LLC,

                              Defendants.[1]

20 Civ. 2831 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

At its core, this is a case about bureaucratic negligence, but as
understandably frustrating as that negligence was, it did not amount to
discrimination.  Plaintiff Bernadette Skorupska, who is proceeding *pro se*, is
the mother of a young child with mobility and vision impairments.  In 2017,
Plaintiff and her son were selected from a pool of more than 75,000 lottery
applicants to receive a one-bedroom apartment in a Manhattan apartment
building.  While Plaintiff believed that the apartment would be too small to
meet her son's medical needs, she felt she had no choice but to accept it after
being told that there were no larger units available.  Plaintiff's intuition was
confirmed soon after she and her son moved into the building, as the
apartment lacked sufficient space to store her son's medical equipment or to
allow him to receive the treatments and therapies that he needed.  These
circumstances led Plaintiff to request a transfer to a two-bedroom apartment,

---

[1]        The Clerk of Court is directed to amend the caption as set forth herein.

to undertake an investigation into the process through which she was awarded her apartment, and ultimately to move out of the apartment in search of suitable housing for her and her son.

This case follows from Plaintiff's investigation. Plaintiff brings this suit against 525 West 52 Property Owner LLC ("525 West 52"); Taconic Management Company LLC ("Taconic," and together with 525 West 52, the "Taconic Defendants"); Phipps Houses Services, Inc. ("PHSI"); and the City of New York (the "City," and collectively, "Defendants"), alleging that Defendants impermissibly refused to provide her and her son with a two-bedroom apartment and misled them as to the availability of such an apartment due to her son's disabilities and her use of public housing vouchers. Based on these alleged acts, Plaintiff asserts claims under the Fair Housing Act (the "FHA"), 42 U.S.C. §§ 3601-3619; Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 794(a); the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. ch. 126; the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law §§ 290 to 301; and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code §§ 8-101 to 8-134.

The Taconic Defendants, PHSI, and the City have filed separate motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, and retaining its dismay as to how Plaintiff was treated, the Court grants Defendants' motions in full.

## BACKGROUND[2]

### A.   Factual Background

### 1.   The Parties

Plaintiff is a single mother to a seven-year-old boy who has been
diagnosed with West Syndrome and a rare genetic mutation called SCN2A.

---

[2]  The facts set forth in this Opinion are drawn from Amended Complaint (Dkt. #48 ("Am.
Compl.")) and the parties' submissions in connection with Defendants' motions for
summary judgment.  As to this latter set of documents, the Court draws primarily from
Defendants' statements of undisputed material facts submitted pursuant to Local Civil
Rule 56.1 (Dkt. #113, 121, 132) and Plaintiff's opposition submissions (Dkt. #137, 138,
139).  While the Taconic Defendants, PHSI, and City each submitted separate Rule 56.1
statements, Defendants coordinated their statements so that the statements are
consecutively numbered and do not overlap.  The Court therefore cites to these
statements collectively as "Def. 56.1 ¶ [ ]."  Citations to a party's Rule 56.1 Statement
incorporate by reference the documents cited therein.  Separately, the Court sources
additional facts from the declarations submitted by Defendants and the exhibits
attached thereto, which are cited using the convention "[Name] Decl., Ex. [ ]."  The
Court draws heavily from the transcripts of Plaintiff's depositions on July 23, 2021, and
August 3, 2021.  (Dkt. #117-1, 2).  Plaintiff's deposition transcripts are also
consecutively paginated, and the Court cites to them using the convention "Pl. Dep."
Lastly, the Court considers Plaintiff's exhibits submitted in opposition to Defendants'
motions, which exhibits are cited using the convention "Pl. Ex."  (*See* Dkt. #166, 167).

Local Rule 56.1 requires that "[t]he papers opposing a motion for summary judgment
shall include a correspondingly numbered paragraph responding to each numbered
paragraph in the statement of the moving party," Local Civil Rule 56.1(b), and that each
statement "be followed by a citation to evidence which would be admissible, set forth as
required by Fed. R. Civ. P. 56(c)," Local Civil Rule 56.1(d).  The rule further provides
that "[e]ach numbered paragraph in the statement of material facts … will be deemed to
be admitted for purposes of the motion unless specifically controverted by a
correspondingly numbered paragraph in the statement required to be served by the
opposing party."  Local Civil Rule 56.1(c).  While "[*p*]*ro se* litigants are … not excused
from meeting the requirements of Local Rule 56.1," the Court retains discretion "to
consider the substance of the plaintiff's arguments" even where there is incomplete
compliance with the rule.  *See Wali* v. *One Source Co.*, 678 F. Supp. 2d 170, 178
(S.D.N.Y. 2009) (internal citations omitted); *see also Holtz* v. *Rockefeller & Co.*, 258 F.3d
62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to
point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an
assiduous review of the record even where one of the parties has failed to file such a
statement." (internal quotation marks omitted)); *accord Kennedy* v. *Arias*, No. 12 Civ.
4166 (KPF), 2017 WL 2895901, at *4 (S.D.N.Y. July 5, 2017) (collecting cases).  The
Court has done so here.

For ease of reference, the Court refers to the briefs submitted by the Taconic
Defendants, PHSI, and the City in support of their motions for summary judgment as,
respectively, "Taconic Br." (Dkt. #112), "PHSI Br." (Dkt. #120), and "City Br." (Dkt.
#128).  The Court refers to Plaintiff's submissions in opposition to the motions filed by
the Taconic Defendants, PHSI, and the City as, respectively, "Pl. Taconic Opp." (Dkt.

(Am. Compl. ¶ 1).  Plaintiff's son has a range of severe disabilities, including epilepsy, muscle disorders, gastric abnormalities, severe developmental delays, sensory disorder, and immunological complications.  (*Id.*).  As a result of these conditions, Plaintiff's son is non-ambulatory, non-verbal, and suffers from peripheral vision loss.  (*Id.*).  Plaintiff's son requires 24-hour care, home-based therapies, and several drug treatments (*id.* at ¶ 2), as well as supportive equipment such as an adaptive stroller, a stander, a bath chair, and more (*id.* at ¶ 3).  Ideally, Plaintiff's son would have a live-in caretaker, but Plaintiff has been unable to secure such care due to a lack of space.  (*Id.* at ¶ 4).

From about November 4, 2017, to about December 31, 2020, Plaintiff and her son lived in an apartment building located at 525 West 52nd Street, New York, New York (the "Building").  (Def. 56.1 ¶ 1).[3]  525 West 52, together with its affiliate 525 West 52 LI Property Owner LLC, owns the Building.  (*Id.* at ¶¶ 5, 31).  525 West 52 contracted with Taconic to manage the Building.  (*Id.* at ¶ 32).  PHSI marketed and leased the Building's affordable housing units.  (*Id.* at ¶ 34).  New York City's Department of Housing Preservation and Development ("HPD") provided financing for the Building and oversaw the leasing of the Building's affordable apartments.  (*Id.* at ¶ 31).

---

#138), "Pl. PHSI Opp." (Dkt. #137), and "Pl. City Opp." (Dkt. #139).  Finally, the Court refers to the reply briefs submitted by the Taconic Defendants, PHSI, and the City in further support of their motions as, respectively, "Taconic Reply" (Dkt. #146), "PHSI Reply" (Dkt. #150), and "City Reply" (Dkt. #153).

3       The parties are somewhat inconsistent as to the exact date on which Plaintiff left the apartment, alternating between December 31, 2020, and January 1, 2021.  (*Compare* Def. 56.1 ¶ 1 (December 31, 2020), *with id.* at ¶ 76 (January 1, 2021)).  Because the inconsistency is immaterial, the Court will refer to December 31, 2020, as Plaintiff's final day in the Apartment.

### 2.      The Building

The Building is a residential apartment building that has commercial
and retail spaces on its ground floor.  (Def. 56.1 ¶ 2).  At a more granular level,
the Building is divided into five condominium units: (i) one affordable
residential unit, which contains 79 apartments; (ii) one market-rate residential
unit, which contains 313 apartments; (iii) one retail unit; and (iv) two
commercial units.  (*Id.* at ¶ 4).  The market-rate and affordable residential units
(the "Residential Units") are privately owned and not open to the public.  (*Id.* at
¶ 7).  Access to the Residential Units is restricted to the apartments' tenants,
their invitees, and staff hired by Taconic.  (*Id.* at ¶¶ 7, 9).  The retail and
commercial units, by contrast, are accessible to the public.  (*Id.* at ¶ 8).

### 3.      The Building's Affordable Apartments

On May 4, 2015, 525 West 52 and the City entered into a Regulatory
Agreement.  (Def. 56.1 ¶ 33; *see also* Snyder Decl. (Dkt. #117), Ex. F
("Regulatory Agreement")).  Pursuant to the Regulatory Agreement, the City
agreed to provide financing for the Building through HPD's Inclusionary
Housing Program and the New York State Housing Finance Agency's Low
Income Housing Tax Credit Program in exchange for 525 West 52's promise to
set aside 79 affordable apartments in the Building.  (Def. 56.1 ¶¶ 33, 106; *see
also* Regulatory Agreement § 2(i)).[4]  The Regulatory Agreement further provided
that five percent of the affordable apartments were to be set aside for people

---

[4]      The Regulatory Agreement defines "affordable" units with reference to New York City's
Zoning Resolution 23-911.  (Def. 56.1 ¶ 106; *see also* Regulatory Agreement, Recitals).

with mobility impairments and two percent of the units were to be set aside for people with vision or hearing impairments.  (Def. 56.1 ¶ 107).  In effect, this latter requirement mandated that six of the 79 affordable apartments were to be set aside for people with disabilities.  (*Id.* at ¶ 44).  Of the six disability set-aside units, four were to be reserved for households that included a person with a mobility disability (comprising three two-bedroom apartments and one one-bedroom apartment) and two were to be reserved for households that included a person with a hearing or vision disability (comprising one two-bedroom apartment and one one-bedroom apartment).  (*Id.* at ¶ 45).

### 4.     The Building's Affordable Housing Lottery

Due to the complexity of the rules governing the leasing of affordable housing in the City, the Taconic Defendants hired PHSI to market and lease the Building's 79 affordable apartments.  (Def. 56.1 ¶¶ 10, 34).  PHSI was responsible for marketing the Building (*id.* at ¶ 34), as well as screening and selecting applicants for the affordable apartments (*id.* at ¶¶ 34, 104).  In discharging these responsibilities, PHSI was required to follow the policies and procedures for resident selection and occupancy established by HPD and the New York City Housing Development Corporation in their Marketing Handbook (the "Handbook").  (*Id.* at ¶¶ 48, 109; *see also* Snyder Decl., Ex. I (Handbook)).  PHSI was also required to secure HPD's final approval before leasing an affordable apartment in the Building.  (Def. 56.1 ¶ 73).

To select residents for the Building's affordable apartments, PHSI conducted a lottery with the assistance of HPD.  (Def. 56.1 ¶ 38).  In

connection with this lottery, PHSI received 75,321 applications for the Building's 79 affordable units.  (*Id.* at ¶ 40).  HPD, for its part, collected the applications, randomly mixed them, assigned each a number, generated an Excel master log of the applications listed according to their numbers, and sent the master log to PHSI.  (*Id.* at ¶¶ 41-42).  PHSI then processed the applications in accordance with the Handbook.  (*Id.* at ¶¶ 42, 48).

The Handbook supplied several rules that guided PHSI's review of the applications.  The Handbook provided that PHSI was required to "offer units only to applicants who meet eligibility requirements, and only in numbered order from the lottery log (after first processing applicants for set-asides and preferences), for whom units of appropriate size are available."  (Def. 56.1 ¶ 50 (quoting Handbook 24); *see also id.* at ¶ 110 (explaining that this version of the Handbook was in effect at the time of Plaintiff submitted her application)).  In other words, PHSI was required to review applications one-by-one, beginning with the application with the lowest log number and working its way up until all 79 affordable apartments were leased.  (*See id.* at ¶ 43).  The Handbook also stated that "[i]f an applicant meets eligibility requirements for more than one available unit type in a project, the Marketing Agent must make the applicant aware of all available unit types for which the applicant is eligible, and offer to the applicant the opportunity to select the unit type."  (Handbook 24).

One of the eligibility requirements PHSI was charged with enforcing was a minimum income requirement.  (*See* Snyder Decl., Ex. D ("Silvera Dep.") at 34:9-11).  To evaluate compliance with this requirement, PHSI required all

applicants to submit financial documents evidencing their income level.  (*Id.*).

Many applicants, including Plaintiff, relied on vouchers to satisfy the income

requirement.  (*See* Am. Compl. ¶ 14).  When an applicant submitted a voucher

to establish his or her income, PHSI would look solely to that voucher to decide

whether the applicant could afford a particular apartment; the applicant's

other income would not factor into its evaluation.  (Silvera Dep. 35:2-5, 16-21).

Put differently, when an applicant submitted a voucher with his or her

application, PHSI would determine whether the applicant's voucher alone was

sufficient to cover the rent for a particular apartment.

PHSI also ran background and credit checks on applicants to evaluate

their rent payment, housing court, and credit histories.  (Def. 56.1 ¶¶ 86, 88).

To generate these credit checks, PHSI used an online platform called On-Site.

(*Id.* at ¶ 87).  On-Site required PSHI to input a monthly rent before it would

create a credit report (*id.* at ¶ 90), and it would then use that rent figure to

calculate the applicant's "annual income to rent ratio" (*id.* at ¶ 89).  While PHSI

used the background and credit reports to evaluate applications, it avers that it

did not consider the income-to-rent ratios when reviewing applications.  (*Id.*).

Separately, PHSI required applicants who sought one of the six

affordable apartments that had been set aside for individuals with disabilities

to submit several third-party verifications attesting to those disabilities.  (Def.

56.1 ¶ 46).  These verifications included three separate forms: (i) a

"Certification of Eligibility for Disability Set Aside Unit" signed by the

household member who had the disability (or, such as in this case, by a parent

or legal guardian if the person with the disability was under 18) (the
"Certification"); (ii) a "Disabled Verification" signed by the applicant and a
diagnostician; and (iii) a "Verification of Mobility, Vision, or Hearing Disability"
filled out by a medical provider (the "Verification of Disability").  (Pl. PHSI
Opp. 10; *see also* Def. 56.1 ¶¶ 62-65).  When evaluating applications for the
disability set-aside units, PHSI reviewed the three verification forms but did not
evaluate or inquire into the medical severity of the applicants' disabilities.  (Def.
56.1 ¶ 47).  Nor was any preference or consideration given to the number or
severity of an applicant's disabilities.  (*Id.*).  PHSI determined only whether the
applicant's forms sufficiently demonstrated a qualifying disability.  (*Id.*).

 Once PHSI determined that an applicant met the relevant eligibility
requirements, it would then determine whether "units of appropriate size" were
available for that applicant.  (*See* Handbook 24).  When deciding whether a unit
was of "appropriate" size, the Handbook explained that, pursuant to guidance
from the United States Department of Housing and Urban Development
("HUD"), "[o]wners must avoid making social judgments on a family's sleeping
arrangement.  For example, it is not for the owner to determine whether a
young child can share a bedroom with a parent."  (Def. 56.1 ¶ 53).  Consistent
with guidance, the Handbook stated:

> to maximize the utilization of its affordable units …
> married or similarly committed couples are assumed to
> share one bedroom.  Apart from that, however, if a
> family (i) qualifies as a household … and (ii) qualifies by
> both number of persons and income for more than one
> unit size, then the family chooses the unit size.

(*Id.* at ¶ 54 (quoting Handbook 53)).

At the conclusion of the lottery process, after leases had been signed for all of the Building's affordable apartments, PHSI created and maintained a waiting list for applicants who had not been offered an apartment.  (Def. 56.1 ¶ 92).  This waiting list did not include tenants of the Building.  (*Id.*).

### 5.    Plaintiff's Apartment Application and Interview

In August 2016, Plaintiff submitted an apartment application to the Building's housing lottery on behalf of herself and her son.  (Def. 56.1 ¶ 55; Snyder Decl., Ex. K ("Application")).[5]  Plaintiff's application was assigned a log number of 5589.  (Def. 56.1 ¶ 57).  Ordinarily, given the relatively high log number assigned to it, Plaintiff's application would not have been considered and Plaintiff and her son would not have been offered any apartment in the Building.  (*Id.* at ¶ 58).[6]  Because Plaintiff applied for an apartment set aside for individuals with disabilities, however, her application was processed before applications with lower log numbers.  (*Id.*; *see also* Handbook 24 (providing that lottery applicants were to be reviewed in numerical order "after first processing applicants for set-asides and preferences")).

Plaintiff's application listed, among other things, a household income of $33,914.45, her source of income, and representations that her son had mobility and visual, but not hearing, impairments.  (Application at T00005-

---

[5]    Because Plaintiff's application contains certain sensitive information related to her and her son, the Court has restricted access to the exhibit to the parties and the Court.

[6]    To put a finer point on it, absent her son's disability, Plaintiff would not have been offered an affordable apartment in the Building unless at least 5,510 of the applicants with lower log numbers were deemed unqualified or declined an apartment.

T00008).  In a section titled "Reason for Moving," Plaintiff checked boxes corresponding to: (i) living with parents; (ii) bad housing condition; (iii) not enough space; (iv) health reasons; (v) disability access problems; (vi) increase in family size; and (vii) other.  (*Id.* at T00006).  Plaintiff elaborated in the "other" section that "my child is disabled and we need to move into a more convenient place where we at least have an elevator.  Currently we move from place to place, living with friends." (*Id.*).  Nowhere in the application was Plaintiff asked, nor did Plaintiff indicate, whether she and her son were seeking a studio, one-, or two-bedroom apartment.

As part of her application, Plaintiff also submitted disability verification documents that contained conflicting information as to the nature of her son's disabilities.  The Certification, which was signed by Plaintiff because her son was less than 18 years old, stated that her son had mobility, hearing, and vision disabilities.  (Def. 56.1 ¶ 63; *see also* Earle Decl. (Dkt. #118), Ex. A (copy of Certification)).  The Disabled Verification, which was signed by Plaintiff and her son's pediatrician, Dr. Joanna B. Lis, likewise reflected that Plaintiff's son had mobility, hearing, and vision impairments.  (Def. 56.1 ¶ 65; *see also* Earle Decl., Ex. B (copy of Disabled Verification); Pl. Dep. 51:20-22 (testifying that Dr. Lis was her son's doctor)).  By contrast, the Verification of Disability, which was signed only by Dr. Lis, reflected that Plaintiff's son had mobility and vision impairments, but did not have a hearing impairment.  (Pl. Ex. 3 at 2; *see also* Pl. PHSI Opp. 10).  While the parties to the instant case do not dispute that

Plaintiff's son had mobility and vision, but not hearing, impairments, they do not explain the discrepancy in Plaintiff's forms.

Of particular importance here, Plaintiff also submitted two voucher forms from the City's Family Eviction Prevention Services ("CITYFEPS") program in connection with her rental application.  CITYFEPS "helps eligible families with children at risk of entry to shelter and those already in shelter to secure permanent housing" by subsidizing their rent through rental vouchers.  (Earle Decl., Ex. C).  The first of the two CITYFEPS forms Plaintiff submitted was dated February 22, 2017, and stated that "[b]ased on his/her family composition, the maximum rent that [Plaintiff] is qualified for under CITYFEPS is $1213 per month."  (*Id.*).  By contrast, the second CITYFEPS form submitted with Plaintiff's application, dated April 27, 2017, stated that Plaintiff had been approved for assistance with her lease at an address located in Brooklyn, New York, with an "approved apartment rent" of $1,031.  (*Id.*, Ex. D).

When processing Plaintiff's application, PHSI claims to have relied on the more recent CITYFEPS form dated April 27, 2017.  (Def. 56.1 ¶ 69).  Based on the form's statement that Plaintiff's "approved apartment rent" was $1,031, PHSI determined that Plaintiff's rental voucher was sufficient to cover the $963 monthly rent for a one-bedroom affordable unit, but insufficient to cover the $1,166 monthly rent for a two-bedroom affordable unit.  (*Id.*).[7]  PHSI also ran a background check and credit report on Plaintiff to review her rent, housing

---

[7]     It is undisputed that if PHSI had relied instead on the CITYFEPS form dated February 22, 2017, Plaintiff would have been deemed qualified for the two-bedroom unit.  (*See* PHSI Reply Br. 4).

court, and credit histories.  (*See id.* at ¶¶ 88, 91).  To generate the report, PHSI

input Plaintiff's total annual income as $28,578.41 and used a rent figure of

$1,166 (the rent for a two-bedroom affordable apartment in the Building).  (*Id.*

at ¶ 91; Pl. Ex. 15).  These figures yielded an annual income-to-rent ratio of

24.51, which the report noted with an image of a thumbs-down.  (Pl. Ex. 15).[8]

On August 21, 2017, Nickeisha Silvera, PHSI's compliance specialist,

interviewed Plaintiff in connection with her application.  (Def. 56.1 ¶ 59).

During this interview, Plaintiff provided Silvera with several documents,

including the Certification, Verification of Disability, and several other

documents related to her son's medical needs.  (Pl. Dep. 83:17-84:9, 89:14-22).

Plaintiff also asked Silvera during this conversation "if there were two-bedroom

apartments available, and [Silvera] said yes, and that [her] application would

be filed for a two-bedroom apartment."  (*Id.* at 84:12-15).  Following the

interview, Plaintiff did not submit or receive any written confirmation that she

had applied for a two-bedroom apartment.  (*Id.* at 85:24-87:16).

About a month after Plaintiff's interview with Silvera, on September 18,

2017, PHSI submitted a memorandum that included Plaintiff's rental

application and related files to Victor Hernandez, HPD's former Director of

Marketing, for HPD's final review and approval.  (Def. 56.1 ¶ 72; *see also*

---

[8]     PHSI does not address why Plaintiff's credit check was run using a household income
figure of $28,578.41, rather than the $33,914.45 figure reported in Plaintiff's rental
application.  (*See* Application at T00004).  Plaintiff deduces that PHSI failed to include
her son's social security income, which amounted to $5060.04, contending that
"33914.4[5]-5060.04 = 28,578.41."  (Pl. PHSI Opp. 5).  In fact, however, this equation
yields $28,854.41.  It is thus unclear from where PHSI obtained the $28,578.41 figure.

Snyder Decl., Ex. K ("Memorandum")).  One of the forms included with the memorandum reflected that Plaintiff was eligible for a studio, one-bedroom, or two-bedroom apartment at 60% area median income, or "AMI."  (Memorandum at T00008).  Despite their eligibility for a larger apartment, a separate form, entitled "Applicant Information Form," recited that Plaintiff and her son had been assigned a one-bedroom apartment in the Building.  (*Id.* at T00004).

On the same date that Plaintiff's application was submitted to HPD, Silvera called Plaintiff and offered her Apartment 4B-N (the "Apartment"), a one-bedroom apartment that had been set aside for individuals with a vision or hearing disability.  (Def. 56.1 ¶¶ 70, 71).  Silvera explained during this call that there were no longer two-bedroom apartments available in the Building, and that the only available units were one-bedroom apartments.  (Pl. Dep. 91:17-24).  There is no evidence that Silvera stated or explained that Plaintiff's voucher had disqualified her and her son from receiving a two-bedroom apartment.  After Plaintiff told Silvera that she would "have to think about it" (*id.* at 91:25-92:2), Silvera responded, "Well, it's a nice building.  You live in the city" (*id.* at 92:3-4).  Plaintiff then asked Silvera, either during the same call or in a separate call made sometime thereafter, whether she could be placed on a waiting list for a two-bedroom apartment.  (*Id.* at 92:5-9, 94:23-95:3).  Silvera responded that there was no waiting list for the Building.  (*Id.* at 95:4-5).

Ultimately, HPD approved Plaintiff's application on September 21, 2017, Plaintiff signed the lease for the Apartment on October 27, 2017, and Plaintiff

14

and her son moved into the Apartment on November 4, 2017.  (Def. 56.1 ¶¶ 74-
75; Pl. Ex. 14; Snyder Decl., Ex. L (copy of lease)).

### 6.    The Building's Other Set-Aside Units

Plaintiff received one of the six apartments in the Building that were set
aside for people with disabilities.  The five other applicants who received set-
aside units were assigned log numbers 2239, 2911, 4382, 4723, and 5804.
(Def. 56.1 ¶ 78).  Plaintiff therefore had the second-highest (and thus the
second-worst) log number of the successful applicants.  (*Id.* at ¶ 82).  Each of
the five other successful applicants submitted third-party verifications
confirming that at least one member of their household had a disability (*id.* at
¶ 79), and four of the five applicants were (like Plaintiff) voucher recipients (*id.*
at ¶ 80).  More specifically, each of the three applicants who received two-
bedroom set-aside apartments were voucher recipients.  (*Id.* at ¶ 81).

As the only successful applicant with a higher log number than Plaintiff,
the applicant assigned log number 5804 features prominently in this case.
This applicant, like Plaintiff, was a voucher recipient and had a household
member with a mobility impairment.  (Def. 56.1 ¶¶ 83, 84; Earle Decl., Ex. E at
000297).  Unlike Plaintiff, however, the applicant received a two-bedroom
apartment.  (Earle Decl., Ex. E at 000297).  The applicant was interviewed by
PHSI on August 10, 2017, had his or her application submitted to HPD on
September 19, 2017 (*i.e.*, the day after PHSI interviewed Plaintiff and submitted
her application to HPD); had his or her application approved by HPD on

September 29, 2017 (*i.e.*, one week after HPD approved Plaintiff's application); and signed the lease for the apartment on October 10, 2017.  (Pl. Ex. 14).[9]

### 7. Plaintiff's Transfer Request

Plaintiff knew before moving into the Apartment that "it would not adequately serve [her or her son's] needs," but "took the limited option which was offered to [her] family[.]"  (Am. Compl. ¶ 22).  As expected, Plaintiff and her son soon confirmed that the Apartment was too small to meet their needs.  For instance, Plaintiff's son requires equipment "such as a feeding chair, gait trainer and … bed," but the Apartment was too small to fit this equipment. (*Id.*).  The lack of space required Plaintiff and her son share the bedroom and made it "impossible to meet his needs and for [Plaintiff] to rest."  (*Id.*).

On June 24, 2018, Plaintiff sent an email to Agim Duraku, a Taconic employee, requesting that she and her son be transferred from the Apartment to a two-bedroom apartment.  (Def. 56.1 ¶ 22; *see also* Schwartz Decl. (Dkt. #111), Ex. 3 (copy of email chain)).  Plaintiff's email reads in part:

> [I]n November I and my 5 year old boy … moved into a one bedroom apartment at [the Building] through New York City Affordable Housing Lottery.  My son is disabled, he is non-verbal and non-ambulatory.  We initially asked for a two bedroom unit and we were told it is a possibility, however at the time when our application was complete we were told there were no 2 bedroom units available and we opt for one bedroom unit.  The building is beautiful and the neighborhood is great, however it has become apparent with the amount

---

[9]     HPD's director of marketing, Monica Morgan, stated at her deposition that the dates reflected in HPD's paperwork are not exact and are subject to a "margin of error" of "a couple of days."  (Snyder Decl., Ex. C at 142:3-8; *see also id.* at 142:13-143:6 (explaining the source of this potential error)).

of equipment and services my son requires we need to
move into a larger unit.

(Schwartz Decl., Ex. 3).  Plaintiff went on to state in her email that she had

spoken to several people who had told her, in effect, that Taconic was

responsible for deciding whether to transfer her and her son to a bigger unit,

but that a transfer would only be possible if such a unit were available at the

time.  (*Id.*).  Plaintiff concluded her email by stating that she "would like to

make a formal request for an accommodation that our situation calls for."  (*Id.*).

Duraku responded to Plaintiff's email the following day, stating: "I see

that you're already on the waiting list for the next available 2BR unit.  You are

also the first and only at the moment.  You will be notified as soon as a 2BR

unit has become available."  (Schwartz Decl., Ex. 3).  The email chain

concludes with Plaintiff's responsive email thanking Duraku.  (*Id.*).

From June 24, 2018, when Plaintiff requested to transfer apartments, to

December 31, 2020, when Plaintiff voluntarily moved out of the Building, no

affordable two-bedroom apartments became available in the Building.  (Def.

56.1 ¶ 25).[10]  All 21 affordable two-bedroom apartments in the Building have

been continuously occupied by their original tenants since before Plaintiff made

her transfer request.  (*Id.* at ¶ 26)  Thus, while the Taconic Defendants never

withdrew or modified their offer to place Plaintiff on the waiting list for the next

---

[10]      In fact, no such apartments had become available by the date the Taconic Defendants
submitted their motion for summary judgment.  (Def. 56.1 ¶ 25).

available affordable two-bedroom apartment, Plaintiff would not have received

such an apartment even if she had not left the Building.  (*Id.* at ¶ 28).

### 8.    Plaintiff's Federal and State Discrimination Complaints

In May 2019, Plaintiff filed a housing discrimination complaint with HUD

and a verified complaint with the New York State Division of Human Rights

("DHR").  (Moed Decl. (Dkt. #124), Ex. 14).  Plaintiff's complaints set forth the

same core allegations that she levies in this case, charging Defendants with

discriminating against her based on her son's disability and, at least arguably,

based on her use of CITYFEPS rental vouchers.  (*Id.* at 3-6).

DHR issued a decision on Plaintiff's complaint on November 1, 2019,

stating that "[a]fter investigation, and following opportunity for review of related

information and evidence by the named parties, [DHR] has determined that

there is NO PROBABLE CAUSE to believe that [Defendants] have engaged in or

are engaging in the unlawful discriminatory practice complained of."  (Moed

Decl., Ex. 16 at 1).  As to Plaintiff's claim of discrimination, DHR found that "it

does not appear that [Plaintiff] was subjected to discrimination ... because [she]

did not qualify for a two-bedroom apartment based on her total household

income. ... [Plaintiff's] housing voucher of $1,031 was not enough to cover the

rent for an affordable two-bedroom unit."  (*Id.* at 2).  DHR also noted with

respect to this claim that PHSI represented during DHR's investigation that "at

the time [Plaintiff] was offered the one-bedroom unit all of the two-bedroom

disability set aside units had already been offered to other tenants in its log"

and therefore that "even if [Plaintiff] had qualified for a two bedroom unit at the

time her application was reached, none were available." (*Id.* at 3).[11]

Separately, with respect to Plaintiff's claim that she had been denied a

reasonable accommodation, DHR found that Defendants "engaged in an

interactive process to try to accommodate [Plaintiff] and placed her on a waitlist

and she is the first in line for a two-bedroom apartment." (*Id.* at 3). Lastly,

DHR noted that while Plaintiff's "allegations could be construed to be a source

of income complaint[,]" "source of income did not become a protected class

[under the NYSHRL] until April 12, 2019." (*Id.* at 4).

HUD followed DHR's lead several months later. (Moed Decl., Ex. 16 at 5).

In a letter dated February 12, 2020, HUD stated that "[a]fter reviewing [DHR's]

investigation and concurring with their finding, HUD has adopted [DHR's]

findings, closing all of the above-referenced complaint(s)." (*Id.*).

## B.    Procedural Background

Plaintiff filed the original Complaint in this case on April 2, 2020. (Dkt.

#2). The City filed its answer to the Complaint on June 9, 2020 (Dkt. #13), and

PHSI and the Taconic Defendants filed their answer on June 17, 2020 (Dkt.

#21).[12] Following the initial pretrial conference, the Court entered a Civil Case

---

[11]    The undisputed evidence demonstrates that this aspect of DHR's decision was made in error. As all parties agree, there was in fact a two-bedroom affordable mobility disability set-aside unit available at the time PHSI assigned Plaintiff to the Apartment. (*See* PHSI Reply 3). Indeed, that unit was the unit that was ultimately assigned to the applicant with log number 5804. (*See* Def. 56.1 ¶ 84).

[12]    PHSI and the Taconic Defendants were originally represented by the same counsel. (*See* Dkt. #21). On November 11, 2020, however, PHSI filed a stipulation and proposed order of substitution providing that its former counsel would continue to represent the Taconic Defendants but that PHSI had retained independent counsel. (Dkt. #43). The Court entered the proposed order the following day. (Dkt. #44).

Management Plan and Scheduling Order (Dkt. #33) and the parties proceeded to discovery. (*See* Minute Entry for October 1, 2020).[13]  On January 13, 2021, Plaintiff filed an Amended Complaint. (Dkt. #48). Defendants filed their answers to the Amended Complaint on February 11, 2021. (Dkt. #56, 58, 59).

On September 3, 2021, the City filed a pre-motion letter seeking leave to file a motion for summary judgment. (Dkt. #98). The Taconic Defendants and PHSI submitted similar letters on September 13, 2021. (Dkt. #99, 100). On September 24, 2021, Plaintiff filed a letter opposing Defendants' anticipated motions. (Dkt. #102). At the pretrial conference held on September 27, 2021, the Court set a briefing schedule for Defendants' motions. (*See* Minute Entry for September 27, 2021). Defendants filed their opening motions and supporting papers on November 15, 2021. (Dkt. #109-115 (Taconic Defendants); 116-121 (PHSI); 122-132 (City)). Plaintiff filed her opposition papers on March 7, 2022. (Dkt. #137 (PHSI); 138 (Taconic Defendants); 139 (City)). Defendants then filed their reply briefs and supplemental declarations on March 28, 2022. (Dkt. #146-147, 156 (Taconic Defendants); 150-151 (PHSI); 153 (City)).[14]  On March 30, 2022, Plaintiff requested leave to file a sur-

---

[13]   Plaintiff received the assistance of *pro bono* counsel for the limited purpose of assisting her with the depositions conducted in this case, and the Court extends its appreciation to counsel for that assistance. (*See* Dkt. #38; *see also* Dkt. #37, 72, 80, 86, 87). Plaintiff has otherwise represented herself *pro se* throughout the case, and has done so with commendable tenacity.

[14]   On March 29, 2022, the Taconic Defendants filed a letter notifying the Court that the declaration of James Robert Pigott, Jr., submitted in further support of the Taconic Defendants' motion for summary judgment inadvertently failed to redact certain social security numbers. (Dkt. #154). The Taconic Defendants requested that the declaration be stricken and replaced by a properly redacted version of the declaration. (*Id.*). That same day, the Court granted the Taconic Defendants' request (Dkt. #155) and the Taconic Defendants filed a redacted version of the declaration (Dkt. #156).

reply, explaining that Defendants "provided additional legal material and declaration[s]." (Dkt. #157). The Court denied Plaintiff's request the next day, stating that it considered briefing to be closed. (Dkt. #160). Accordingly, Defendants' motions are fully briefed and ripe for the Court's decision.

## DISCUSSION

### A.    Summary Judgment Pursuant to Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[15] A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the

---

[15]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

burden of proof at trial."  *Id.* at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party failed to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" using affidavits or otherwise but cannot rely on the "mere allegations or denials" contained in the pleadings.  *Anderson*, 477 U.S. at 248; *see also Wright* v. *Goord,* 554 F.3d 255, 266 (2d Cir. 2009).  In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  In considering "what may reasonably be inferred" from witness testimony, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts."  *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342

(S.D.N.Y. 2005) (citing *Cty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).  "Put another way, summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-movant."  *Borley* v. *United States*, 22 F.4th 75, 78 (2d Cir. 2021) (internal alterations omitted).

Where, as here, "a *pro se* litigant is involved, the same standards for summary judgment apply, but 'the *pro se* litigant should be given special latitude in responding to a summary judgment motion.'"  *Williams* v. *Savory*, 87 F. Supp. 3d 437, 451 (S.D.N.Y. 2015) (quoting *Knowles* v. *N.Y.C. Dep't of Corr.,* 904 F. Supp. 217, 220 (S.D.N.Y. 1995)).  The Court must construe Plaintiff's submissions "liberally" and interpret them "to raise the strongest arguments that they suggest."  *Biton* v. *City of New York*, No. 21-23, 2022 WL 1448207, at *1 (2d Cir. May 9, 2022) (summary order) (quoting *Triestman* v. *Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006)).

## B.   The Court Grants Summary Judgment to Defendants as to Plaintiff's Claims for Disability Discrimination

The Court begins with Plaintiff's claim that Defendants discriminated against her on the basis of her son's disabilities in violation of the ADA, Rehabilitation Act, FHA, NYSHRL, and NYCHRL.  (Am. Compl. ¶¶ 30-40).  Each of these statutes proscribes disability discrimination.  In particular, Title II of the ADA and Section 504 of the Rehabilitation Act provide that no person shall be excluded from participation in or be denied the benefits of a public entity by reason of a disability.  42 U.S.C. § 12132; 29 U.S.C. § 794(a).  Similarly, the FHA makes it unlawful to discriminate in the sale or rental of any dwelling to

any buyer or renter because of a handicap.  42 U.S.C. § 3604(f).  "Because of similarities in the three statutes, intentional discrimination claims under the ADA, Rehabilitation Act, and FHA are considered in tandem." *Forziano* v. *Indep. Grp. Home Living Program, Inc.*, 613 F. App'x 15, 18 (2d Cir. 2015) (summary order) (citing *McElwee* v. *County of Orange,* 700 F.3d 635, 640 (2d Cir. 2012)).  Further, housing discrimination claims under the NYSHRL and NYCHRL are evaluated using the same framework as claims under the FHA, and thus are appropriately analyzed alongside comparable housing discrimination claims brought under the FHA, ADA, and Rehabilitation Act. *See Birch Fam. Servs., Inc.* v. *Wlody*, No. 21-1553, 2022 WL 1468160, at *2 (2d Cir. May 10, 2022) (summary order) (NYCHRL); *Olsen* v. *Stark Homes, Inc.*, 759 F.3d 140, 153 (2d Cir. 2014) (NYSHRL); *see also De La Fuente* v. *Sherry Netherland, Inc.*, No. 17 Civ. 4759 (PAE), 2019 WL 3430207, at *11 (S.D.N.Y. July 30, 2019) (applying the same legal standards to housing discrimination claims under FHA, NYSHRL, and NYCHRL), *aff'd*, 845 F. App'x 29 (2d Cir. 2021) (summary order).[16]

---

[16]    The Second Circuit has suggested that a district court "may" err by evaluating a housing discrimination claim brought under the NYCHRL together with comparable claims brought under federal or state statutes.  *See De La Fuente* v. *Sherry Netherland, Inc.*, 845 F. App'x 29, 33 (2d Cir. 2021) (summary order).  Even under the NYCHRL's more permissive substantive standards, however, a plaintiff must still show that the conduct complained of was motivated "at least in part" by their protected characteristic. *Id.* (affirming district court's grant of summary judgment to defendants as to housing discrimination claims brought under FHA and NYCHRL because plaintiff failed to show that defendants were motivated by discriminatory animus).  Because the Court finds that Plaintiff has not made that minimal showing here, it does not separately address her discrimination claim under the NYCHRL.  *See Farkas* v. *River House Realty Co.*, 103 N.Y.S.3d 376, 377 (1st Dep't 2019) (holding that plaintiff could not state housing discrimination under NYCHRL where she "failed to plead any concrete allegations in support of her claim that defendants were motivated" to take their alleged actions because of bias against her protected characteristic).

Under these statutes, a plaintiff "can base a discrimination claim on any of three available theories: [i] intentional discrimination (disparate treatment); [ii] disparate impact; and [iii] failure to make a reasonable accommodation." *Fulton* v. *Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (internal quotation marks omitted)). Here, Plaintiff bases her discrimination claims on theories of both disparate treatment and failure to make a reasonable accommodation, and the Court considers each in turn. (*See* Am. Compl. ¶¶ 30-32 (disparate treatment); 37-40 (failure to accommodate)).[17]

### 1.   Disparate Treatment

#### a.   Applicable Law

Plaintiff's primary claim is brought under a disparate treatment theory. As the Second Circuit has observed, "[d]isparate treatment is the most easily understood type of discrimination. The [defendant] simply treats some people less favorably than others because of their race, color, religion or other protected characteristics. Proof of discriminatory motive is critical." *Brooklyn Ctr. for Psychotherapy, Inc.* v. *Philadelphia Indem. Ins. Co.*, 955 F.3d 305, 311 (2d Cir. 2020) (quoting *Hazen Paper Co.* v. *Biggins*, 507 U.S. 604, 609 (1993)).

"When, as here, a plaintiff brings a claim under the [ADA, Rehabilitation Act, FHA, NYSHRL, or NYCHRL] that does not rest on direct evidence of

---

[17]   Plaintiff separately claims in her Amended Complaint that the Building did not in fact have 79 affordable set-aside units as required under the Regulatory Agreement between the City and 525 West 52. (Am. Compl. ¶ 32). While the parties do not address whether Plaintiff's allegation, if shown to be true, would state a claim under any applicable statute, the Court finds that Defendants are entitled to judgment on this claim because Plaintiff has not produced any evidence to support her claim.

landlord discrimination, we analyze the claim under the familiar *McDonnell Douglas* burden-shifting framework first developed in Title VII cases." *Francis* v. *Kings Park Manor, Inc.*, 992 F.3d 67, 73 (2d Cir. 2021) (citing Mc*Donnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973)).[18]  Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  In the context of a claim for housing discrimination, a plaintiff establishes a *prima facie* case by showing: "[i] that a person residing in or intending to reside in the dwelling after its sale or rental to the plaintiff had a handicap as defined in the [relevant federal or state statute], [ii] that the plaintiff sought and was qualified to purchase or rent the housing, [iii] that [s]he was rejected, and [iv] that the rejection occurred in circumstances giving rise to an inference of discrimination on the basis of the handicap of the person residing or intending to reside with the plaintiff." *Olsen*, 759 F.3d at 152.[19]

---

[18]  "Direct evidence of discriminatory treatment is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse action." *Fair Hous. Just. Ctr., Inc.* v. *Cuomo*, No. 18 Civ. 3196 (VSB), 2018 WL 4565152, at *11 (S.D.N.Y. Sept. 24, 2018) (quoting *United States* v. *Hylton*, 944 F. Supp. 2d 176, 187 (D. Conn. 2013)); *see also Fair Hous. Just. Ctr., Inc.* v. *Cuomo*, No. 18 Civ. 3196 (VSB), 2019 WL 4805550, at *13 (S.D.N.Y. Sept. 30, 2019) (finding direct evidence of discrimination where certain housing applicants were told they "would not be admitted because they used a wheelchair; i.e., because they had a mobility impairment").  Here, Plaintiff has not identified any direct link between her son's disability and the decision to offer them a one-bedroom apartment.  The Court therefore evaluates her discrimination claim using the *McDonnell Douglas* framework.

[19]  The Second Circuit has not always been perfectly consistent in describing the elements of a *prima facie* case of housing discrimination.  In addition to the test articulated above, which is taken from *Olsen* v. *Stark Homes, Inc.*, 759 F.3d 140, 152 (2d Cir. 2014), the Second Circuit has stated that plaintiffs "may establish a *prima facie* case of housing discrimination by showing [i] that they are members of a protected class; [ii] that they sought and were qualified to rent or purchase the housing; [iii] that they were rejected; and [iv] that the housing opportunity remained available to other renters or purchasers." *Mitchell* v. *Shane*, 350 F.3d 39, 47 (2d Cir. 2003).  The difference between the two articulations of the legal standards concerns the fourth element, which under either test is meant to answer the question: "is there anything in the record to

"[O]nce a plaintiff has established a *prima facie* case of discrimination, the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision." *Mitchell* v. *Shane*, 350 F.3d 39, 47 (2d Cir. 2003). "If the defendant makes such a showing, the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the defendant's action." *Id.* "The ultimate burden of proof remains on the plaintiff to show that the defendants intentionally discriminated against [her] on a prohibited ground." *Olsen*, 759 F.3d at 152 (internal quotation marks omitted).

---

suggest that the defendants' conduct was discriminatory?" *Babul* v. *Demty Assocs. Ltd. P'ship*, No. 17 Civ. 5993 (BMC), 2019 WL 79423, at *5 (E.D.N.Y. Jan. 2, 2019).

The difference in these articulations of the relevant legal test has some, but not dispositive, effect on the analysis that follows. If the Court were to adopt the standard articulated in *Mitchell*, there is no question that Plaintiff would meet her burden of demonstrating a *prima facie* case of housing discrimination. This is because Defendants do not dispute that she has satisfied the first three elements of her case, limiting their challenge to whether she has shown that she was denied a two-bedroom apartment because of her son's disability or her use of rental vouchers. (*See* PHSI Br. 8-9; City Br. 15-17). Under *Mitchell*, Defendants' limited challenge would bear only on the later stages of the *McDonnell Douglas* burden-shifting framework. *See De La Fuente* v. *Sherry Netherland, Inc.*, No. 17 Civ. 4759 (PAE), 2019 WL 3430207, at *12 (S.D.N.Y. July 30, 2019) (finding that plaintiff had met his burden of demonstrating a *prima facie* case of housing discrimination under *Mitchell* and its predecessors, but that plaintiff's showing "does not, and should not be taken to, connote that there is affirmative evidence of discriminatory intent here on any defendant's part"), *aff'd*, 845 F. App'x 29 (2d Cir. 2021) (summary order). By contrast, and as discussed in depth in the remainder of this Opinion, Plaintiff cannot demonstrate the fourth element of her *prima facie* case as described in *Olsen*.

Judge Brian M. Cogan recently noted the differences between these two standards in a case alleging disability discrimination in the housing context under the FHA, NYSHRL, and NYCHRL. *See Babul*, 2019 WL 79423, at *5. Ultimately, Judge Cogan reasoned that "[b]ecause the latter articulation of the fourth prong [described in *Olsen*] is more recent than the former [described in *Mitchell*], and because it is specific to the subsection of the FHA at issue here, the Court will apply that articulation of the fourth prong here." *Id.* As previewed above, the Court will do the same. That said, the difference is ultimately immaterial because even if the Court were to find that Plaintiff has stated a *prima facie* case of housing discrimination, it would further find that she has not shown that Defendants' proffered reasons for their actions are mere pretexts for discrimination. Accordingly, the Court would grant Defendant summary judgment under either articulation of the relevant legal principles.

"Summary judgment is appropriate if no reasonable jury could find that the defendant's actions were motivated by discrimination." *Mitchell*, 350 F.3d at 47.

### b.   *Prima Facie* Case

The first three elements of Plaintiff's *prima facie* case are not in dispute. There is no dispute that Plaintiff's son has a handicap within the meaning of the relevant statutes, that Plaintiff was qualified to rent an affordable two-bedroom apartment in the Building, or that Plaintiff and her son did not receive a two-bedroom apartment. (*See* PHSI Br. 8-9; City Br. 15-16). Thus, the only disputed element of Plaintiff's claim is whether she has shown that the denial of her request for a two-bedroom apartment "occurred in circumstances giving rise to an inference of discrimination on the basis of the handicap of the person residing or intending to reside with the plaintiff." *Olsen*, 759 F.3d at 152.

Plaintiff argues that the timeline of relevant events suggests that PHSI made the decision not to offer her a two-bedroom apartment at least in part due to her son's disability. (*See* Pl. PHSI Opp. 2). As recounted earlier, at the time Plaintiff submitted her lottery application, she included a CITYFEPS voucher that would have covered the monthly rent for a two-bedroom apartment in the Building. (Earle Decl., Ex. C; *see also* PHSI Reply 4). Based on its review of Plaintiff's lottery application, PHSI determined that she was qualified to rent a studio, one-, or two-bedroom apartment. (Memorandum at T00008). Yet, despite there being a two-bedroom available at the time, PHSI assigned Plaintiff to a one-bedroom apartment and did not offer her the option

28

of renting a two-bedroom apartment.  (*Id.* at T00004; Pl. PHSI Opp. 2).  Plaintiff argues that PHSI's decision violated the Handbook's provision that lottery applicants were to be made "aware of all available unit types for which the applicant is eligible, and offer to the applicant the opportunity to select the unit type."  (Pl. PHSI Opp. 2 (quoting Handbook 12)).

There are several undisputed facts that ultimately undermine Plaintiff's claim.  To begin, there is no dispute that PHSI offered Plaintiff a lease to the Apartment, or that Plaintiff signed the lease and lived in the Apartment with her son for about three years.  (*See* Def. 56.1 ¶¶ 74-76).  Nor is there any dispute that but for her son's disabilities, Plaintiff's apartment application would not have been considered unless more than 5,000 other applicants with lower log numbers either were deemed unqualified or elected not to accept an apartment.  (*See* Earle Decl. ¶ 20).  Further, the evidence shows that the applicants who received the available two-bedroom disability set-aside apartments also had household members with disabilities and thus also were qualified to rent those apartments under the applicable regulations and the Handbook rules.  (*See* Def. 56.1 ¶ 79).  This includes the applicant with log number 5804, whose application and supporting documents show that the applicant had a household member with a mobility disability.  (*Id.* at ¶ 84).

Against this backdrop, Plaintiff has fallen short of establishing a *prima facie* case of disability discrimination based on the timing of the relevant events.  To be sure, Plaintiff appears to have shown that PHSI failed to follow certain of the rules set forth in the Handbook.  But, even construing her

submissions liberally, Plaintiff has not established a relationship between PHSI's deficiencies and her son's disabilities, whether through direct or circumstantial evidence. As discussed in more detail below, Plaintiff has not identified any evidence that PHSI employees held any particular view of or attitude toward her son and his disabilities, much less that they harbored an animus toward him. In fact, there is no evidence that a PHSI employee ever met Plaintiff's son or knew anything about him other than what was reflected in Plaintiff's lottery application. (*See* Def. 56.1 ¶ 60). Plaintiff has also not shown that similarly situated lottery applicants were mistreated by PHSI. Nor could she. As discussed earlier, the two-bedroom apartment that Plaintiff argues should have been offered to her and her son was instead offered to another applicant who also had a family member with mobility disabilities. (*Id.* at ¶ 84). Plaintiff's evidence thus suggests, at most, that PHSI should have offered her a two-bedroom apartment, but not that PHSI elected against doing so even in part based on hostility toward her son's disabilities.

Separately, Plaintiff argues that PHSI's discriminatory animus can be inferred from the fact that the Apartment was designed to accommodate hearing, but not mobility, impairments. (*See* Pl. PHSI Opp. 8-11). There is no dispute that Plaintiff's son had mobility and vision impairments, but not a hearing impairment. The parties also agree that the Apartment was designed to accommodate individuals with hearing impairments. (Def. 56.1 ¶ 71). But the Court cannot infer from this evidence that Plaintiff was assigned to the Apartment based on an animus toward her son's particular mobility and vision

disabilities.  Most critically, Plaintiff herself submitted two forms to PHSI that stated that her son had a hearing disability.  (*Id.* at ¶¶ 62-65).  Considering the undisputed evidence that PHSI reviewed disability verifications only to ensure that they were provided, and not to evaluate the severity of an applicant's impairment, the fact that PHSI relied on Plaintiff's verifications to assign her an apartment designed to accommodate hearing disabilities does not suggest that it harbored an animus toward her son's mobility disability.[20]

Lastly, Plaintiff seeks to support her claim using the circumstances of several other residents in the Building.  Plaintiff begins by arguing that several of the other successful applicants who received disability set-aside units in the failed to provide certain disability verification forms.  (*See* Pl. PHSI Opp. 12-13). The record shows, however, that each of the applicants submitted verifications attesting to their disabilities.  (*See* Snyder Decl., Ex. M).  Plaintiff also contends that Anna Hernandez, another resident in the Building "with a special needs son[,] was subjected to the same type of treatment[.]"  (Pl. PHSI Opp. 4). Plaintiff asserts that despite being able to afford a two-bedroom apartment, Hernandez was also selected for a one-bedroom apartment and placed on a waiting list for a larger unit.  (*Id.*).  From this fact, Plaintiff argues that there is evidence of a "discriminatory pattern" against "single mothers and children with special needs."  (*Id.* at 7).  But the record does not support Plaintiff's claim.  Preliminarily, Plaintiff concedes that she and Hernandez are differently

---

[20]    Plaintiff also argues that PHSI discriminated against her and her son by not considering the seriousness or number of her son's disabilities.  (Pl. PHSI Opp. 9).  Plaintiff does not identify any legal authority supporting this claim, and the Court is not aware of any.

situated by virtue of the fact that Hernandez leased one of the Building's apartments that had been set aside for residents who lived in the Building's community board district (as opposed to individuals with disabilities) and was not a voucher recipient.  (*Id.*).  Moreover, Hernandez's apartment application demonstrates that Hernandez did not apply for a disability set-aside unit and did not submit any disability verifications.  (*See* Earle Suppl. Decl., Ex. E). Given that Hernandez did not seek a disability set-aside unit or note her child's disability in her application, Plaintiff has failed to show how the circumstances surrounding Hernandez's application and receipt of a one-bedroom apartment demonstrate that PHSI harbored a discriminatory animus toward Plaintiff.[21]

On this record, Plaintiff has not come forward with sufficient evidence to create an issue for trial that PHSI elected not to offer her a two-bedroom apartment in the Building at least in part because of her son's disabilities, and thus has failed to establish a *prima facie* case of housing discrimination.  *See De La Fuente*, 2019 WL 3430207, at *12 (finding insufficient evidence of discriminatory intent where plaintiff had not shown "any communication" by a decisionmaker addressing plaintiff's protected characteristic or that defendant

---

[21]    Plaintiff suggests that she and Hernandez were also similarly situated in that both shared one-bedroom apartments with their sons.  (*See* Pl. PHSI Opp. 7).  In Hernandez's view, echoed by Plaintiff in her opposition brief, "a mother and a male child should not be in one bedroom."  (*Id.* at 8).  As Plaintiff recognizes, however, three other households comprising a mother and son lived in studio or one-bedroom apartments in the Building.  (*Id.* at 6; *see also* Earle Decl. ¶ 26).  Plaintiff distinguishes these households on the grounds that they either did not qualify for larger units or did not use rental vouchers.  (Pl. PHSI Opp. 6).  But Plaintiff's distinctions demonstrate that PHSI offered one-bedroom apartments to mothers and sons who varied in whether they had disabilities or not and whether they used vouchers or not.  This evidence brings into sharper relief the absence of evidence of discrimination in this case.

"treated differently any comparator[,]" and where evidence demonstrated that similarly-situated individuals owned apartments in the building); *Zlotnick* v. *Crystal Run Vill., Inc.*, No. 21 Civ. 1001 (PED), 2021 WL 4993712, at *6 (S.D.N.Y. Oct. 27, 2021) (holding that plaintiff could not maintain disability discrimination claim where she alleged that defendants were negligent "but fail[ed] to connect any discriminatory animus to their actions or omissions").[22]

### c.  Nondiscriminatory Basis

While Plaintiff has not met her burden of demonstrating a *prima facie* case of housing discrimination based on her son's disabilities, the Court will address the remainder of the *McDonnell Douglas* burden-shifting analysis for the sake of completeness.  To review, if Plaintiff had demonstrated a *prima facie* case of disability discrimination, "the burden of production [would] shift[ ] to the defendants to come forward with a legitimate, nondiscriminatory reason for their decision."  *Olsen*, 759 F.3d at 152 (internal quotation marks omitted).

PHSI identifies one reason for its decision to offer Plaintiff a one-bedroom apartment: its contemporaneous belief that Plaintiff could not afford a two-bedroom apartment.  (*See* Def. 56.1 ¶ 69).  As noted earlier, Plaintiff submitted two CITYFEPS vouchers in connection with her lottery application.  (*Id.* at

---

[22]  Plaintiff's claims against the City largely rest on its alleged failure to adequately review PHSI's paperwork and decision to assign her and her son to the Apartment.  (*See, e.g.*, Pl. City Opp. 1 (stating that it is an "undisputable fact that HPD is responsible for *an independent review, not a limited review*, of each application" (emphasis in original)).  Because Plaintiff has not established a *prima facie* case of discrimination with respect to PHSI's underlying decision, her derivative claim against the City likewise fails.  Further, even judged on its own merits, Plaintiff's claims against the City fail for the same reason identified above: she has not come forward with any evidence that the City acted with animus toward her or her son that was rooted in the fact of her son's disabilities.

¶¶ 67-68).  The first of these vouchers, dated February 22, 2017, stated that Plaintiff qualified for a maximum rent of $1,213 per month.  (*Id.* at ¶ 67).  And the second, dated April 27, 2017, reflected an "approved apartment rent" of $1,031.  (*Id.* at ¶ 68).  PHSI represents that in reviewing Plaintiff's application, it relied on her more recent CITYFEPS voucher to determine that she qualified to rent a one-bedroom apartment in the Building (at a rate of $963 per month), but not a two-bedroom apartment (at a rate of $1,166 per month).  (*Id.* at ¶ 69).

Defendants have met their burden at this stage of the burden-shifting analysis.  While Plaintiff challenges PHSI's interpretation of her CITYFEPS vouchers, that challenge is better addressed in resolving whether PHSI's proffered reason for its decision is pretextual.  For present purposes, it is sufficient that PHSI has proffered a nondiscriminatory reason for its decision.  *See Reeves* v. *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (explaining that the burden of providing a legitimate, nondiscriminatory reason "is one of production, not persuasion; it can involve no credibility assessment"); *see also Mhany Mgmt., Inc.* v. *County of Nassau*, 819 F.3d 581, 613 (2d Cir. 2016) (describing defendants' burden of production at this stage as "minimal").

### d.   Pretext

The Court now considers whether Plaintiff has shown that PHSI's justification for its decision not to offer her a two-bedroom apartment is pretextual.  *See Olsen*, 759 F.3d at 152.  "The ultimate burden of proof remains on the plaintiff to show that the defendants intentionally discriminated against [her] on a prohibited ground."  *Id.* (internal quotation marks omitted).

34

Plaintiff seeks to establish pretext based on her argument that she was, in fact, qualified to rent a two-bedroom apartment in the Building, and that PHSI's contrary determination was therefore wrong.  Plaintiff suggests that her February 22, 2017 voucher stating that she qualified for a maximum rent of $1,213 per month reflected the standard maximum rent that CITYFEPS covered for a two-person household.  (*See* Pl. PHSI Opp. ¶ 6).  By contrast, the April 27, 2017 voucher, which specified an "approved apartment rent" of $1,031, was the rental rate for the particular apartment in Brooklyn listed on the voucher.  (*Id.*).  In other words, Plaintiff contends that she could have received up to $1,213 per month from CITYFEPS, but needed less than that amount to cover the rent for her prior apartment.  Based on this understanding of her vouchers, Plaintiff asserts that PHSI erred in concluding that her voucher was insufficient to cover the rent for a two-bedroom apartment in the Building.  (*Id.*).

PHSI does not contest Plaintiff's interpretation of her CITYFEPS vouchers or that "Plaintiff would … have qualified for a two-bedroom [apartment]" had it based its evaluation of Plaintiff's income on her February 22, 2017 voucher. (PHSI Reply 4).  Rather, PHSI asserts that Plaintiff has shown, at most, that PHSI erred when interpreting Plaintiff's vouchers and assigning her an apartment, and that such an error "is not equivalent to intentional discrimination."  (*Id.*; *see also* PHSI Br. 16).  Neither PHSI nor the City elaborates on how this error was not detected or corrected during their respective evaluations of Plaintiff's application.  The Court's own review of the

record suggests that the process PHSI and the City used to evaluate lottery applications was highly compartmentalized and dependent upon the judgment of people with insufficient familiarity or training with the relevant vouchers to ensure that such errors would not occur.  For instance, Silvera testified at her deposition that she was responsible for collecting proof of applicants' rental subsidies, but that the decision as to whether the subsidies were sufficient to cover the rent for a particular apartment was made entirely by her supervisor. (Silvera Dep. 84:19-20, 85:15-18).  Silvera's supervisors, Anka Earle and Alice Wong (*id.* at 38:7-8), for their part, both aver that the decision to offer Plaintiff a one-bedroom apartment was made based on her second and more recent CITYFEPS voucher (Earle Decl. ¶ 23; Wong Decl. (Dkt. #119) at ¶ 11).  Neither discusses whether this decision was correct, or how it is that they failed to distinguish between Plaintiff's maximum possible voucher amount and the amount she was using to rent her apartment.  Meanwhile, the City disclaims any responsibility for reviewing lottery applicants' vouchers, leaving that review to the marketing agent.  (*See* Snyder Decl., Ex. C at 166:23-25).

All said, Plaintiff's argument carries some peripheral weight, but does not suggest that PHSI's rationale for its decision is pretextual.  Undoubtedly, a mistake or some other "departure[ ] from normal substantive criteria" may, in some instances, suggest the presence of discriminatory animus.  *See Quad Enterprises Co., LLC* v. *Town of Southold*, 369 F. App'x 202, 207 (2d Cir. 2010) (summary order).  Here, PHSI's error might have provided circumstantial evidence of a discriminatory animus had PHSI assigned the two-bedroom

apartment to an applicant who lacked a qualifying disability or who otherwise was not qualified for the apartment. But that is not what happened. Instead, as noted earlier, after PHSI offered the Apartment to Plaintiff, it then offered a two-bedroom apartment to a household that included someone with a mobility disability. (Def. 56.1 ¶ 84). Under these circumstances, PHSI's error in evaluating Plaintiff's voucher plainly suggests that it was negligent in processing her application, but it does not demonstrate that PHSI was motivated by a discriminatory animus or that its justification is pretextual.

Next, Plaintiff argues that the circumstances surrounding her background and credit check suggest that PHSI believed that she was qualified for a two-bedroom apartment. (*See* Pl. PHSI Opp. 4-6). All parties agree that when PHSI ran Plaintiff's credit check, it input a rent figure of $1,166, which amounts to the rent for an affordable two-bedroom apartment in the Building. (*Id.*; Def. 56.1 ¶ 91). According to Plaintiff, PHSI's use of the rent for a two-bedroom apartment suggests that it deemed her qualified for such an apartment, because "[i]f a two-bedroom unit would not have been available and would not have been requested there is no reason to run a credit check for such unit." (Pl. PHSI Opp. 4). Other than Plaintiff's assertion, however, there is no evidence that PHSI was required to or did run credit checks using the rent figures corresponding to the specific apartments that it intended to offer to an applicant. To the contrary, PHSI explains that it only entered a rent figure because the credit check platform that it used required one. (Def. 56.1 ¶ 90).

This evidence is thus insufficient to allow a reasonable factfinder to conclude that PHSI's nondiscriminatory justification for its decision is pretextual.

Relatedly, Plaintiff seeks support for her claim from the fact that PHSI appears to have entered Plaintiff's income incorrectly when running her credit report. (*See* Pl. PHSI Opp. 5). As noted earlier, Plaintiff reported an income of $33,914.45 in her application. (Application at T00008). When generating Plaintiff's credit report, however, PHSI input an income of $28,578.41. (Pl. Ex. 15). Plaintiff attributes the difference in these two figures to PHSI's exclusion of her son's public benefits, which totaled $5,060.04. (Pl. PHSI Opp. 5). In Plaintiff's words, PHSI's exclusion of this income demonstrates that PHSI made a "deliberate choice … to steer [her and her son] to take a less favorable unit and use the ineligibility argument as a pretext to limit [their] choices." (*Id.* at 6). Setting aside the fact that Plaintiff's son's disability benefits do not account for the difference between Plaintiff's reported income and the income figure PHSI used to generate the credit report, *see supra* n.8, there is no dispute that PHSI evaluated Plaintiff's ability to afford an apartment in the Building based on her CITYFEPS voucher, not her income. (Silvera Dep. 35:2-5, 16-21). Thus, Plaintiff has not shown how this alleged error supports her claim. If Defendants had sought to defend PHSI's decision not to award Plaintiff a two-bedroom apartment based on her income or her income-to-rent ratio, then its error in calculating and entering her income might serve as evidence of pretext. Here, however, PHSI mounts no defense of its calculation of Plaintiff's income as reflected in the credit report it ran, resting

instead on its argument that the purported error provides no indication of an illicit animus. (*See* PHSI Reply 7). Because Plaintiff has not produced any evidence linking her misstated income to PHSI's decision not to offer her a two-bedroom apartment, the Court cannot find that PHSI's mistake evidences its animus or undercuts its nondiscriminatory justification for its decision.

*   *   *

Plaintiff has not shown that PHSI's decision to offer her the Apartment, rather than the then-available two-bedroom apartment, was influenced by a bias against her or her son. As the foregoing discussion makes clear, Plaintiff *has* shown that Defendants acted with a disturbing lack of attention to detail that appears to have resulted in the mistaken and irreversible denial of her request for a two-bedroom apartment for her and her son. But Plaintiff cannot maintain a disparate treatment claim on the syllogism that because her son has disabilities, and because Defendants made a mistake that negatively affected him, that Defendants made that mistake in some measure due to his disabilities. *Cf. Francis*, 992 F.3d at 74 (finding comparable "speculative inference" to be insufficient to state disparate treatment claim under the FHA). Because Plaintiff has not come forward with non-conclusory evidence of Defendants' alleged animus, no reasonable factfinder could find that Defendants engaged in housing discrimination based even in part on her son's disabilities. Accordingly, the Court grants summary judgment to Defendants as to Plaintiff's federal, state, and city disability disparate treatment claims.

39

2. **Reasonable Accommodation**

a. **Applicable Law**

Plaintiff also brings claims on a reasonable accommodation theory. "[F]ailure-to-accommodate claims involve allegations that 'a disability makes it difficult for a plaintiff to access benefits' 'to which she is legally entitled.'" *Brooklyn Ctr. for Psychotherapy, Inc.*, 955 F.3d at 311-12 (quoting *Henrietta D.* v. *Bloomberg*, 331 F.3d 261, 276 (2d Cir. 2003)) (internal alterations omitted).

"Due to the similarities between the statutes, courts apply a similar analysis to reasonable accommodation claims under the ADA, [Rehabilitation Act], FHA, NYSHRL, and NYCHRL." *Pinckney* v. *Carroll*, No. 18 Civ. 12198 (VEC), 2019 WL 6619484, at *6 (S.D.N.Y. Dec. 4, 2019). To prove a reasonable accommodation claim under these statutes, "a plaintiff must show [i] that the plaintiff or a person who would live with the plaintiff had a handicap within the meaning of [the statute]; [ii] that the defendant knew or reasonably should have been expected to know of the handicap; [iii] that the accommodation was likely necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; [iv] that the accommodation requested was reasonable; and [v] that the defendant refused to make the requested accommodation." *Olsen*, 759 F.3d at 156. "Requested accommodations are reasonable where the cost is modest and they do not pose an undue hardship or a substantial burden on the housing provider." *Currin* v. *Glenwood Mgmt. Corp.*, No. 20 Civ. 6047 (DLC), 2021 WL 4710485, at *3 (S.D.N.Y. Oct. 8, 2021).

### b.  Analysis

Plaintiff's reasonable accommodation claim rests on her assertion that she requested, but did not receive, a transfer to a two-bedroom set-aside apartment.  (*See* Pl. Taconic Opp. ¶¶ 25-28; *see also id.*, Additional Facts). Defendants move for summary judgment as to this claim on the basis that Plaintiff received a reasonable accommodation when the Taconic Defendants placed her on a waiting list for the next available affordable two-bedroom apartment.  The Court agrees that this amounted to a reasonable accommodation and therefore grants summary judgment as to this claim.

Preliminarily, the Court finds that Plaintiff was granted a reasonable accommodation.  There is no dispute that Plaintiff requested an accommodation on June 24, 2018, when she emailed Taconic and requested to be moved to a two-bedroom apartment.  (Def. 56.1 ¶ 22).  In that email, Plaintiff explained that she and her son had moved into the Building "through New York City Affordable Housing Lottery," that the Apartment was too small to meet her son's medical needs, and that she believed she was entitled to a larger unit under the Handbook.  (Schwartz Decl., Ex. 2).  Taconic responded by informing Plaintiff that she was first on the waiting list for an affordable two-bedroom apartment in the Building.  (*Id.*, Ex. 3).  The Taconic Defendants further represent in connection with their present motion that no such units were available at the time Plaintiff made her request and that no units became available between when she made her request and when the Taconic Defendants filed their motion for summary judgment.  (Def. 56.1 ¶¶ 25-28).

This evidence demonstrates that the Taconic Defendants granted Plaintiff the reasonable accommodation that she requested in her email. *See Passannante* v. *R.Y. Mgmt. Co.*, No. 99 Civ. 9760 (DLC), 2001 WL 123858, at *5 (S.D.N.Y. Feb. 13, 2001) (finding plaintiff had not demonstrated a *prima facie* case of housing discrimination where "only two apartments have become available, and neither has been a one-bedroom apartment for an applicant at [the plaintiff's] income level").

Plaintiff does not dispute that she was placed on a waiting list, but argues that the waiting list was not a reasonable accommodation because there were two-bedroom set-aside apartments that were either available or occupied by people without disabilities at the time she made her request or thereafter. (Pl. Taconic Opp. ¶ 25). The only evidence that Plaintiff points to in support of this claim is that one of the affordable set-aside units in the Building, Apartment 14HN, appears to have been occupied by a mother and *son* at the time of this litigation, but that the apartment was originally leased to a mother and her *daughter*. (*Id.*). In response to this argument, the Taconic Defendants have produced the relevant files for the apartment. These files demonstrate that the original tenants — a woman and her mother — were joined by the woman's granddaughter. (*See* Pigott Reply Decl. (Dkt. #156), Ex. 5). Plaintiff has therefore not shown that the apartment, or any other affordable set-aside apartment, turned over or otherwise could have been made available to her.

On a related note, the Court rejects Plaintiff's suggestion that Defendants should have transferred her and her son to a market-rate unit within the

Building.  Plaintiff argues that a "[r]easonable accommodation is a change in rules, policies or services of a housing provider ….  When the landlord said I am o[n] a wait list for the next two bedroom, while excluding us from all two bedroom units, he did not 'change' anything[.]"  (Pl. Taconic Opp. 28).  At the outset, the record does not show that Plaintiff asked the Taconic Defendants to move her to a two-bedroom market-rate apartment.  Plaintiff's email to Taconic references the fact that she was living in an affordable unit that she received through the Building's lottery process; stated that she had been in touch with HPD; and requested an accommodation consistent with the Handbook. (Schwartz Decl., Ex. 2).  There is no indication that Plaintiff was seeking anything other than a two-bedroom affordable unit.  And more to the point, even if Plaintiff had requested a market-rate unit, the Taconic Defendants would not have discriminated against her by refusing to provide her with one absent some indication that she could afford the unit.  The rent for a two-bedroom affordable unit at the time Plaintiff made her request was $13,992 per year.  (Taconic Reply 8).  By contrast, the rent for a similarly-sized market-rate unit at that time was $73,200 to $108,000 per year.  (*Id.*).  To the extent Plaintiff suggests that Defendants failed to accommodate her by not transferring her and her son to a market-rate unit and subsidizing the cost of that unit, her claim fails because such an accommodation would impose far more than a "modest" cost on the Taconic Defendants.  *Olsen*, 759 F.3d at 156. Indeed, such an accommodation would "pose [both] an undue hardship [and] a substantial burden on the housing provider."  *Id.*

Accordingly, the Court grants Defendants summary judgment as to Plaintiff's discrimination claim based on a theory of failure to accommodate.

## C. The Court Grants Summary Judgment to Defendants as to Plaintiff's Claims for Source of Income Discrimination

### 1. Applicable Law

Next, the Court considers Plaintiff's claim that she was discriminated against based on her use of public housing vouchers. (*See* Am. Compl. ¶ 30). The NYCHRL prohibits discrimination based on a lawful source of income. N.Y.C. Admin. Code § 8-107(5)(a)(1). Discrimination claims brought under the statute are analyzed using the same *McDonnell Douglas* burden-shifting framework described earlier in this Opinion. *See Short* v. *Manhattan Apartments, Inc.*, 916 F. Supp. 2d 375, 396 (S.D.N.Y. 2012).[23]

### 2. Analysis

The arguments raised in connection with Plaintiff's claim for source of income discrimination are substantially the same as those that were discussed with respect to her disability discrimination claim, and the Court's analysis is correspondingly brief. Put simply, Plaintiff has not stated a viable claim for source of income discrimination. Plaintiff was offered and able to lease the Apartment using CITYFEPS vouchers. (Def. 56.1 ¶¶ 67-68). Four of the five

---

[23] In 2019, the NYSHRL was amended to ban discrimination based on lawful source of income. *See* N.Y. Exec. Law § 296(5)(a)(1). Because Plaintiff's claims arise from events that occurred in 2017, the amendments are inapplicable here. (*See* Moed Decl., Ex. 16 (DHR determination and order stating that while Plaintiff's "allegations could be construed to be a source of income complaint[,] … source of income did not become a protected class until April 12, 2019")). Nonetheless, even if the recent amendment to the NYSHRL were applicable here, Plaintiff's claim under the NYSHRL would fail for the same reasons outlined in the remainder of this section.

other applicants who received affordable disability set-aside apartments were voucher recipients.  (*Id.* at ¶ 80).  And most critically, the applicant with log number 5804 — who received the only two-bedroom affordable disability set-aside apartment available at the time Plaintiff's application was processed — relied on vouchers from the New York City Housing Authority to cover the rent for the apartment.  (*Id.* at ¶ 83).  On this record, there is no evidence indicating that PHSI declined to offer Plaintiff the two-bedroom apartment because of the *source* of her income rather than the *amount* of her voucher.  Accordingly, the Court grants Defendants summary judgment as to this claim.

### D.    The Court Grants Summary Judgment to Defendants as to Plaintiff's Accessibility Claim under Title III of the ADA

Lastly, the Court addresses Plaintiff's claim that the Building is inaccessible and not compliant with the ADA.  (Am. Compl. ¶¶ 45-47).  Plaintiff's chief complaint is that the Building's entrances and common areas are not accessible to individuals with mobility disabilities.  (*Id.*).  In moving for summary judgment on this claim, the Taconic Defendants argue that the Building is not covered by the ADA and therefore Plaintiff cannot maintain a claim premised on that statute.  (Taconic Br. 14-18).  The Court declines to reach this argument because it finds that Plaintiff lacks standing to bring a claim for injunctive relief based on the Building's alleged accessibility barriers.

"The ADA 'consists of three parts: Title I, 42 U.S.C. §§ 12111-17, which prohibits discrimination in employment; Title II, 42 U.S.C. §§ 12131-65, which prohibits discrimination by public entities; and Title III, 42 U.S.C. §§ 12181-89, which prohibits discrimination in access to public accommodations.'"  *Burke* v.

45

*Verizon Comm'cns, Inc.*, No. 18 Civ. 4496 (PGG) (GWG), — F. Supp. 3d —, 2022 WL 883793 (S.D.N.Y. Mar. 25, 2022) (quoting *DeJesus* v. *Rudolph*, No. 19 Civ. 4480 (CM), 2019 WL 5209599, at *2 (S.D.N.Y. Oct. 11, 2019)).  Plaintiff's claim that the Building's entrances and common areas are not accessible to tenants and visitors with mobility impairments implicates Title III of the ADA.  (*See* Am. Compl. ¶¶ 45-47).  "While '[a] private individual may … obtain injunctive relief for violations of a right granted under Title III[,] he cannot recover damages.'" *Thompson* v. *CRF-Cluster Model Program, LLC*, No. 19 Civ. 1360 (KPF), 2020 WL 4735300, at *9 (S.D.N.Y. Aug. 14, 2020) (quoting *Powell* v. *Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 86 (2d Cir. 2004), *opinion corrected*, 511 F.3d 238 (2d Cir. 2004)).  And while Plaintiff seeks only compensatory and punitive damages in her Amended Complaint, Rule 54(c) of the Federal Rules of Civil Procedure empowers the Court to "grant any relief to which a prevailing party is entitled, whether or not that relief was expressly sought in the complaint."  *Powell*, 364 F.3d at 86.

To be entitled to injunctive relief under Title III of the ADA, a plaintiff must have standing.  *See Calcano* v. *Swarovski N. Am. Ltd.*, 36 F.4th 68, 74 (2d Cir. 2022).  A plaintiff has standing where she can show "(i) that [s]he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion LLC* v. *Ramirez*, 141 S. Ct. 2190, 2203 (2021).  In the Title III context, the Second Circuit has held "that a plaintiff seeking injunctive relief has suffered an injury in fact when:

46

'[i] the plaintiff alleged past injury under the ADA; [ii] it was reasonable to infer that the discriminatory treatment would continue; and [iii] it was reasonable to infer, based on the past frequency of plaintiff's visits and the proximity of defendants' [businesses] to plaintiff's home, that plaintiff intended to return to the subject location.'" *Calcano*, 36 F.4th at 74 (quoting *Kreisler* v. *Second Ave. Diner Corp.*, 731 F.3d 184, 187-88 (2d Cir. 2013) (per curiam)).

Here, Plaintiff cannot maintain a claim under Title III of the ADA because she has not shown that she has suffered an injury in fact.  There is no dispute that Plaintiff no longer lives in the Building.  (*See* Def. 56.1 ¶ 1).  Further, there is nothing in the Amended Complaint or Plaintiff's submissions in opposition to Defendants' motions for summary judgment that suggests that Plaintiff contemplates ever returning to the Building.  Indeed, Plaintiff does not seek an order providing her with a two-bedroom apartment in the Building or other injunctive relief, but instead moves only for damages for the harm she alleges she suffered in the past.  (Am. Compl., Claim for Relief).  Accordingly, Plaintiff lacks standing to pursue a claim for injunctive relief under the ADA and the Court grants Defendants' motion for summary judgment as to this claim.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS the motions for summary judgment filed by the Taconic Defendants, PHSI, and the City.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case. The Clerk of Court is further directed to mail a copy of this Opinion to Plaintiff's address of record. The Court will also email a copy of this Opinion to Plaintiff.

SO ORDERED.

Dated:  September 1, 2022
        New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge